UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                    Chapter 11

    Griffon Gansevoort Holdings LLC            Case no.  23-11711 (PB)

                Debtor.

--------------------------------------------------------x

### AMENDED SALE APPLICATION

        Griffon Gansevoort Holdings LLC (the "Debtor"), as and for its application for an order (a) authorizing the Debtor to assume and close on the contract ("Contract," Exhibit A) for the Debtor's sale ("Sale") of the real property at 55 Gansevoort Street, New York, New York (the "Property") to Restoration Hardware, Inc. ("Purchaser"), free and clear of all liens, claims and encumbrances, (b) authorizing the assumption and assignment of the Debtor's tenant lease ("Lease"), (c) determining that the Purchaser is a good faith purchaser entitled to the protections afforded by section 363(m) of the Bankruptcy Code; and (d) waiving the 14-day stay required by Bankruptcy Rule 6004(h) and (f), respectfully represents as follows:

### BACKGROUND

        1.      On November 6, 2023 (the "Petition Date"), the Debtor filed a Chapter 11 petition under the Bankruptcy Code.

        2.      The Debtor owns the real property at 55 Gansevoort Street, New York, New York, (the "Property"). The Property is a commercial building subject to a triple net lease with Restoration Hardware, Inc.  Based on a contract of sale with Restoration Hardware, the Debtor estimates that the Property value is $57,711,000.

        3.      The Property is encumbered by that certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing,

dated as of March 29, 2016 (the "Mortgage") between the Debtor and Mishmeret Trust Company Limited ("Mortgagee"), as trustee for those certain Debentures (Series B) issued by Delshah Capital Limited ("DCL") pursuant to that certain Deed of Trust, dated as of January 5, 2016 (as amended, the "Deed of Trust"). The Mortgage secures obligations of the Debtor under (a) that certain Consolidated, Amended and Restated Promissory Note, dated as of March 29, 2016 among the Debtor, DCL, and the Mortgagee (the "Note"), (b) that certain Guaranty, dated as of March 29, 2016, between the Debtor and Griffon GHC LLC, in favor of the Mortgagee (the "Guarantee"), and (c) the Deed of Trust (collectively, the "Secured Obligations"). The Secured Obligations are also secured by that certain Assets Pledge and Security Agreement, dated as of March 29, 2016, between the Debtor, DCL, and the Mortgagee (the "Asset Pledge" and collectively with the Deed of Trust, the Note, the Mortgage, and the Guarantee, the "Bond Documents"). As of the Petition Date, the Mortgagee's Claim is approximately $58,692,020 The Debtor expects the Mortgagee's claim to be reduced to the extent that the proceeds from that certain sale of 100 Christopher Street (the "Christopher Property") as described more fully in an affiliated bankruptcy case of 100 Christopher Street Propco LLC, Case No. 23-11542 (PB) (Bankr. S.D.N.Y. 2023) (*See* Dkt. No. 35) are distributed to the Mortgagee. If such proceeds are not distributed, the Mortgagee's claim will remain impaired, and the Mortgagee will be entitled to vote on the Plan.

       4.       New York City Lien Claims total about $212,146

       5.       The Debtor maintains funds of approximately $7,393,203 in brokerage accounts at UBS Bank as collateral for a line of credit UBS issued to Delshah Capital Acquisition LLC, a Debtor affiliate, on which $7,091,987 is due. The Debtor is not a borrower under the line of credit, but a guarantor.

6.      In addition to the Mortgagee's claim, the Debtor is aware of general unsecured claims of about $180,955.

7.      The Debtor has signed that certain Agreement of Purchase and Sale (the "Contract") to sell the Property to the Purchaser for $57,711,000.  The Purchaser provided a $2,885,550 deposit which is being held in escrow.  The Contract provides for a December 1, 2023 target closing date and December 21, 2023 outside closing date.

8.      The Debtor's liability under the guarantee was triggered by DCL's default under the Deed of Trust.   Absent a consensual resolution, the Mortgagee has the right to foreclose on the Property to ensure that the Bondholders receive the net proceeds from any sale of the Property.   If the Mortgagee were to exercise such rights, the Debtor would likely lose control of the Property and the pending sale could be jeopardized.  As part of its overall agreement with the Debtor and DCL, the Mortgagee has agreed to defer taking action to effect its remedies under the Mortgage and Deed of Trust to the extent the Debtor commenced this Chapter 11 case and proceeded promptly to obtain approval of the sale in the bankruptcy case and turn over the net proceeds of such sale to the Trustee and pay all other Claims against the Debtor as set forth below and under the Chapter 11 plan.

9.      Thus, by selling the Property in this Court, the Debtor has ensured payment to general unsecured creditors despite the fact that they are subordinate to the Mortgagee.  Moreover, the Debtor's obligation to the Mortgagee is denominated in Israeli Shekels, and based on the exchange rate in effect on the Petition Date, to the extent the Mortgagee receives the proceeds from the sale of the Christopher Property, the purchase price is sufficient not only to pay all of the Debtor's creditors in full in cash at closing, but to provide a distribution to the Debtor's sole owner.

10.     In the meantime, the Debtor intends to preserve and protect the Property by operating in the ordinary course of business.  Since the lease is triple net, including payment of insurance and taxes, the Debtor anticipates no use of cash collateral pending the sale.

## RELIEF REQUESTED HEREIN

11.     By this application, the Debtor seeks an order (a) authorizing the Debtor to assume and close on the Contract for the Sale of the Property to the Purchaser, free and clear of all liens, claims and encumbrances, (b) authorizing the assumption and assignment of the Debtor's tenant leases ("Leases"), (c) determining that the Purchaser is a good faith purchaser entitled to the protections afforded by section 363(m) of the Bankruptcy Code; (d) waiving the 14-day stay required by Bankruptcy Rule 6004(h) and (e) shortening time in connection therewith so as to facilitate a closing on or before October 24, 2023.

**(a)     The Proposed Sale Satisfies the Applicable Standards for a Private Sale Under Section 363(b)**

12.     Under section 365(a) of the Code, the Debtor seeks to assume the Contract.  In deciding a motion under section 365(a), courts apply the business judgment test to determine whether it would be a benefit to the Debtor's estate to assume.  *E.g. In re Orion Pictures Corp.* 4 F.3d 1095, 1099 (2d Cir. 1993), *cert dismissed*, 114 S.Ct. 1418 (1994).

13.     Similarly, section 363(b)(1) of the Bankruptcy Code authorizes a debtor, after notice and a hearing, to use, sell or lease, property of the estate other than in the ordinary course of business. *See* 11 U.S.C. § 363(b)(1).  Bankruptcy Rule 6004(f)(1) in turn provide that "[a]ll sales not in ordinary course of business may be by private sale or by public auction."  Fed. R. Bank. P. 6004(f)(1).  The test for approval under section 363(b)(1) is whether the Debtor is

exercising sound business judgment. *See Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983); *Licensing By Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 387 (2d Cir. 1997); *Official Committee of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

14.     The business judgment test is applied liberally. *See e.g., Lionel Corp.*, 722 F.2d at 1070; *In re Thomson McKinnon Sec., Inc.*, 120 B.R. 301, 307 (Bankr. S.D.N.Y. 1990); *In re Oneida Lake Dev., Inc.*, 114 B.R. 352, 355-56 (Bankr. N.D.N.Y. 1990); *In re Au Natural Rest., Inc.*, 63 B.R. 575, 580 (Bankr. S.D.N.Y. 1986).  A debtor need not make an exhaustive showing of a sound business justification. Rather, a debtor may conduct a sale other than in the ordinary course of business "if a good business reason exists to support it."  *In re Gucci*, 126 F.3d at 387; *see In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

15.     "[G]ood business reason" is determined by consideration of the following nonexclusive factors: "(a) the proportionate value of the asset to the estate as a whole; (b) the amount of elapsed time since the filing; (c) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (d) the effect of the proposed disposition on future plans of reorganization; (e) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (f) which of the alternatives of use, sale or lease the proposal envisions; and (g) whether the asset is increasing or decreasing in value."  *In re General Motors Corp.*, 407 B.R. 463, 490 (S.D.N.Y. 2009). The facts and circumstances of each case determine whether or not there are sufficient business reasons to justify a sale. *Lionel Corp.*, 722 F. 2d at 1071.

16.     Here, the Debtor moving to sell the Property with the bankruptcy filing, to fund its filed plan of reorganization that pays all creditors in full in cash at closing is pending, thus satisfying the relevant factors.

17.     In addition to the general standards set forth above for evaluating a proposed 363(b) sale, when evaluating a proposed private sale, additional factors include: (a) whether there are compelling facts and circumstances that support approval of the sale; (b) whether the debtor has solicited other prospective purchasers; (c) whether the price paid is fair and reasonable; (d) whether the sale is in the best interests of the estate; (e) whether notice is reasonable; and (f) whether the sale is being made in good faith. *See In re Ancor Exploration Company* (*In re Ancor*), 30 B.R. 802, 808 (D. N.D.Okla. 1983); *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).  While "the bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b). . . each such proposed sale must be examined from its own facts to determine if approval is justified."  *In re Ancor, 30 B.R. at 808*; *see also Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 388 (6th Cir. 1986).

18.     Here, the Debtor has marketed the Property extensively before the petition was filed for many months with one of the New York's leading brokerage firms with experience in marketing properties both outside and inside of the bankruptcy cases.  There is pressure to sell the Property because absent a quick sale and transfer of the sale proceeds remaining after satisfaction of all of the Debtor's obligations to the Debtor's sole member's creditors, the Debtor may lose control of the process.  The Debtor believes that the purchase price under the Contract

may also be at the high end of the range of "market" since the Purchaser is incentivized to close

on its purchaser of the Property quickly in order to realize significant tax savings.

19.     Since the sale will pay all of the Debtor's creditor claims in full in cash,

and since the Debtor's sole member supports the sale, the Debtor submits that it is a sound

exercise of the Debtor's business judgment to sell the Property to the Purchaser under the

Contract.

**(b) The Property May be Sold Free and Clear of Liens, Claims and Encumbrances**

20.     Under Bankruptcy Code section 363(f), a Debtor may sell property free

and clear of any interest in such property of an entity other than the estate only if, at least one of

the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of
> such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is
> greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a
> money satisfaction of such interest.

11 U.S.C. § 363(f).

21.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive,

satisfaction of any one of its five (5) requirements will suffice to approve the sale of the Property

"free and clear" of liens, claims and encumbrances. 11 U.S.C. § 363(f); *see also In re Boston

Generating, LLC*, et al., 440 B.R. 302, 331 (Bankr. S.D.N.Y. 2010) (noting that "[s]ection 363(f)

of the Bankruptcy Code authorizes a debtor to sell property under section 363(b) 'free and clear of

any interest in such property of an entity other than the estate' if one of the [the subsections of

363(f) are satisfied]"); *Mich. Employment Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine

Radio Co.*), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (recognizing that Bankruptcy Code section

363(f) is written in the disjunctive and holding that court may approve sale "free and clear"

provided that at least one subsection of section 363(f) is met), *cert. dismissed*, 503 U.S. 978

(1992); *Accord, Citicorp Homeowners Servs., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D.

Pa. 1988).

22.      Here, the Debtor respectfully submits that sections 363(f)(2), (3) and (5)

are all satisfied, thereby allowing the Property to be sold free and clear of all liens, claims and

encumbrances.  The Mortgagee consents to a sale of the Property and will be paid in full from

such sale.  The Purchase Price is greater than the aggregate value of all claims against the

Debtor's estate and, as such, the requirement of section 363(f)(3) is satisfied.  Likewise, the

Mortgagee and any other secured creditors could be compelled, in a legal or equitable proceeding,

to accept a money satisfaction and, as such, section 363(f)(5) is satisfied.

**(c)      The Purchaser is Entitled to Good Faith Protection**

23.      Bankruptcy Code section 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or
(c) of this section of a sale or lease of property does not affect the validity of a
sale or lease under such authorization to an entity that purchased or leased such
property in good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).

24.     While the Bankruptcy Code does not define the term "good faith," the Second Circuit has held that:

> A [good] faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings … A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

*In re Gucci*, 1216 F.3d 380, 390 (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code); *see also Evergreen Int'l Airlines Inc. v. Pan Am. Corp.* (In re Pan Am Corp.), Nos. 92 Civ. 8319 (LMM) to 91 Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988).

25.     The Contract was negotiated at arms' length, between two (2) unrelated parties, and in good faith. The Property was marketed extensively prior to the Debtor entering into the Contract. The Purchaser is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Contract to be avoided under section 363(n) of the Bankruptcy Code. Accordingly, the Debtor submits that the Purchaser should be afforded the protections of Bankruptcy Code section 363(m).

**(d)     The Debtor Should be Authorized to Assume and Assign Leases**

26.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

27.    Under section 365 of the Bankruptcy Code, the assumption or rejection of an executory contract is subject to the "business judgment test." *In Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523, 550 (1943) ("whether a lease should be rejected and if not on what terms it should be assumed is one of business judgment.").  *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 524 (1984) (stating that the business judgment standard applies to the rejection of executory contracts with the exception of collective bargaining agreements).  The business-judgment test is not a strict standard and merely requires a showing that either assumption or rejection of a contract will benefit the debtor's estate.  *In re Orion Pictures Corp*., 4 F.3d 1095, 1099 (2d Cir. 1993); *see Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc*. (*In re Richmond Metal Finishers, Inc.*), 756 F.2d 1043, 1047 (4th Cir. 1985) ("Transposed to the bankruptcy context [from corporate litigation], the [business judgment] rule . . . requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion.").

28.    Here, the assumption of Leases and assignment to the Purchaser satisfies the "business judgment test" since it is necessary to close on the Contract.  The Debtor would be prejudiced if it did not assume and assign the Leases.  Indeed, under section 365(h) of the Bankruptcy Code, if the Debtor rejected the unexpired Leases, the Debtor/Purchaser would still bear the burden of any damages claims resulting from the rejection and breach of the Leases. In contrast, the Debtor's failure to assume the Leases may entitle the lessees to leave their leased premises without any liability to the Debtor as result of their departures. Finally, the residential tenants and their tenancy remain subject to protection under New York law.

29.     To assume an unexpired lease, a debtor must cure any defaults thereunder. 11 U.S.C. § 365(b). The Debtor is not aware of any defaults under the Leases. Accordingly, as it is in the best interest of the Debtor's estate, the Debtor requests that the Court approve assumption and assignment of the Leases to the Purchaser.

**(e)     Waiver of the Stay Under Bankruptcy Rule 6004(h) will Ensure a Timely Closing**

30.     The Debtor requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As noted above, a waiver may be necessary for the Debtor to preserve value for its estate.  "Time is of the essence" under the Contract to facilitate a closing before October ___, 2023, and the Debtor seeks a cushion to ensure a timely closing.  Accordingly, the Debtor requests that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**(f)     The Debtor is Entitled to a Stamp Tax Exemption if the Property is Sold Under a Plan**

31.     The Debtor intends to sell the Property under the Contract pursuant to the Plan.  If sold under the Plan, the delivery of the deed to be issued to the Purchaser pursuant to the Plan will be made in implementation of the Plan, and qualify for the transfer tax exemption under section 1146(a) of the Bankruptcy Code, such that the filing of said deed shall not be subject to payment of any local, county or State transfer tax, a stamp tax or similar tax.

**(h)     Cause Exists to Shorten Time for the Sale Hearing**

32.     The Debtor's contract with the Purchaser and the cash collateral agreement with the Mortgagee require the Debtor to obtain Court approval and to close by October 24, 2023.  The Debtor, therefore seeks to shorten time under Bankruptcy Rule 9006 so that the sale hearing may be heard at least one week before that date so there is a cushion of time to resolve any issues that may arise in the meantime.

33.     The Debtor is moving by order to show cause instead of by notice of motion because, were the Debtor to wait the regular notice period for a motion to reduce time, the Debtor would be unable to accommodate the Purchaser's and the Debtor's express intention to close quickly.

<u>**CONCLUSION**</u>

WHEREFORE, the Debtor respectfully requests that the Court (a) enter the annexed order scheduling a hearing on the Application on shortened notice, (b) at such hearing approve the sale and enter the annexed sale order and (c) grant such other, further and different relief as may be just and proper.

Dated: New York, New York
         November 8, 2023

BACKENROTH FRANKEL & KRINSKY, LLP
Attorneys for the Debtor

By:     <u>s/Mark Frankel</u>
         488 Madison Avenue
         New York, New York 10022
         (212) 593-1100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re                                Chapter 11

      Griffon Gansevoort Holdings LLC        Case no.  23-11711 (PB)

                      Debtor.

------------------------------------------------------------x

## <u>ORDER APPROVING SALE OF PROPERTY</u>

Upon the application ("Application") of Griffon Gansevoort Holdings LLC (the

"Debtor") for approval of the sale ("Sale") of the real property at 55 Gansevoort Street, New

York, New York (the "Property"), to Restoration Hardware, Inc., and upon the hearing held on

_____, 2023, and upon all prior pleadings and hearings held in this case, and the Court

having found that:  (a) the Sale is an arms-length transaction, non-collusive, fair and reasonable,

conducted openly and in good faith, (b) the Sale is as sound exercise of the Debtor's business

judgment, (c) the Purchaser is a good faith purchaser within the meaning of section 363(m) of

the Bankruptcy Code and, as such, is entitled to the full protection of section 363(m) of the

Bankruptcy Code or similar provisions of law, and (d) the sale of the Property to the Purchaser

was not controlled by an agreement among potential purchasers in violation of section 363(n) of

the Bankruptcy Code; it is

ORDERED, that the Sale Contract be, and it hereby is, deemed assumed by the

Debtor; and it is further

ORDERED, that the Debtor is authorized to sell, transfer and convey the Property

to the Purchaser for the purchase price of $57,711,000 free and clear of all liens, claims,

encumbrances and interests, with all such liens claims and encumbrances and interests to attach

to the proceeds of sale; and it is further

ORDERED, that the Debtor's lease with the Purchaser be, and hereby is, deemed

assumed and assigned to the Purchaser at the closing of the Property sale; and it is further

ORDERED, that the Purchaser is a good faith purchaser within the meaning of

section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protection of section

363(m) of the Bankruptcy Code or similar provision of law; and it is further

ORDERED, that at the closing of the Sale, the Debtor be, and hereby is,

authorized to (a) execute and deliver such documents (collectively, the "Closing Documents") as

may be necessary to close the sale of the Property to the Purchaser as set forth in the Contract,

and (b) turn over to the Purchaser the Property, and all books, records, files, and other documents

relating to the Property; and it is further

ORDERED, that the Debtor be, and hereby is, authorized and directed to execute,

in the name of any necessary party, to the extent such necessary party fails to do so itself, any

transfer documents, notice of satisfaction, release or discharge of any Lien, Claim or

encumbrance not expressly preserved in this Order, and to deliver such notices to any and all

federal, state and local governmental agencies or departments for filing and recordation; and it is

further

ORDERED, that at the closing of the Sale, the Debtor be, and hereby is

authorized to fully satisfy the Claim of the Mortgagee (including post-petition interest and

2

attorneys' fees and costs pursuant to section 506(b) of the Bankruptcy Code) and fully satisfy

post-petition real estate taxes and closing costs due; and it is further

ORDERED, that the New York County Clerk is hereby authorized and directed to

record the necessary deeds and all other documents as so executed; and it is further

ORDERED, pursuant to Bankruptcy Code § 1146, that the delivery of the deeds

to be issued pursuant to Sale and the Debtor's Chapter 11 plan ("Plan") shall be made in

implementation of the Plan, and qualify for the transfer tax exemption under section 1146(a) of

the Bankruptcy Code, such that the filing of said deeds shall not be subject to payment of New

York City Real Property Transfer Tax, the taxes due under Article 31 of the Tax Law of the State

of New York, transfer tax, a stamp tax or similar tax; and it is further

ORDERED, that each and every federal, state and local governmental agency or

department shall be authorized to accept and record any and all documents and instruments

necessary, useful or appropriate to effectuate, implement and consummate the transactions

contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release

or discharge of any lien, claim or encumbrance not expressly preserved by the Plan; and it is

further

ORDERED, that in the event of any inconsistency between this Order and the

Debtor's Plan, this Order controls, and it is further

ORDERED, that within three days after closing, the Debtor shall file a closing report on the docket of this case, with notice to the United States Trustee, reporting the Debtor's closing disbursements; and it is further

ORDERED, that this Court hereby retains exclusive jurisdiction over this Order, and to hear and to determine all controversies, suits and disputes, if any, as may arise in connection with the Order.

ORDERED, that this Order shall not be stayed under Bankruptcy Rule 6004 (h).

Dated: _____
      New York, New York

_____
Philip Bentley
UNITED STATES BANKRUPTCY JUDGE

4

Exhibit A

*Execution Version*

**AGREEMENT**

**OF**

**PURCHASE AND SALE**

between

**GRIFFON GANSEVOORT HOLDINGS LLC,**

as Seller,

and

**RESTORATION HARDWARE, INC.,**

as Purchaser.

Date:  November 3, 2023

## TABLE OF CONTENTS

Page

1.    Sale of Property.................................................................................................1

2.    Purchase Price....................................................................................................2

3.    Deposit; Remedies. ...........................................................................................2

4.    Permitted Exceptions. .......................................................................................3

5.    Adjustments. .....................................................................................................5

6.    Inability to Convey. ..........................................................................................6

7.    Title Report .......................................................................................................7

8.    Seller Covenants Through Closing. ..................................................................7

9.    OFAC Disclosure...............................................................................................9

10.    Lease, Rents. .....................................................................................................9

11.    Violations ........................................................................................................10

12.    Representations. ..............................................................................................11

13.    Conditions Precedent ......................................................................................15

14.    Closing Documents..........................................................................................16

15.    Diligence and Inspection of the Real Property. .............................................18

16.    Financing..........................................................................................................19

17.    Closing; Closing Costs....................................................................................19

18.    Transfer Taxes .................................................................................................19

19.    Brokerage .........................................................................................................20

20.    Notices .............................................................................................................20

21.    Assignment ......................................................................................................21

22.    Personal Property ............................................................................................21

23.    [Reserved .........................................................................................................21

24.    Casualty............................................................................................................21

25.    Condemnation. .................................................................................................22

26.    Voluntary Bankruptcy Filing. .........................................................................23

27.    [Reserved .........................................................................................................24

28.    Exclusivity .......................................................................................................24

29.    Indemnification for Pre-Closing Taxes...........................................................25

30.    Indemnification Procedure ..............................................................................25

i

31.    Miscellaneous. ................................................................................................................26

## LIST OF EXHIBITS

Exhibit A  -    Description of Land
Exhibit B  -    Escrow Agent's Wire Transfer Instructions
Exhibit C  -    Permitted Exceptions
Exhibit D  -    Description of the Lease
Exhibit E  -    Existing Litigation
Exhibit F  -    Form of Consent of Israeli Bond Trustee
Exhibit G  -    Form of Deed
Exhibit H  -    Form of Bill of Sale
Exhibit I  -    Form of General Assignment and Assumption Agreement
Exhibit J  -    Form of Assignment and Assumption of Tenant Lease
Exhibit K  -    Form of Title Affidavit
Exhibit L  -    Form of Purchaser Release
Exhibit M  -    Form of Seller Party Release
Exhibit N  -    List of Israeli Bond Documents
Exhibit O  -    Form of Joinder
Exhibit P  -    Form of Seller Party Bring-Down Certificate
Exhibit Q  -    Confirmation Order Provisions
Exhibit R  -    Seller Parties' Organizational Chart
Exhibit S  -    Israeli Indebtedness of Seller Parties
Exhibit T  -    Lease Termination Agreement
Exhibit U  -    Form of Israeli Bond Trustee Waiver and Release
Exhibit V  -    Form of Deed-in-Lieu Escrow Agreement
Exhibit W  -    Israeli Bond Defaults

*Execution Version*

# AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale (this "**Agreement**"), made as of November 3, 2023 between **GRIFFON GANSEVOORT HOLDINGS LLC**, a Delaware limited liability company, with an office at c/o Delshah Capital Limited, 114 East 13th Street, Front 1, New York, New York 10003 (hereinafter called "**Seller**") and **RESTORATION HARDWARE, INC.**, a Delaware corporation with an office at 15 Koch Road, Suite J, Corte Madera, CA 95925 (hereinafter called "**Purchaser**").

RECITALS:

Seller is the owner of the land and building located at and commonly known as 55-61 Gansevoort Street, New York, New York, and Purchaser is a lessee of such building.

Seller intends to file a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "**Bankruptcy Code**") commencing a chapter 11 case (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") for the purpose of implementing this Agreement and the transactions described herein.

Purchaser wishes to purchase said real property along with the buildings, improvements and the easements and appurtenant rights thereto and Seller is agreeable to said sale, on the terms and conditions set forth herein and in accordance with §§ 363 and 365 of the Bankruptcy Code.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Seller and Purchaser hereby agree as follows:

1.    <u>Sale of Property</u>.  Seller agrees to sell and convey, and Purchaser agrees to purchase, all of Seller's right, title and interest in and to:

(a)    That certain parcel of land (the "**Land**") described on <u>Exhibit A</u> annexed hereto and made a part hereof and more commonly known by the street address of 55-61 Gansevoort Street, New York, New York and by the New York County Tax Map Designation of Block 644, Lot 60;

(b)    All improvements situated on the Land (the "**Improvements**");

(c)    The streets, roads, lands, and alleys in front of and adjacent to the Land;

(d)    All hereditaments and appurtenances to the Improvements and the Land, including, without limitation, all easements, rights-of-way, and other similar interests appertaining to the Improvements;

(e)    All machinery, equipment, fixtures and appliances of whatever nature affixed or attached to the Land or Improvements (the "**Fixtures**");

(f)    All appliances, equipment, furniture, fittings, tools, supplies, building materials and other similar articles of personal property not affixed or attached to the

Improvements but which are used or to be used for or useable in any present or future enjoyment, occupancy or operation of the Improvements, if any (the "**Personal Property**");

        (g)     The Lease (hereinafter defined);

        (h)     All development and air rights pertaining to the Property;

        (i)     Any unpaid award for any taking by condemnation or any damage to the Land or Improvements by reason of a change of grade of any street or highway; and

        (j)     Seller's interest in all licenses, permits and warranties which relate to the Real Property and which may be assigned by Seller to Purchaser to the extent assignable by Seller in accordance with § 365 of the Bankruptcy Code or otherwise.

        Seller's right, title and interest in and to the items set forth in <u>clauses (a) through (e)</u> above shall collectively hereinafter be referred to as the "**Real Property**".  Seller's right, title and interest in and to the items set forth in <u>clauses (a) through (j)</u> above shall collectively hereinafter be referred to as the "**Property**". The Property shall be sold SUBJECT TO the "**Permitted Exceptions**" (as defined in <u>Section 4</u> below).

**2.**    **Purchase Price**.  The Purchase Price for the Property is Fifty-Seven Million Seven Hundred Eleven Thousand and 00/100 Dollars ($57,711,000) (the "**Purchase Price**"), payable as follows:

        (a)     Within two (2) business days' of the execution of this Agreement, Purchaser shall deliver to First American Title Insurance Company (the "**Escrow Agent**") the sum of Two Million Eight Hundred Eighty-Five Thousand Five Hundred Fifty and 00/100 Dollars ($2,885,550) (the "**Deposit**") by wire transfer of immediately available federal funds in accordance with the wire transfer instructions attached hereto as <u>Exhibit B</u>.  If Purchaser fails to timely deliver the Deposit, Seller may terminate this Agreement by written notice to Purchaser and retain any portion of the Deposit which shall have been paid.  The Deposit shall disbursed to Purchaser or Seller in accordance with the provisions of <u>Section 3</u> of this Agreement.

        (b)     At Closing, the balance of Fifty-Four Million Eight Hundred Twenty-Five Thousand Four Hundred Fifty and 00/100 Dollars ($54,825,450) (as adjusted pursuant to the terms hereof) payable by wire transfer of immediately available federal funds to such account(s) as Seller may designate in writing not less than one (1) business day prior to the Closing.

**3.**    **Deposit; Remedies.**

        (a)     Escrow Agent shall hold the Deposit in an escrow account at a bank with at least one branch in New York State, and such Deposit shall be invested in any Permitted Investment(s) selected by Purchaser.  Escrow Agent shall only dispose of the Deposit in accordance with the terms and provisions of the escrow agreement entered into simultaneously herewith between and among Seller, Purchaser and the Escrow Agent (the "**Escrow Agreement**"). Purchaser and Seller hereby agree that all interest or other return earned on the Deposit (the "**Deposit Interest**") shall be paid to Seller at the Closing and credited toward the aggregate Purchase Price.  If the Closing does not occur, any Deposit Interest shall be paid to Purchaser or Seller in accordance with the terms of this Agreement at such time as the funds held by the Escrow Agent are otherwise released.  The employer identification numbers of the parties shall be

2

furnished to the Escrow Agent upon request.  For purposes of this underline(clause (a)), "**Permitted Investments**" shall mean: (i) securities issued or fully guaranteed by United States government agencies with a maturity of one year or less, (ii) commercial paper rated AAA or better by Moody's Investors Services, Inc., (iii) money market funds invested in instruments issued or fully guaranteed by United States government agencies with a maturity of one year or less, and/or (iv) other investments similar to those set forth in underline(clauses (i)-(iii)) as Purchaser may determine.

(b)     In the event of a default by Purchaser under this Agreement, and provided that no Seller Party is in breach of this Agreement, the parties hereto agree that (i) the damages that Seller will sustain as a result thereof will be substantial but will be difficult to ascertain, and (ii) the Seller Parties shall have the right to terminate this Agreement and retain the Deposit as liquidated damages, as its sole remedy, with any Deposit Interest to be paid to Seller as set forth in underline(clause (a)) above (subject to the express requirements of the Escrow Agreement), but only if in each case, Seller first notifies Purchaser in writing of such and Purchaser does not cure or cause the cure of such breach within ten (10) business days; underline(provided) that upon such termination and retention neither party shall have any further claim against the other party (other than any claims that expressly survive termination of this Agreement), and this Agreement shall be of no further force and effect.

(c)     If the Closing occurs, the Deposit and any Deposit Interest shall be paid to Seller at Closing and credited toward the aggregate Purchase Price payable at Closing as set forth in underline(clause (a)) above.

(d)     If the Closing does not occur due to a breach of this Agreement by a Seller Party (other than an immaterial breach that does not damage the Purchaser) or a failure to satisfy any condition to Closing, provided Purchaser is not in default under this Agreement, (i) Purchaser shall have the right to either (x) terminate this Agreement and obtain a return of the Deposit and any Deposit Interest or (y) seek specific performance of the Seller Parties' obligations hereunder, but only if (A) Purchaser first notifies Seller in writing of such breach or failure to satisfy such condition and Seller does not cure or cause the cure of such breach or satisfaction of such condition within ten (10) days and (B) Purchaser commences an action for specific performance within ninety (90) days of the end of such cure period.

(e)     If Purchaser is the prevailing party in connection with any legal or equitable action under this Agreement or any other document executed pursuant thereto, the Seller Parties shall be responsible for reimbursing any costs and expenses incurred by Purchaser (including, without limitation, any reasonable attorneys' fees and expenses) in connection with such legal or equitable action (including any action to seek specific performance).  If Seller or the other Seller Parties are the prevailing party in connection with any legal or equitable action under this Agreement or any other document executed pursuant hereto, Purchaser shall be responsible for reimbursing any costs and expenses incurred by the Seller or Seller Parties as applicable (including, without limitation, reasonable attorneys' fees and expenses) in connection with such legal or equitable action.

4.    **Permitted Exceptions**.

(a)     The Property shall be sold and conveyed subject to the following (collectively, the "**Permitted Exceptions**"): (i) the matters set forth in underline(Exhibit C) hereto, (ii) the lease described in underline(Exhibit D) hereto (the "**Lease**") between Seller and Restoration Hardware, Inc. (in such capacity, "**Tenant**") (unless Purchaser has elected to terminate the Lease effective as of

3

the Closing as set forth in the form attached as <u>Exhibit T</u> hereto), (iii) any encumbrances, violations, claims or proceedings arising from acts or omissions of Purchaser, Tenant or anyone acting at the direction of or on behalf of Purchaser or Tenant and (iv) any violations at the Property (other than any violations caused by or due to the negligence of any Seller Party that arises after the date hereof until the Closing, as to which Seller shall pay all fines and penalties accrued as of the date of Closing, but shall not be required to cure same).

(b)     The existence of any mortgages, liens, claims or encumbrances which are not Permitted Exceptions shall not be grounds for an objection to title if properly executed instruments in recordable form necessary to satisfy (or, in the case of a mortgage, assign to Purchaser's lender) the same are delivered to Purchaser at the Closing, together with the required recording and/or filing fees.

(c)     If the Property or any part thereof shall be or shall have been affected by an assessment or assessments, Seller shall remain responsible for any installments due and payable prior to the Closing for which Seller is responsible (if any) in connection with the Lease, and Purchaser shall be responsible for all other installments or assessments due and payable. Seller reserves the right to convert the payment period for any such assessment or installment to the maximum period permitted by law.

(d)     [Reserved].

(e)     If, at the Closing, there are any liens or encumbrances on the Property which Seller is obligated by this Agreement or elects to pay and discharge, Seller may use any portion of the Purchase Price for the Property to satisfy the same, provided that the Seller Parties shall have delivered to Purchaser at the Closing instruments in recordable form sufficient to satisfy such liens and encumbrances of record, together with the cost of recording or filing said instruments.

(f)     Upon written request of Purchaser made within fifteen (15) business days of the date of this Agreement, the Seller Parties shall, at no out of pocket cost or expense to Seller, request that the holder of any existing mortgages encumbering the Property as of the date of Closing (as defined in <u>Section 17</u>) (such date, the "**Closing Date**" and such mortgages, collectively, the "**Existing Mortgage**") assign the Existing Mortgage to Purchaser's mortgage lender at the time of the Closing. If the Existing Mortgage is assigned to Purchaser's mortgage lender, then Purchaser shall pay all costs and expenses or charges required to be paid to the holder(s) of the Existing Mortgage to effectuate the assignment, and the reasonable fees and disbursements of the Existing Mortgagee's attorneys, in connection with such assignment. Purchaser shall pay to Seller 50% of all net mortgage recording tax savings actually realized by Purchaser by reason of the assignment of the Existing Mortgage to Purchaser's mortgage lender, by payment to Seller at the Closing in the manner provided in <u>Section 2</u>. If Purchaser elects not to take an assignment of the Existing Mortgage, then Seller may, with the prior written consent of the Israeli Bond Trustee, spread the Existing Mortgage to one or more other properties of Seller's affiliates and release the Property from the lien thereof at Closing, subject to documentation satisfactory to Purchaser. Assignment of the Existing Mortgage is not a condition to Closing, and if for any reason the Purchaser's lender refuses to take it by assignment, or Purchaser's title insurer refused to insure it, the parties shall proceed to Closing without the assignment, with no offset, credits or claims as a result thereof; <u>provided</u> that the release of the lien of the Existing Mortgage in a manner satisfactory to Purchaser shall continue to be a condition precedent to Closing.

4

(g)       The Seller Parties shall indemnify Purchaser and its affiliates against any claims asserted against the Purchaser or any of its affiliates related to the Property by creditors of Seller and any affiliates of Seller (other than with respect to any Permitted Exceptions).  This Section 4(g) shall expressly survive Closing and, for the avoidance of doubt, all of the other Seller Parties shall be jointly and severally liable as a primary obligor for the obligations of any of the Seller Parties under this Section 4(g) as set forth in the Joinder.

## 5.       Adjustments.

(a)       Except as otherwise specifically provided herein, Purchaser and the Seller Parties shall adjust as of midnight of the day preceding the Closing the items hereinafter set forth.  If any such items are not determinable at the Closing, the adjustment shall be made subsequent to the Closing when the amount is determined.  Any errors or omissions in computing adjustments at the Closing shall be promptly corrected.  The obligations set forth in this Section 5 shall survive the Closing.  Except as otherwise specifically provided for herein, all adjustments shall be made in the manner recommended by the Customs in Respect to Title Closings of the Real Estate Board of New York, Inc., and there shall be no other adjustments.  The items to be adjusted are:

(i)       Subject to Section 10(d) below, rents (including all items of additional rent) under the Lease which are (x) collected prior to the Closing and (y) applicable to the month in which the Closing occurs.

(ii)       Except to the extent payable by Tenant under the Lease, real estate taxes and business improvement district charges (if any) on the basis of the fiscal period for which assessed.  If the Closing shall occur before the tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding fiscal period applied to the latest assessed valuation.  Promptly after the new tax rate is fixed, the apportionment of real estate taxes shall be recomputed.  If Seller has made an overpayment of real estate taxes for the New York City fiscal year in which Closing occurs or any earlier fiscal year and any portion of the overpayment is credited towards payment of real estate taxes for the Real Property for subsequent fiscal years rather than being refunded to Seller, an appropriate adjustment shall be made at Closing in favor of Seller for its right, title and interest in such credit.

(iii)       Except to the extent payable by Tenant under the Lease, water rates, water meter charges and sewer rents, if any, on the basis of the fiscal period for which assessed.  If there is a water meter or meters on the Property, the Seller Parties shall obtain a meter reading within thirty (30) days prior to the Closing.

(iv)       Except to the extent payable by Tenant under the Lease, fuel oil, if any, on the basis of Seller's last cost therefor, including sales tax, as evidenced by a written statement of Seller's fuel oil supplier dated within thirty (30) days of the Closing, which statement shall be conclusive as to quantity and cost.

(v)       Charges for all electricity, steam, gas and other utility services, to the extent not payable directly by Tenant (collectively, "**Utilities**"), shall be billed to Seller's account (if any) up to the Apportionment Date and, from and after the Apportionment Date, all Utilities shall be billed to Purchaser's account.  If for any reason such changeover in billing is not practicable as of the Closing Date as to any Utility, such Utility shall be apportioned on the basis of actual current readings or, if such readings have not been made, on the basis of the

5

most recent bills that are available. If any apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) business days following notice of the determination of such actual reading, readjust such apportionment and the Seller Parties shall promptly deliver to Purchaser, or Purchaser shall promptly deliver to Seller, as the case may be, the amount determined to be due upon such adjustment.

(vi)     Any other item which, under the express terms of this Agreement, is to be apportioned at the Closing.

(b)     At the Closing, the net adjustment pursuant to this <u>Section 5</u> shall be paid (i) if in favor of Seller, in the same manner as set forth in <u>Section 2</u> of this Agreement or (ii) if in favor of Purchaser, as a credit against the Purchase Price payable pursuant to <u>Section 2</u> of this Agreement.

(c)     On or prior to the Closing Date, Purchaser and the Seller Parties shall execute a closing statement, which shall be generated by Escrow Agent (the "**Closing Statement**"). If final bills are not available or cannot be issued prior to Closing for any item being prorated under this <u>Section 5</u>, and/or if any amounts which Seller has agreed to refund to Tenant in respect thereof have not been paid as of Closing (it being understood that if any such disputes are determined to exist prior to Closing, the Seller Parties shall use commercially reasonable efforts to resolve such disputes and to pay any refunds they had agreed to provide to Tenants), Purchaser and Seller agree, provided a specific request therefore is made within twelve (12) months of the Closing Date, to allocate such items on a fair and equitable basis as soon as such bills are available or such disputes are resolved (it being understood that Seller and Purchaser shall jointly agree in each party's reasonable discretion on the resolution of any such disputes that continue to exist following Closing), final adjustment to be made as soon as reasonably possible after Closing. Payments in connection with the final adjustment will be due within ten (10) business days of notice. Purchaser and Seller agree to cooperate and to use commercially reasonable efforts to complete such adjustments not more than nine (9) months after Closing. In addition, if any obvious error in either the calculations or amount of final figures used in a closing adjustment is discovered within ninety (90) days after Closing, Purchaser and Seller agree to correct such error promptly upon notice from the other party and to use commercially reasonable efforts to complete such adjustment within such twelve (12)-month period after Closing. This <u>Section 5(c)</u> shall survive Closing and the delivery of the Deed and shall not be deemed merged into the Deed or any instrument of conveyance delivered at Closing.

**6.      <u>Inability to Convey</u>.**

(a)     If the Seller Parties shall be unable to convey title to the Property free of any liens (including, without limitation, the Existing Mortgage, unless the Existing Mortgage will be assigned pursuant to <u>Section 4(f)</u> of this Agreement), claims (actual or threatened), encumbrances or exceptions that relate to any Seller Party or the Property, other than any lien, claim, encumbrance or exception which is a Permitted Exception (a "**Title Defect**"), Purchaser shall have the right, at Purchaser's sole election, to terminate this Agreement; <u>provided</u> that the Seller Parties shall be entitled to one or more adjournments of the Closing for a period not to exceed thirty (30) days in the aggregate, and the Closing shall be adjourned to a date specified by Seller not beyond such thirty (30)-day period if the Seller Parties shall elect to take action to remove, remedy or comply with each such Title Defect. Purchaser shall also have the right to waive the failure of any closing condition or any Title Defect and elect to close this transaction without abatement of the

6

Purchase Price, credit or allowance of any kind or any claim or right of action against the Seller Parties for damages or otherwise; <u>provided</u> that Purchaser shall inform Seller within five (5) business days of the Seller Parties' failure to cure such closing condition or Title Defect as to whether Purchaser intends to terminate this Agreement or to waive such failure of closing condition or Title Defect in accordance with this <u>Section 6(a)</u>. No action taken by Seller to remove, remedy or comply with or attempt to remove, remedy or comply with any purported lien, claim, encumbrance or exception shall be an admission that any such purported lien, claim, encumbrance or exception is not a Permitted Exception. For the avoidance of doubt, nothing in this <u>Section 6(a)</u> shall affect or prejudice Purchaser's remedies as set forth in <u>Section 3(d)</u> hereof in any way.

(b)     The acceptance of the deed set forth in <u>Section 14</u> hereof shall be deemed to be full performance and discharge of every agreement, covenant and obligation on Seller's part to be performed under this Agreement, and no such agreement, covenant or obligation of the Seller Parties shall survive acceptance of the deed, except for those which expressly survive the Closing.

**7.**     **Title Report**.  Within five (5) days of the date hereof, Purchaser shall order an updated title report for the Property from KV Metro, a subsidiary of Kensington Vanguard National Land Services (the "**Title Agent**") in its capacity as agent for First American Title Insurance Company (the "**Title Underwriter**"); <u>provided</u> that the selection of KV Metro, a subsidiary of Kensington Vanguard National Land Services as Title Agent shall not result in any additional cost to Purchaser compared to the use of another title agent or underwriter selected by Purchaser. Title Agent in its capacity as agent for Title Underwriter is referred to herein as Title Insurer.  Upon receipt thereof, and in any event at least twenty (20) days before the Closing, Purchaser shall forward a true copy of the title report to Seller's attorneys, Tarter Krinsky & Drogin LLP, 1350 Broadway, New York, New York 10018, or by email to wweisner@tarterkrinsky.com.  Purchaser shall also send to Seller and Seller's attorneys (by e-mail to the same address) a written statement specifying all exceptions to title set forth in such report which Purchaser claims are not Permitted Exceptions.  The failure of Purchaser to so deliver a true copy of such report to Seller or such written statement on or before the twentieth (20th) day prior to the Closing shall be deemed an irrevocable waiver of Purchaser's right to object to any exception set forth in such title report and all title continuations issued prior to such day.  Purchaser shall instruct the Title Insurer, in writing, to furnish copies of all title continuations to Seller's counsel at the addresses set forth above simultaneously with the delivery thereof to Purchaser.

**8.**     **Seller Covenants Through Closing**.

(a)     Purchaser acknowledges that it is the sole tenant of the Real Property, has inspected the Property, is very familiar with the physical condition thereof, and, other than as set forth in this Agreement with respect to the Seller Parties' representations and warranties (implied or otherwise)and other obligations, Purchaser is purchasing the Property "as is" on the date hereof, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the Closing.  This Agreement, as written, contains all the terms of the agreement between the parties, and Purchaser acknowledges that no Seller Party has made representations and has not held out any inducements to Purchaser other than those herein expressed.  Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and no Seller Party has made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to any matter, including, without limitation, (i) the current or

7

future real estate tax liability, assessment or valuation of the Property, (ii) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, (iii) the present and future condition and operating state of the Real Property and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation, (iv) the operation of the Property in compliance with any laws, ordinances, codes, rules or regulations and (v) whether the Improvements comply with applicable laws, ordinances, codes, rules or regulations.  Seller is not liable or bound to Purchaser in any manner by any verbal or written statements pertaining to the Property or the operation, layout, expenses, condition, income, the Lease, rents, agreements, licenses, easements, instruments or documents furnished by any real estate broker, agent, employee or other person.

(b)    Simultaneously with and as condition to Closing, Purchaser shall execute the release in favor of the Seller Parties substantially in the form attached hereto as <u>Exhibit L</u>.

(c)    Simultaneously with and as condition to Closing, the Seller Parties shall each execute the release in favor of Purchaser and its affiliates substantially in the form attached hereto as <u>Exhibit M</u>.

(d)    The Seller Parties shall not, and shall not permit any other Seller Party to, (i) enter into any new leases, license agreements, subleases, management agreements, service contracts or similar agreements, or amend any existing agreements of such nature, in each case related to Seller or the Property, without the prior written consent of Purchaser, (ii) remove or permit the removal from the Property of any of the Fixtures or Personal Property, excluding any actions by Purchaser or Tenant, (iii) grant any easements or permit any new title encumbrances that will affect the Property after the Closing, (iv) cause or permit the Seller or its sole member to incur any additional indebtedness or obligations (or permit any new liens) that directly encumber the Property or any membership interest in Seller, or (v) cause or permit (A) any additional indebtedness or obligations (or increase any existing indebtedness or obligations) at the Property, Seller or its sole member, or (B) any new liens at any Seller Party that directly or indirectly encumber the Property, Seller or any membership interest in Seller, excluding in the case of (A) or (B) any such arrangement arising (x) as a result of any act or omission of Purchaser or Tenant, or (y) as otherwise contemplated by the DIL Escrow Agreement (solely to the extent in accordance therewith).

(e)    The Seller Parties shall deliver and/or shall cause each Seller Party to deliver to Purchaser, promptly after any Seller Party's receipt thereof, a copy of any written notice from any governmental authority with respect to (i) any real estate taxes or special assessments relating to the Property or proposed increases in the valuation of the Property, (ii) any condemnation or eminent domain proceedings affecting the Property or any portion thereof, or (iii) any material violation of any environmental law or any zoning, health, fire, safety or other law, regulation or code application to the Property.  In addition, the Seller Parties shall deliver and shall cause each Seller Party to deliver to Purchaser, promptly upon the giving or receipt thereof by Seller or any other Seller Party, copies of any written notices of default given or received by Seller or such Seller Party under any service agreements affecting the Property to which any Seller Party is a party.

(f)    Seller will promptly notify Purchaser of any litigation, arbitration proceeding or administrative hearing which concerns or affects the Property which is instituted by any Seller Party after the date hereof or, if instituted by a third party against any Seller Party, of which any Seller Party has received written notice.  The Seller Parties shall promptly notify Purchaser if they become aware of any time that any Seller Party's representations and warranties made hereunder are untrue in any material respect.

(g)    The Seller Parties shall not commence or permit (and shall not permit any Seller Party to commence) any work or capital improvements at the Property, excluding any work by Tenant.

(h)    The Seller Parties shall not, and shall not permit any Seller Party to, (i) attempt to obtain any variance or change in zoning for the Property, or (ii) terminate or modify any material licenses or permits relating to the Property.

(i)    To the extent required under the Lease, the Seller Parties shall maintain the current insurance policies (or renewals or replacements thereof) reflected in certificates of insurance delivered by Seller to Purchaser outside this Agreement, in full force and effect.

(j)    The Seller Parties shall provide to Purchaser (and shall cause each Seller Party to provide to Purchaser) all written correspondence with the Israeli Bond Trustee or the holders of the Bonds (including any public disclosures, proxy statements and similar documents) from and after the date hereof and shall provide for reasonable opportunity of Purchaser to review and comment on any such documents in advance of delivery.

**9.**    **OFAC Disclosure**.  Purchaser is not a person and/or entity with whom Seller is restricted from doing business under the Internal Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq.; the Trading With The Enemy Act, 50 U.S.C. App. Section 5; the U.S.A. Patriot Act of 2001; any executive orders promulgated thereunder, any implementing regulations promulgated thereunder by the U.S. Department of Treasury Office of Foreign Assets Control ("**OFAC**") (including those persons and/or entities named on OFAC's List of Specially Designated Nationals and Blocked Persons); or any other applicable law of the United States.  Neither Purchaser nor any person and/or entity who owns an interest in Purchaser is now nor shall be at any time prior to or at the Closing a person and/or entity with whom a U.S. person and/or entity, including a financial institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

**10.**    **Lease, Rents**.

(a)    At the Closing, unless Purchaser has elected to terminate the Lease effective as of the Closing upon execution and delivery of a lease termination agreement in the form attached hereto as Exhibit T, Purchaser and the Seller Parties shall execute an agreement pursuant to which (i) Purchaser shall assume Seller's obligations as the landlord under the Lease arising from and after the Closing, and (ii) the Seller Parties shall assign the Lease to Purchaser (or an entity designated by Purchaser).

9

(b)      Purchaser acknowledges and agrees that no representation has been made and no responsibility is assumed by Seller with respect to the continued occupancy of any portion of the Property by Tenant, and Seller does not guarantee or undertake to insure that Tenant will be in occupancy at the Closing.  Purchaser agrees that the default by Tenant prior to the Closing shall not be the basis for any claim on the part of Purchaser or affect the obligations of Purchaser under this Agreement in any manner whatsoever, and in the case of any such default by Tenant, or dispossession of Tenant not related to any action by Seller for enforcement of the Lease, Purchaser shall close title and accept delivery of the deed with or without Tenant in possession, without any abatement against the Purchase Price, allowance or credit of any kind or any claim or right of action against Seller for damages or otherwise in connection with (i) such default, or (ii) any such unrelated dispossession.

(c)      Prior to the Closing and to the extent this Agreement remains in effect, each of the Seller Parties, Purchaser and Tenant hereby agrees that, (i) provided that rent and any other monetary obligations related to the Property (excluding any indemnities or other reimbursement obligations in favor of Seller as landlord thereunder) are paid by Tenant in accordance with the Lease, Seller shall immediately cease and desist from asserting or threatening to assert any claims or other rights of action pursuant to the Lease pending the Closing, and (ii) Purchaser shall not assert any claims or other rights of action against Seller in its capacity as landlord under the Lease pursuant to the Lease; provided that this subsection (c) shall no longer apply and any claims pursuant to the Lease shall be reinstated (including with respect to any accrued claims) if this Agreement is terminated in accordance with the terms hereof.

(d)      From and after the date of this Agreement and until the Closing:

(i)      Rent from Tenant shall belong to Seller to the extent that it relates, or is attributable, to the period up to but not including the date of Closing, and shall belong to Purchaser to the extent that it relates, or is attributable, to the period from and after the date of Closing.  At Closing, the Seller Parties shall credit against the Purchase Price the amount of any rent which has been paid to Seller by Tenant which rent is attributable to any period from and after the date of Closing.

(ii)      [If Tenant has not paid any rent attributable to the period of time between January 1, 2023 and the month in which Closing occurs, the Seller Parties shall receive a credit with respect to such prorated amount attributable to such period prior to Closing; provided that nothing herein is to be construed as permitting Tenant to refrain from paying any rents under the Lease between the date hereof and the date of Closing.][1]

(iii)      The provisions of this subsection (d) shall survive the Closing.

**11.    Violations**.  Seller shall not be required to remove or comply with any violations or alleged violations of laws, codes or regulations, or obtain or update the Certificate of Occupancy for the Property, and such violations shall not be an objection to title.  Purchaser shall accept the Property subject to all such violations and with or without a current Certificate of Occupancy, without

---

[1] Seller should be covered here for *any* unpaid rent for the period prior to closing.

10

abatement against the Purchase Price, credit or allowance of any kind or any claim or right of action against Seller for damages or otherwise (subject to the last sentence of this Section 11). Seller shall not be responsible for any violations at the Property caused by or due to the negligence of Purchaser or its agents or representatives and Purchaser shall not be responsible for any violations at the Property caused by or due to the negligence of Seller or its agents or representatives.  As to any violations at the Property caused by or due to the negligence of any Seller Party after the date hereof until the Closing, Seller shall escrow with Title Insurer at Closing the amount of all fines and penalties accrued thereon as of the date of Closing.

**12.    Representations.**

(a)    Each Seller Party represents and warrants to Purchaser that:

(i)    No Seller Party has received written notice of any pending or threatened condemnation or eminent domain proceedings that would affect any part of the Property.

(ii)    (A) Each of Seller and Griffon GHC LLC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and each has the power to enter into the transactions contemplated by this Agreement and to execute any and all documents to effectuate same, (B) Delshah Capital Limited is a British Virgin Islands company duly organized, validly existing and in good standing under the laws of the British Virgin Islands and has the power to enter into the transactions contemplated by this Agreement and to execute any and all documents to effectuate same, (C) Delshah BVI Holdings LLC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the power to enter into the transactions contemplated by this Agreement and to execute any and all documents to effectuate same, (D) the transactions contemplated by this Agreement do not violate (x) any applicable provisions of the operating agreement or other documents creating or governing any Seller Party (other than Michael Shah) or (y) any contract, document, understanding, agreement or instrument to which any Seller Party or any affiliate of a Seller Party is a party or by which it is bound, (E) member approval of the transactions contemplated by this Agreement has either been obtained or is not required, (F) this Agreement and any and all other documents executed in connection with the transactions contemplated herein, when executed, will constitute legal, valid and binding obligations of the Seller Parties and will be enforceable in accordance with their respective terms, and (G) no Seller Party or any principal thereof is listed on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control, Department of the Treasury or is under investigation by any governmental authority for (or has been charged with or convicted of) violating any antiterrorism or anti-money laundering laws, orders, rules or regulations, or has been notified that any of its or their assets have been "frozen" by any governmental authority.

(iii)    No Seller Party owns or leases any Personal Property at the Property.

(iv)    The only person having any right to occupy the Property is the Tenant under the Lease, subject to any subleases, licenses or other permissions  which may have been granted by Tenant to any persons.

(v)    Except for Purchaser's rights hereunder, no person, firm or entity, has any rights to acquire the Property or any part thereof from Seller.

11

(vi)     No Seller Party has, with respect to the Property, received written notice from any governmental body or agency of any violation or alleged violation of any zoning ordinance or land use law or, to the Seller Parties' knowledge, which violation or alleged violation has not been corrected.

(vii)     No Seller Party has received any written notice from any governmental body or agency of any violation or, to the Seller Parties' knowledge, alleged violation, of any applicable law with respect to Hazardous Materials on the Property which has not been corrected or withdrawn. Each Seller Party has provided or made available to Purchaser a copy of the most recent environmental report for the Property it has obtained, which was obtained in connection with this transaction.  For purposes of the foregoing, "**Hazardous Materials**" means and refers to explosives, radioactive materials, asbestos, asbestos-containing materials, polychlorinated biphenyls, lead, lead-based paint, radon, under and/or above ground storage tanks, hazardous materials, toxic substances, hazardous wastes, hazardous substances, mold, petroleum, petroleum based materials or any other materials or substances which are listed or regulated by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 6901, et seq.), the Resources Conservation and Recovery Act of 1976 (42 U.S.C. Section 9601, et seq.), the Clean Water Act (33 U.S.C. Section 1251, et seq.), the Safe Drinking Water Act (42 U.S.C. Section 300f, et seq.:), the Hazardous Materials Transportation Act (49 U.S.C. Section 5101, et seq.), the Toxic Substance Control Act (15 U.S.C. Section 2601, et seq.), the New York Navigation Law or any other applicable federal, state or local laws.

(viii)     Each Seller Party (which for this purpose includes its partners, members, principal stockholders and any other constituent entities) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, <http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf> or at any replacement website or other replacement official publication of such list and (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of the Office of Foreign Asset Control of the Department of the Treasury and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

(ix)     There are no pending third party claims or litigation (actual or threatened) involving the Property, any Seller Party or any of their respective affiliates, or any party having an ownership or controlling interest in any Seller Party.

(x)     Seller does not have any employees and is not a party to any collective bargaining agreement.

(xi)     There are no pending applications, proceedings or appeals for the reduction of real estate taxes or assessments or special assessments for the Property, other than any that Tenant may have commenced.

(xii)     The Bonds (as defined below) are the only indebtedness or liability, current or future, of any type of any of the Seller Parties in Israel that relate to the Property except as provided in Exhibit S.

12

(xiii)    Each Seller Party agrees and acknowledges that no tenant improvement or other work is required to be completed by Purchaser under the Lease.

(xiv)    No written demand has been made upon any Seller Party by any mortgagee, insurance company or board of fire underwriters requiring any work to be done on or at the Property or for additional fire insurance.

(xv)    There are no outstanding leasing commissions or fees due from any Seller Party to brokers and/or agents in connection with Leases at the Property outstanding as of the date hereof.

(xvi)    Each Seller Party has delivered to Purchaser all documents relating to any financing encumbering or related to the Property.

(xvii)    (A) The documents listed on Exhibit N attached hereto related to the Debentures (Series B) of Delshah Capital Limited listed for trade on the Tel Aviv Stock Exchange (the "**Bonds**"), with Mishmeret – Trust Services Company Ltd. acting as trustee (the "**Israeli Bond Trustee**") are in full force and effect, (B) Seller has delivered true and correct copies of such documents to Purchaser pursuant to an officer's certificate delivered as of the date hereof, (C) such documents represent all of the documentation governing the Bonds, and (D) other than as set forth on Exhibit W attached hereto, the Bonds are not currently in default as of the date hereof.

(xviii)    Each Seller Party has filed (and, if required prior to the Closing will timely file) any and all financial statements required by all governmental authorities (including, without limitation, any governmental authorities with jurisdiction over the Bonds).

(xix)    Either (A) Seller is not a foreign person and is a "United States person" as such term is defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "**Code**") or (B) Seller is a disregarded entity for U.S. income tax purposes and none of Seller's regarded owners is a foreign person and is a "United States person" as such term is defined in Section 7701(a)(30) of the Code.

(xx)    Each Seller Party has filed (or has caused to be filed) all material Tax Returns required to be filed with respect to the Property under applicable law, and such Tax Returns are true, correct and complete in all material respects as of their respective dates. Seller has paid (or has caused to be paid) all material Taxes required to be paid with respect to the Property.  "**Tax Returns**" means all reports, estimates, declarations, claims for refund, information statements, returns and any other documents filed or required to be filed with a taxing authority in connection with any Taxes, in each case, including any schedule or attachment thereto, and including any amendment thereof.

(xxi)    To Seller's knowledge, there are no liens for Taxes on any Seller Party or the Property, and no audit, examination or other proceeding with respect to material Taxes of the Seller or related to the Property is presently in progress or pending. No Seller Party has received any written notice by any government entity indicating an intent to open an audit or action of any material Tax Return or any written notice of material Tax deficiency or material proposed Tax adjustment. No Seller Party has waived any statute of limitations with respect to any Taxes or Tax Returns with respect to the Property, which such waiver is currently still in effect. There are no pending applications, proceedings or appeals for the reduction of real estate taxes or

13

assessments or special assessments for the Property, other than any that Tenant may have commenced. "**Tax**" or "**Taxes**" means all taxes, however denominated, including any interest, penalties or other additions to tax that may become payable in respect thereof, which taxes shall include, without limiting the generality of the foregoing, all net income, gross income or profits (including, but not limited to, U.S. federal, state, local and non-U.S. income taxes), branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, unclaimed property, escheat, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind.

(xxii)  An accurate and complete corporate entity and structure chart showing the Seller Parties, and all of its direct or indirect beneficial owners and their respective ownership positions with respect to the Seller Parties, is attached hereto as <u>Exhibit R</u>.

(xxiii)  None of the Seller Parties possesses any building records, alteration plans, plans and specifications, or painting or employee records with respect to the Property, other than any which may have been provided to Seller by or on behalf of Tenant.

(xxiv)  All of the information set forth in this Agreement, and all other information that has been provided to Purchaser or any of its representatives by or on behalf of the Seller Parties in connection with the transactions contemplated hereby is accurate and complete in all material respects.  No Seller Party is aware of any material facts or circumstances that may affect the Property, or the ability of the Seller Parties to perform their obligations in connection with this Agreement, that has not been disclosed to Purchaser in the schedules and exhibits to this Agreement.  No representation or warranty or other statement made by any of the Seller Parties in connection with this Agreement or any of the other documents to be executed pursuant to this Agreement, when all such documents are read together in their entirety, (A) contains or will contain as of the Closing any untrue statement of fact or (B) omits or will omit to state any fact necessary to make any of such representations, warranties or statements not misleading.

(b)    Purchaser represents and warrants to Seller that (i) Purchaser is a corporation duly organized and validly existing under the laws of the State of Delaware and has the power to enter into the transactions contemplated by this Agreement and to execute any and all documents to effectuate same, (ii) the transactions contemplated by this Agreement do not violate any applicable provisions of the charter, by-laws, partnership agreement, operating agreement, or other documents creating, governing or affecting Purchaser, (iii) shareholder/partner/member approval of the transactions contemplated by this Agreement has either been obtained or is not required, (iv) this Agreement and any and all other documents executed in connection with the transactions contemplated herein, when executed, will constitute valid and binding obligations of Purchaser and will be enforceable in accordance with their respective terms, and (v) Purchaser is not listed on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control, Department of the Treasury and is not under investigation by any governmental authority for (and has not been charged with or convicted of) violating any antiterrorism or anti-money laundering laws, orders, rules or regulations, and has not been notified that any of its assets have been "frozen" by any governmental authority.

14

(c)    All representations contained in this <u>Section 12</u> shall survive the Closing for a period of eight (8) months.  Thereafter only those representations which Purchaser (i) alleges in a written notice given to Seller within said eight (8) month period that a Seller Party has breached and (ii) commences an action for damages in a court of competent jurisdiction within ninety (90) days after the end of said eight (8)-month period, and diligently prosecutes same to completion at all times thereafter, shall survive.   Notwithstanding anything to the contrary contained herein: (i) Purchaser will not have any right to bring any action against a Seller Party as a result of any untruth or inaccuracy of such representations and warranties or any claim under an indemnity or any such breach of a covenant under this Agreement or any representation, warranty, covenant or indemnity in any other instrument delivered by the Seller Parties to Purchaser at Closing, unless and until the aggregate amount of all liability and losses arising out of any such untruth or inaccuracy, indemnity or any such breach, exceeds One Hundred Twenty-Five Thousand and 00/100 Dollars ($125,000), in which event the Seller Parties' liability respecting any final judgment concerning such claim(s) shall be for the entire amount thereof (without deductible for such One Hundred Twenty-Five Thousand and 00/100 Dollars ($125,000)); and (ii) in no event will the Seller Parties' liability for all such inaccuracies of representations and breaches of covenants and liability with respect to indemnities exceed, in the aggregate, One Million Seven Hundred Thirty One Thousand Three Hundred Thirty and 00/100 Dollars ($1,731,330.00), and Purchaser shall have no further recourse to any Seller Party in excess of any amount.  Concurrently with execution of this Agreement, the Seller Parties shall each execute a joinder to this Agreement in the form of <u>Exhibit O</u>, providing that they shall be jointly and severally liable for all obligations of the Seller Parties pursuant to this <u>Section 12(c)</u>.  No Seller Party shall have any liability with respect to any of the Seller Parties' representations, warranties, indemnities and covenants herein if, prior to the Closing, Purchaser has actual knowledge of any inaccuracy or breach of a representation, warranty, indemnity or covenant of the Seller Parties herein, or Purchaser obtains actual knowledge that contradicts any of the Seller Parties' representations and warranties herein, and Purchaser nevertheless consummates the transaction contemplated by this Agreement.

**13.**    **Conditions Precedent**.  Unless waived by Purchaser in its sole discretion, Purchaser's obligation to consummate the Closing shall be expressly subject to and conditioned upon (a) the receipt of any written consent required in connection with the Chapter 11 Case or entry of the Confirmation Order, each as defined in <u>Section 26</u> hereof), (b) a waiver and release by the Israeli Bond Trustee (on behalf of the holders of the Bonds), executed and delivered to and for the benefit of Purchaser in the form attached hereto as <u>Exhibit U</u>) (the "**Bond Trustee Release**"), (c) a full release by the Israeli Bond Trustee of any liens, encumbrances and claims against the Property and the Lease, (d) a full release by any other third party with respect to any claim or encumbrance whatsoever with respect to the Property held by such party (other than the Permitted Exceptions), or in the case of existing mortgages held by the Israeli Bond Trustee, an assignment thereof to Purchaser's mortgage lender, as applicable, (e) evidence of payment of all prepayment premiums and penalties required to repay any existing loans or financing with respect to the Property, or a statement by the Israeli Bond Trustee or its attorney that no such premiums or penalties apply, as applicable, and any other necessary approvals to the transactions contemplated hereunder to the extent required by applicable law, (f) termination of any governmental or legal proceedings (including any threatened claims, filed claims, or notices issued in connection therewith) relating to any Seller Party or the Property, to the reasonable satisfaction of Purchaser, subject to <u>Section 26(e)</u> hereof and the Permitted Exceptions, (g) accuracy of the representations and warranties of each Seller Party and its respective affiliates as set forth herein in all material respects as of the

15

Closing as if then made (including delivery of the certification set forth in <u>Section 14(a)(xii)</u>), (h) delivery of title in the condition specified in <u>Section 4</u> hereof, (i) termination by Seller of all management and service contracts relating to the Property to which Seller is a party (if any exist) which Purchaser designates to be terminated by Seller at its cost or assigned to Purchaser at Purchaser's request (to the extent assignable after commercially reasonable efforts by Seller to cause the assignment), at Seller's cost, (j) execution and delivery by the Seller Parties of the documents listed in <u>Section 14(a)</u> hereof, (k) the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be in full force and effect and shall not have been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Purchaser, acting reasonably) and not be subject an appeal, petition for certiorari, or motion for a new trial, stay, reargument or rehearing, (l) the effective date of the Plan (as defined in <u>Section 26</u> hereof) shall have occurred or shall occur concurrent with the Closing, (m) no litigation, arbitration, proceeding or administrative proceeding shall have been instituted by any Seller Party or any other third party with respect to the transfer of the Property contemplated by this Agreement, and (n) the Seller Parties shall have performed and be in compliance with the covenants set forth in <u>Section 26</u> in all material respects. The Seller Parties shall use their best efforts to ensure that all conditions precedent to Closing have been satisfied. In addition, on or prior to the date hereof, (A) the Israeli Bond Trustee (on behalf of the holders of the Bonds) shall have executed the form of consent in the form attached hereto as <u>Exhibit F</u>, (B) Seller shall have executed a revocation of that certain notice of termination dated as of September 14, 2023 and delivered to Tenant in connection with the Lease, in form and substance satisfactory to Purchaser. On or prior to the date that Seller delivers any additional security documents related to the Property, Seller or Seller's sole member (including any deed-in-lieu with respect to the Property deed and any operating agreement addendums with respect to any Seller Parties' operating agreements) to the Israeli Bond Trustee or its representative, Seller shall execute and deliver (and cause to be executed an delivered) that certain escrow agreement in the form attached hereto as <u>Exhibit V</u> (the "**DIL Escrow Agreement**") between Seller, Delshah Capital Limited, Purchaser, Israeli Bond Trustee and Madison Title Agency, LLC; <u>provided</u> that any such security documents delivered to the Israeli Bond Trustee or its representative shall be executed and delivered in the form provided to Purchaser prior to the date hereof, or otherwise subject to the prior review and approval of Purchaser.

**14.    <u>Closing Documents</u>.**

(a)    At the Closing, The Seller Parties shall deliver (or shall cause to be delivered) the following documents (collectively, the "**Seller's Closing Documents**") as a condition to the Closing:

(i)    a duly executed counterpart of a Bargain and Sale Deed with covenants, substantially in the form of <u>Exhibit G</u> attached hereto (the "**Deed**");

(ii)    a duly executed counterpart of a Bill of Sale, substantially in the form of <u>Exhibit H</u> attached hereto;

(iii)    two (2) duly executed counterparts of a General Assignment and Assumption Agreement (the "**General Assignment**"), substantially in the form of <u>Exhibit I</u> attached hereto;

16

(iv)     two (2) duly executed counterparts of an Assignment and Assumption of Lease (the "**Assignment of Lease**"), substantially in the form of <u>Exhibit J</u> attached hereto;

(v)     a certification, pursuant to Section 1445 of the Internal Revenue Code, that Seller (or, if Seller is an entity disregarded from its owner for U.S. income tax purposes, Seller's regarded owner) is not a "**foreign person**" within the meaning of said Section;

(vi)     the Closing Statement described in <u>subsection 5(c)</u> hereof;

(vii)     duly executed transfer tax returns and statements described in <u>Section 18</u> hereof (if applicable), and deposit with Title Insurer funds sufficient to pay all applicable New York City and New York State transfer taxes imposed on Seller in connection with the sale of the Property to Purchaser;

(viii)     a duly executed title affidavit, substantially in the form of <u>Exhibit K</u> attached hereto;

(ix)     a certified copy of each Seller Party's (other than Michael Shah) duly executed resolutions authorizing the execution of this Agreement, all documents required to be executed and delivered by the Seller Parties in connection therewith and the consummation of the transactions contemplated by this Agreement;

(x)     all licenses, certificates, permits, plans, books, records and reports, and other materials that comprise any intangible property related to the Property, to the extent such items are in any Seller Party's possession;

(xi)     any service agreements related to the Property (excluding any to which Tenant is a party) to the extent in any Seller Party's possession;

(xii)     a certification of the Seller Parties in the form attached hereto as <u>Exhibit P</u> reaffirming that all of the representations and warranties made by the Seller Parties in this Agreement are true and correct as of the Closing Date in all material respects, unless otherwise specified therein;

(xiii)     an executed copy of the joinder required under <u>Section 12(c)</u> in the form attached hereto as <u>Exhibit O</u>, by the Seller Parties, jointly and severally, in favor of Purchaser (which for the avoidance of doubt shall have been executed as of the date hereof);

(xiv)     a release by the Seller Parties in the form attached hereto as <u>Exhibit M</u>;

(xv)     to the extent in any Seller Party's possession, all keys and security devices with respect to the Property;

(xvi)     the Seller Parties shall have executed that certain Notice of Close of Escrow Account from Purchaser to Seller dated as of February 8, 2021 (which for the avoidance of doubt shall have been executed as of the date hereof), and all related escrow funds in such account shall be immediately released to Purchaser;

(xvii)     the Seller Parties shall return to Purchaser any applicable security deposit in connection with the Lease and shall arrange for the return and cancellation of any bonds, letters of credit guarantees or other credit support and similar arrangements with respect to the Lease, in each case to the extent any such items exist; and

17

(xviii) such additional assignments, instruments and documents appropriate to be executed and delivered by the Seller Parties as may be reasonably necessary to complete the transaction contemplated hereby and to carry out the intent and purposes of this Agreement provided the same are commercially reasonable and do not require disclosure of proprietary information.

(b)    At the Closing, Purchaser shall deliver or cause to be delivered the following documents (collectively, the **"Purchaser's Closing Documents"**) as a condition to the Closing:

(i)    The balance of the Purchase Price plus or minus the prorations pursuant to Section 5;

(ii)    a certified copy of Purchaser's duly executed resolutions authorizing the execution of this Agreement, all documents required to be executed and delivered by Purchaser in connection therewith and the consummation of the transactions contemplated by the foregoing;

(iii)    two (2) duly executed counterparts of the Assignment of Lease;

(iv)    duly executed transfer tax returns and statements described in Section 18 hereof (if applicable);

(v)    the Closing Statement;

(vi)    a release by Purchaser (and Tenant, if Tenant is not the grantee on the deed) in the form attached hereto as Exhibit L; and

(vii)    such other instruments or documents which by the terms of this Agreement are to be delivered by Purchaser at the Closing.

**15.    Diligence and Inspection of the Real Property.**

(a)    At all times prior to Closing, Purchaser shall be permitted to perform, and each Seller Party shall cooperate with respect to, confirmatory due diligence to ensure the accuracy of the representations and warranties of the Seller Parties with respect to this Agreement, any actual or potential creditor or other third party claims against the Seller Parties or the Property (including with respect to the Bonds), the organizational structure of the Seller Parties, and with respect to the Chapter 11 Case. Seller will provide, or cause to be provided, all information in Seller's possession reasonably requested by Purchaser or its representatives in connection with the due diligence rights of the Purchaser in connection with the transactions contemplated hereby, including with respect to (i) the Seller Parties, (ii) the Property, and (iii) all assets, operations, businesses, liabilities, financial condition, and prospects of the Seller Parties, in each case of (i) through (iii) in respect of the Property or the transactions contemplated hereby including the performance by the Seller Parties of their obligations with respect to such matters.

(b)    Seller agrees and acknowledges that Tenant may continue to occupy in accordance with the Lease and may enter onto the Real Property and inspect the same at its discretion, and to make environmental, engineering and other tests, appraisals and such other studies as are deemed necessary or desirable by Purchaser; provided that in the event of any invasive due diligence with

18

respect to environmental or other matters, Purchaser shall repair any damage or impact to the Property or the premises resulting from such invasive diligence.

(c)    [Reserved].

(d)    Other than as expressly set forth herein, Purchaser shall have no right to terminate this Agreement based on Purchaser's inspection of the Property or any conditions Purchaser may discover.

**16.    Financing**.  The obligations of Purchaser hereunder are not in any way conditioned upon or qualified by Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing, equity investment, or otherwise) to consummate the transaction contemplated hereby.

**17.    Closing; Closing Costs**.

(a)    The Seller's Closing Documents and the Purchaser's Closing Documents shall be delivered, together with payment of the Purchase Price, at the closing (the "**Closing**"), which shall be held at the offices of Tarter Krinsky & Drogin LLP, 1350 Broadway, New York, New York 10018, or, at Purchaser's election, by escrow with the Title Insurer, at 10:00 a.m. on or before the date that is two (2) business days after the Bankruptcy Court enters the Confirmation Order, as to which date and time, time shall be of the essence with respect to the parties' obligations hereunder; provided that Purchaser and the Seller Parties shall use reasonable efforts to consummate the Closing as soon as practicable after the date hereof after entry of the Confirmation Order by the Bankruptcy Court (and on or prior to December 1, 2023 if reasonably possible); provided further that if (a) the Confirmation Order does not authorize the Purchaser to deliver proceeds from the sale of the Property hereunder in an amount not less than Fifty-Two Million Seven Hundred Thousand and 00/100 Dollars ($52,700,000.00) directly to the Israeli Bond Trustee at Closing, and (b) all other conditions to closing set forth in Section 13 are satisfied, then the Closing may be adjourned, at Purchaser's option, for a period not to exceed thirty (30) days to provide the parties with time to obtain an order from the Bankruptcy Court authorizing such payment.  Each of Purchaser and Seller shall have all remedies available set forth herein if the Closing has not occurred on or prior to December 21, 2023 (subject to extension as set forth in the proviso above, or any mutual agreement to adjourn the Closing set forth in writing and executed by each party hereto) as a result of a breach of this Agreement by the other party or the failure to satisfy a condition to Closing.

(b)    Except as expressly provided in this Agreement, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby; provided that (i) Purchaser shall pay the cost of recording the Deed, (ii) Purchaser shall pay for the cost of any owner's title insurance report, title insurance policy and any endorsements and searches ordered by Purchaser with respect to the Property and for those title and escrow charges set forth in Schedule 17(b) hereto, (iii) other than as set forth in the foregoing clause (ii), the Seller Parties shall pay for all title and escrow charges in connection with the Closing, and (iv) the Seller Parties shall pay all costs incurred by the Seller Parties in connection with the Chapter 11 Case.

**18.    Transfer Taxes**.  The Seller Parties shall pay at the Closing any applicable New York State Real Estate Transfer Tax in accordance with Article 31 of Chapter 60 of the New York Tax Law

19

and the New York City Real Property Transfer Tax imposed by Title 11 of Chapter 21 of the New York City Administrative Code. Seller and Purchaser shall each execute and/or swear to the returns or statements required in connection with the aforesaid taxes (if applicable). Any such tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Insurer.

19.    **Brokerage**. Each Seller Party represents and warrants to Purchaser that this sale was brought about solely by Meridian Capital (the "**Broker**") and that no other broker, finder or other party is entitled to a commission or other compensation or was instrumental or had any role in bringing about this sale. Purchaser represents and warrants to Seller that Purchaser has not used any broker or finder in connection with this sale. The Seller Parties' agree that should any claim be made for a commission, finder's fee or other compensation, other than a claim for commission by a party (other than the Broker) who has dealt with Purchaser, the Seller Parties will indemnify, defend and hold Purchaser free and harmless, for, from and against any and all claims, liabilities, losses, damages, costs or expenses including, without limitation, reasonable attorneys' fees and expenses, in connection with the falsity of the representation set forth above. Purchaser agrees that should any claim be made for a commission, finder's fee or other compensation in connection with dealings of Purchaser with any broker or finder related to the sale, the Purchaser will indemnify, defend and hold Seller free and harmless, for, from and against any and all claims, liabilities, losses, damages, costs or expenses including, without limitation, reasonable attorneys' fees and expenses, in connection with the falsity of the representation set forth above. The Seller Parties shall pay the brokerage commission, if any, due the Broker in accordance with Seller's separate written agreement with Broker. The provisions of this Section 19 shall survive the Closing or termination of this Agreement.

20.    **Notices**. All notices hereunder shall be in writing and shall be sent by (a) personal delivery against return receipt, (b) registered or certified mail, return receipt requested, postage prepaid, or (c) reputable overnight courier, to the parties at the following addresses:

To Seller:

Griffon Gansevoort Holdings LLC
c/o Delshah Capital Limited
114 East 13th Street, Front 1
New York, New York 10003
Attn: Michael Shah
Email: michael@delshah.com

with a copy to:

Tarter Krinsky & Drogin LLP
1350 Broadway, 11th Floor
New York, New York 10018
Attn: William W. Weisner, Esq.
Email: wweisner@tarterkrinsky.com

To Purchaser:

20

Restoration Hardware, Inc.
15 Koch Road, Suite J
Corte Madera, CA 95925
Attn:   Edward Lee; Jack Preston
Email:  EdwardLee@rh.com; jpreston@restorationhardware.com

with a copy to:

Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Attn: Gavin Grover
Email: ggrover@mofo.com

or at such other address in the United States of America as may be designated by either of the parties in a written notice given in accordance with the provisions of this Section 20.  Copies of all notices shall also be sent by email to the other party's attorney at his email address above.  Any such notice shall be effective on the date of receipt or failure to accept receipt.  Either party's attorneys may give notice on behalf of their respective clients.

21.    **Assignment**.  Neither this Agreement nor any of the rights of Purchaser hereunder (nor the benefits of such rights) may be assigned or encumbered without Seller's prior written consent (other than to any affiliate of Purchaser), and any attempted or purported assignment or encumbrance without Seller's prior written consent (other than to any affiliate of Purchaser) shall be void.  Purchaser shall not "flip" this Agreement or resell the Property or any part thereof through a double-escrow arrangement (or similar arrangement) without Seller's prior written consent (other than to any affiliate of Purchaser), which consent may be granted or withheld in Seller's sole discretion.  Purchaser shall inform Seller in writing of the exact name, address, place of formation and employer identification number of the entity to be named as grantee in the deed (and the names of all direct and indirect members thereof), together with all other information required to complete and file all required transfer tax forms, at least ten (10) business days prior to Closing.

22.    **Personal Property**.  The parties hereto agree that no part of the Purchase Price shall be deemed to have been paid by Purchaser for any Personal Property transferred hereunder (if any).  Sales taxes, if any, payable by reason of the sale of any of any Personal Property shall be paid by Purchaser and Purchaser shall indemnify Seller with respect thereto.  The indemnity set forth in the preceding sentence shall survive Closing.

23.    [**Reserved**].

24.    **Casualty.**

(a)    Seller and Purchaser waive the provisions of all applicable laws (including General Obligations Law Section 5-1311) relating to the occurrence of a casualty between the date hereof and the Closing, and agree that the following provisions with respect thereto shall govern.

(b)    If the Property or any portion thereof shall be damaged by fire or other casualty between the date of this Agreement and the Closing and the cost of restoring and repairing the portion of the Property so damaged to substantially its present condition (the

21

"**Restoration Cost**") is less than Five Million and 00/100 Dollars ($5,000,000), as reasonably estimated by an architect or engineer selected by Seller and reasonably satisfactory to Purchaser, then Purchaser shall have no right to terminate this Agreement and shall purchase the Property in its damaged condition and assume full responsibility for repair thereto, without reduction of the Purchase Price or any other claim or offset.  The Seller Parties shall (i) assign to Purchaser the right to receive any insurance proceeds payable to Seller as a result of such fire or other casualty and (ii) credit to Purchaser at Closing an amount equal to the deductible on Seller's policy of hazard insurance, provided that (x) the Seller Parties shall be entitled to retain, to the extent theretofore paid, and shall not be obligated to assign the right to receive, to the extent not theretofore paid, an amount of such insurance proceeds equal to Seller's expenses incurred in collecting such proceeds and in protecting or restoring the Property and (y) the amount of any credit under clause (ii) above shall not exceed the excess of the Restoration Cost for all restoration work remaining to be performed over the amount of insurance proceeds assigned.

(c)     If the Property or any portion thereof shall be damaged by fire or other casualty between the date of this Agreement and the Closing and the Restoration Cost is more Five Million and 00/100 Dollars ($5,000,000), as reasonably estimated by an architect or engineer selected by Seller and reasonably satisfactory to Purchaser, and the fire or other casualty did not arise due to acts or omissions of Purchaser, then either party shall have the option, to be exercised within fifteen (15) days from the date of delivery of a written estimate of the Restoration Cost, to terminate this Agreement by written notice to the other party (a "**Casualty Termination Notice**").  In such case neither party hereto shall have any further duties, obligations or liabilities to the other hereunder, except that Purchaser shall be entitled to the return of the Deposit (with any Deposit Interest to be paid to Purchaser as set forth in Section 3(a) above), and except for those obligations specifically provided for in this Agreement to survive the termination of this Agreement.  If neither Seller nor Purchaser shall elect to terminate this Agreement as provided above, or if Seller elects to restore pursuant to subsection (d) of this Section 24, then this Agreement shall remain in full force and effect and the provisions of subsections (b) or (d), as the case may be, of this Section 24 shall apply to such damage and restoration and any insurance proceeds payable in connection therewith.

(d)     Notwithstanding the provisions of subsections (b) and (c) of this Section 24, if the portion of the Property damaged or destroyed can be restored to substantially its present condition within one hundred-eighty (180) days after the date of damage or destruction Seller may elect, by giving written notice to Purchaser (which shall supersede any Casualty Termination Notice which Purchaser may have sent) within thirty (30) days of Seller's receipt of a written estimate of the Restoration Cost, to restore the Property to substantially its present condition.  If Seller makes such an election, (x) Seller may adjourn the Closing for such period of time (not to exceed one hundred-eighty (180) days) as may be necessary to enable Seller to so restore the Property and (y) Seller may utilize any insurance proceeds to pay the cost of restoration.

(e)     Unless Seller has elected pursuant to subsection (d) to restore the Property, in no event shall Seller have any obligation to repair any damage to the Property resulting from fire or other casualty.

## 25.    **Condemnation.**

(a)     Seller and Purchaser hereby waive the provisions of all applicable laws (including General Obligations Law Section 5-1311) relating to the occurrence of a

22

condemnation between the date hereof and the Closing, and Seller and Purchaser agree that the following provisions with respect thereto shall govern.  Seller agrees to notify Purchaser promptly if the Property shall be taken in whole or in part by right of eminent domain or condemnation prior to the Closing (a "**Taking**").

(b)    If the Taking will so affect the Property as to cause the Property to not comply with applicable laws, codes and regulations concerning zoning and land use or prevent the use of the Property for its current purposes, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller within fifteen (15) days of the date Seller sends written notice to Purchaser of the Taking.  In such case, neither party hereto shall have any further duties, obligations or liabilities to the other hereunder, except for those obligations specifically provided for in this Agreement to survive the termination of this Agreement, and Purchaser shall be entitled to the return of the Deposit (with any Deposit Interest to be paid to Purchaser as set forth in Section 3(a) above).  If Purchaser does not so terminate this Agreement, or shall have no right to terminate this Agreement, then (x) this Agreement shall remain in full force and effect notwithstanding such Taking, (y) Purchaser shall purchase the Property in its then condition without reduction of the Purchase Price or any other claim or offset and (z) the Seller Parties shall assign to Purchaser at Closing the right to negotiate and receive any condemnation award payable to Seller as a result of the Taking, net of (A) any costs incurred by Seller in the process of litigating or negotiating the amount of, or collecting, the award and (B) any sums expended by Seller to restore or protect the Property as a result of the Taking.

(c)    In no event shall Seller have any obligation to repair any damage to the Property resulting from a Taking.

## 26.    **Voluntary Bankruptcy Filing.**

(a)    Purchaser and the Seller Parties shall structure the sale as a private sale approved by the Bankruptcy Court pursuant to Sections 363(f), 363(m), 365, 1123, 1129 and 1146(a) of the Bankruptcy Code.  The sale shall be effectuated through a chapter 11 plan (the "**Plan**") that has been confirmed by order of the Bankruptcy Court (the "**Confirmation Order**"). The Plan and the Confirmation Order shall be reasonably acceptable to Purchaser and, subject to Bankruptcy Court approval, shall (a) authorize the Purchaser to deliver proceeds from the sale of the Property hereunder in an amount of not less than Fifty-Two Million Seven Hundred Thousand and 00/100 Dollars ($52,700,000.00) directly to the Israeli Bond Trustee in accordance with the account instructions set forth in the Bond Trustee Release, or in such other manner as may be agreed to by the Purchaser and the Israeli Bond Trustee, and (b) contain provisions (which may be findings of fact and/or conclusions of law) substantially similar to those set forth on Exhibit Q attached hereto.

(b)    Each Seller Party shall cause the sale to be conducted in accordance with the following milestones, which milestones may be extended in writing by Purchaser in its sole discretion:

(i)    Within four (4) business days after the execution of this Agreement, Seller shall file a voluntary petition commencing the Chapter 11 Case in the Bankruptcy Court (the date of filing of such petition, the "**Petition Date**");

(ii)    Within three (3) business days after the Petition Date, the Seller shall have filed (A) the Plan and (B) a motion seeking entry of an order from the Bankruptcy Court setting a hearing on confirmation of the Plan (the "**Confirmation Hearing**");

(iii)    Within three (3) business days after entry of an order setting the Confirmation Hearing date, Seller shall have caused due and proper notice of the Confirmation Hearing to be served on all parties that are entitled to receive notice of such hearing under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, and the local rules of the Bankruptcy Court; and

(iv)    On or before December 13, 2023, (A) the Bankruptcy Court shall have held the Confirmation Hearing and entered the Confirmation Order, and (B) the Plan shall have been confirmed, subject to availability of the Bankruptcy Court.

(c)    Seller shall provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, petitions, declarations, affidavits, schedules and supporting papers prepared by Seller relating to the Plan, the Confirmation Order, this Agreement, or the transactions described herein (including forms of orders and notices to interested parties) (the "**Bankruptcy Pleadings**") at least one (1) day prior to the filing thereof. All Bankruptcy Pleadings shall be reasonably satisfactory to the Purchaser.

(d)    Seller shall promptly take actions as are reasonably requested by Purchaser to assist in obtaining entry of the Confirmation Order and consummating the transactions contemplated by this Agreement, including making necessary pleadings and furnishing affidavits or other documents or information for filing with the Bankruptcy Court.

(e)    The Chapter 11 Case will not be concluded or terminated by the date of Closing; provided, that the Plan shall have been confirmed prior to or concurrent with the Closing.

(f)    Seller shall be responsible for preparing and filing all pleadings required by Seller in order to commence, pursue and conclude a chapter 11 reorganization (the "**Chapter 11 Filing**"), at Seller's expense.

(g)    The provisions of this Section 26 shall survive the Closing.

**27.**    [**Reserved**].

**28.    Exclusivity**.

(a)    Each Seller Party hereby represents and warrants to Purchaser that neither Seller, nor any Seller Party, nor any affiliate of a Seller Party has entered into any contract, agreement, arrangement or understanding with respect to the transfer of any interest in the Property (including any backup offers, purchase options or other contingent arrangements).  Each Seller Party covenants not to (either directly or indirectly) offer to (i) discuss, negotiate, undertake, authorize, recommend, propose or enter into any Competing Transaction, (ii) facilitate, encourage, solicit or initiate any discussions, negotiations or inquiry, or the making of any proposal related to, or that reasonably may be expected to lead to, a Competing Transaction, (iii) furnish or cause to be furnished, to any Person, any information concerning the business, operations, properties or assets of the Seller Parties in connection with a potential Competing Transaction, or (iv) otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other person or entity to do or seek any of the foregoing.  Each Seller Party will immediately

24

cease and cause to be terminated any existing activities, discussions or negotiations with any Persons conducted heretofore with respect to any potential Competing Transaction.  For purposes hereof, "**Competing Transaction**" shall mean a transaction (other than the sale contemplated hereby) involving (A) any sale of the Property or any direct or indirect interests in the Property or in any Seller Party, (B) any indirect transaction such as a purchase option, right of first refusal, issuance of any derivatives with respect to any of the foregoing, (C) any sale, lease, exchange, mortgage, pledge, transfer or other disposition of any material assets of any Seller Party (other than assets of Delshah Capital Limited and Delshah BVI Holdings LLC that do not relate to any direct or indirect interests in Seller or the Property) in a single transaction or a series of related transactions or (D) any agreement to, or public announcement by any Seller Party, of a proposal, plan or intention to, do any of the foregoing.

(b)    The Seller Parties shall promptly (and in any event within forty-eight (48) hours of the occurrence of the relevant event) notify Purchaser in writing (i) if any written inquiries, proposals or requests for information concerning a Competing Transaction are received by any Seller Party, or any of their respective equity holders, directors, managers or officers, or (ii) when such persons become aware that any such inquiries or proposals have been received by any of their employees, investment bankers, financial advisors, attorneys, accountants or other representatives or agents.  Such written notice shall include the material terms and conditions of the Competing Transaction.

(c)    This Section 28 shall expire upon the earlier to occur of (i) the Closing and (ii) such date as either party is entitled to terminate this Agreement in accordance with the terms hereof, provided that such party sends to the other party a notice terminating this Agreement in accordance with the terms hereof.

**29.    Indemnification for Pre-Closing Taxes**.  The Seller Parties shall indemnify and hold harmless Purchaser from and against any and all Pre-Closing Taxes. "**Pre-Closing Taxes**" means all (i) Taxes of the Seller Parties and their respective affiliates, (ii) to the extent not required to be paid by Tenant under the Lease, all Taxes with respect to the Property for each taxable period (or portion thereof) ending on or prior to the Closing Date, and (iii) any Transfer Taxes. In the case of a taxable period beginning on or before the Closing Date and ending after the Closing Date (a "**Straddle Period**"), the portion of any Tax that is allocable to the period that is deemed to end on the Closing Date will be: (A) in the case of all real property Taxes, personal property Taxes and similar ad valorem Taxes, deemed to be the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days of such Straddle Period prior to the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period, and (B) in the case of all other Taxes, determined as though the taxable year with respect to each Property terminated at the close of business on the Closing Date.

**30.    Indemnification Procedure**.  Any claim for indemnification pursuant to this Agreement shall be subject to the following conditions:

(a)    In the event any claim shall be made or action or proceeding instituted by any person against a party to be indemnified pursuant to this Agreement (the "**Indemnitee**") for which indemnity may be sought, the Indemnitee will, with reasonable promptness, notify the party that agreed to indemnity (the "**Indemnitor**") and shall continue to give the Indemnitor reasonably prompt written notice of all developments in connection therewith within the Indemnitee's knowledge.  The failure of the Indemnitee to perform or comply with any

25

of the Indemnitee's obligations hereunder shall not affect the Indemnitor's obligations hereunder except to the extent of any actual prejudice to it therefrom.

(b)       The Indemnitor shall have the option of defending the claim, action or proceeding (collectively, an "**Action**"), at the Indemnitor's sole cost and expense, in the name of the Indemnitee, and shall have the right to designate an attorney to defend such Action, subject to the reasonable consent of such Indemnitee.  The Indemnitor shall conduct all proceedings with respect to the Action with due diligence.  The Indemnitee shall have the right to participate and be represented by counsel or other representative of the Indemnitee's choosing in any Action and all negotiations relative thereto.  Fees of any counsel representing the Indemnitee shall be paid for entirely by the Indemnitee unless (a) the employment of such counsel has been authorized by the Indemnitor, (b) the Indemnitor shall not have employed counsel to assume the defense of the Action or (c) if there are defenses available to the Indemnitee which are not available to the Indemnitor, and which are in direct conflict with the rights, obligations or defenses of the Indemnitor.  The Indemnitee shall fully cooperate with the Indemnitor and the Indemnitor's attorneys at all stages of such Action.  The Indemnitee agrees to supply promptly to the Indemnitor and the Indemnitor's attorneys all papers, documents and evidence in the Indemnitee's possession and such other information within the Indemnitee's knowledge pertinent to such Action.  The Indemnitee agrees to produce at the appropriate place or places, at reasonable times, such witnesses under Indemnitee's control as may be requested by the Indemnitor or the Indemnitor's attorneys.  In the event the Indemnitor does not exercise the Indemnitor's right to defend any such Action, the Indemnitee shall defend the same in good faith and with due diligence.

(c)       In the event indemnification is sought pursuant hereto, no claim shall be settled without the prior written consent of the Indemnitee unless a full release in favor of the Indemnitee is obtained from the party asserting the claim.

(d)       Notwithstanding anything to the contrary in this Agreement, Seller and Purchaser agree that Seller's obligation to consummate the Closing in accordance with this Agreement and all Seller's obligations hereunder that explicitly survive Closing, including without limitation Seller's obligations under Section 4(g) and Section 12(c) (such obligations, "**Seller's Joint and Several Obligations**"), are hereby deemed to be joint and several obligations of the Seller Parties (together, the "**Joint and Several Obligors**"), in accordance with that certain joinder and agreement attached hereto as Exhibit O and executed as of the date hereof (the "**Joinder**").

## 31.    **Miscellaneous.**

(a)       This Agreement constitutes the entire agreement between the parties.  This Agreement cannot be changed, modified, waived or terminated orally but only by an agreement in writing signed by the parties hereto.  This Agreement shall be binding upon the parties hereto and their respective heirs, executors, personal representatives, successors and permitted assigns.

(b)       This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same original, and the execution of separate counterparts by Purchaser and the Seller Parties shall bind Purchaser and the Seller Parties as if they had each executed the same counterpart, and facsimile or electronic (*i.e.*, "pdf") copies of this Agreement shall be effective as originals for all purposes.

(c)    This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

(d)    The headings used in this Agreement are for convenience only and do not constitute substantive matters to be considered in construing same.

(e)    If either party hereto shall commence litigation against the other in connection herewith, the substantially non-prevailing party in such action shall reimburse the attorneys' fees of the substantially prevailing party in such action.

(f)    Submission of drafts of this Agreement for examination or execution by Purchaser shall not bind Seller in any manner or be construed as an offer to sell, and no contract or obligation of the Seller Parties shall arise until this instrument is executed and delivered by both Seller and Purchaser and the Deposit has been received by the Escrow Agent.

(g)    Any sums payable after the Closing by either party hereto to the other shall bear interest at the rate of twelve percent (12%) per annum from the later of (i) the date the obligation to pay arises and (ii) ten days after demand is made for the payment, to the date of payment.  The provisions of this <u>subsection (g)</u> shall survive the Closing.

(h)    Purchaser may not record this Agreement or any memorandum hereof, and any recordation or attempted recordation by Purchaser shall constitute a material default hereunder, giving Seller the right to terminate this Agreement and exercise any and all remedies of Seller set forth herein, or otherwise available at law or in equity.

(i)    No failure of any party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder shall constitute a waiver of any party's right to demand strict compliance with the terms of this Agreement.

(j)    Each Seller and Purchaser agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them or the Title Insurer, Title Agent or Escrow Agent may reasonably request to carry out the intents and purposes of this Agreement. The provisions of this <u>subsection (j)</u> shall survive the Closing.

(k)    **THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.    THE PROVISIONS OF THIS SUBSECTION (k) SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT**.

(l)    The rights and obligations of the parties hereto shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, assigns, heirs and the legal representatives of their respective estates.  Nothing in this Agreement is intended to confer any right or remedy under this Agreement on any person other than the parties to this Agreement and their respective successors and permitted assigns, or to relieve or discharge the

27

obligation or liability of any person to any party to this Agreement or to give any person any right of subrogation or action over or against any party to this Agreement.

        (m)     If any term or provision of this Agreement is determined to be illegal, unconscionable or unenforceable, all of the other terms, provisions and sections hereof will nevertheless remain effective and be in force to the fullest extent permitted by law.

        (n)     For purposes of this Agreement, Seller, Michael Shah, Griffon GHC LLC, Griffon Gans Manager LLC, Delshah Capital Limited, and Delshah BVI Holdings LLC shall each be referred to herein individually as a "**Seller Party**" and collectively as the "**Seller Parties**".

        (o)     All currency amounts stated herein shall refer to United States Dollars and "Dollars" or "$" shall in each case refer to United States Dollars.

        (p)     The parties hereto agree that no press or other publicity release or communication to the general public concerning the transactions contemplated by this Agreement shall be issued by any party without Purchaser's and Seller's prior written approval prior to the Closing, unless same is required by applicable law or an order of instruction from any governmental authority with jurisdiction (or with respect to Purchaser, in connection with public company filings or as required by the U.S. Securities and Exchange Commission). The parties agree that the terms of this Agreement and all matters and documents related hereto are confidential and the parties agree to (i) keep such information confidential and (ii) not disclose it to any person in any matter; provided, that (A) each party may make any disclosure of such information to which the other party gives its prior written consent, (B) any such information may be disclosed to such other party's officers, directors, employees, capital partners, investors, consultants, attorneys, title company and advisors who need to know such information for the sole purpose of evaluating and/or facilitating the transaction, and who are advised of the confidentiality obligations under this Agreement ("**Transaction Parties**"), (C) each party may disclose that information which, on the advice of its counsel, is required to be disclosed by law or the rules of any exchange to which it is subject or pursuant to any demand of any judicial, administrative, legislative, regulatory or self-regulatory body, so long as such party uses commercially reasonable efforts to give the other party advance written notice of such intended disclosure including the contents of the proposed disclosure, (D) in furtherance of the provisions of clause (C) above, the parties understand that Seller may disclose such information to the holders of the Bonds and their representatives to the extent required by the documents governing such Bonds, and as required by Israeli securities laws and regulations or the rules of the Tel Aviv Stock Exchange, so long as in each case Seller uses commercially reasonable efforts to give Purchaser advance written notice of such intended disclosure including the contents of the proposed disclosure, and (E) subject to each Seller Party's obligations under <u>Section 26(c)</u> hereof, the Seller Parties may disclose such information as is required to be disclosed by the Bankruptcy Code or regulations, the rules of the Bankruptcy Court or any order of such court in connection with the Chapter 11 Case. If this Agreement is terminated, such confidentiality shall be maintained and the parties will destroy (and instruct any Transaction Parties to whom such materials have been delivered to destroy) all documents and other materials, and all copies thereof, obtained thereby in connection with this Agreement that are subject to such confidence. The foregoing confidentiality obligations shall not apply to the extent that any such information is a matter of public record or is provided in other sources other than as a result of disclosure by a Seller Party or Purchaser, or is necessary to enforce

the obligations of the other party under this Agreement.  The provisions of this <u>subsection (p)</u> shall survive any termination of this Agreement, but shall not survive the Closing.

[Signature page follows]

ny-2632276

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

SELLER:

GRIFFON GANSEVOORT HOLDINGS LLC
a Delaware limited liability company

By:    Griffon Gans Manager LLC,
       a Delaware limited liability company, its Manager

By:_____
Name: Michael Shah
Title:   Manager

PURCHASER:

RESTORATION HARDWARE, INC.

By:_____
   Name:
   Title:

*[Signature Page to Agreement of Purchase and Sale]*

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

SELLER:

GRIFFON GANSEVOORT HOLDINGS LLC
a Delaware limited liability company

By:    Griffon Gans Manager LLC,
       a Delaware limited liability company, its Manager


By:_____
Name: Michael Shah
Title:  Manager

PURCHASER:

RESTORATION HARDWARE, INC.

By:_____
Name:  Jack Preston
Title:   Chief Financial Officer

*[Signature Page to Agreement of Purchase and Sale]*

## EXHIBIT A

## DESCRIPTION OF LAND

*ALL* that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of  Manhattan, County of  New York, City and State of New York, bounded and described as follows:

*BEGINNING* at a point on the northerly side of Gansevoort Street, 185.81 feet (185'9-3/4" Tax Map) from the corner formed by the intersection of the said northerly side of Gansevoort Street, as widened, with the easterly side of Washington Street, as widened;

*RUNNING THENCE* northerly from said point along a line forming an interior angle of 88 degrees 55 minutes with the northerly side of Gansevoort Street, 64.77 feet (64'9-1/4" Tax Map);

*THENCE* in a southeasterly direction along a line parallel to 12th Street, forming an interior angle of 61 degrees 33 minutes with the aforementioned course, 131.36 feet (131'4-3/8" Tax Map) to the northerly side of Gansevoort Street;

*AND THENCE* westerly along the northerly side of Gansevoort Street, forming an interior angle of 29 degrees 32 minutes with the aforementioned course, 115.52 feet (115'6-1/4" Tax Map) to the point or place of *BEGINNING.*

A-1

<u>EXHIBIT B</u>

**Escrow Agent's Wire Transfer Instructions**

[Attached]

B-1



First American Title Insurance Company
Att: Agent Advantage, 4795 Regent
Blvd, Mail Code 1300
Irving, TX 75063

# INCOMING WIRE INSTRUCTIONS

**Beware of cyber-crime**! If you receive an e-mail or any other communication that appears to be generated from a First American Title Insurance Company employee that contains new, revised or altered bank wire instructions, consider it suspect and call our office at a number you trust.

## ** Our Wire Instructions Do Not Change. **

**Funds from other than buyer or seller:** Other than funds from a designated lender, real estate agent or broker, or the attorney of record, we will only accept incoming wires that are from the buyer or seller on a transaction. Other third-party deposits not accompanied by appropriate instructions will be returned to the remitter.

**IMPORTANT! DO NOT SEND AN ACH TRANSFER FOR CLOSING:** An ACH transfer is not immediately available funds and requires additional time for clearance. *If you are unsure if you are sending the funds via Wire Transfer or ACH, contact your bank for Wiring Instructions prior to transmitting the funds.* **Contact our office at (866)889-7619 prior to sending funds by ACH transfer.** Acceptance of ACH transfers are subject to state law.

**Funds from a non-U.S. Bank:** If your funds are being wired from a non-U.S. bank, additional charges may apply. When wires are returned to a bank outside the United States, First American Title Insurance Company shall not be responsible or liable for any loss or expense incurred as a result of currency exchange rates, delays in availability of funds, or delays due to the U.S. bank or foreign bank requiring additional information. First American Title Insurance Company shall have no liability or responsibility after properly initiating the wire return. Failure to deposit funds as specified herein may delay the recordation and closing of this escrow transaction. First American Title Insurance Company will not accept any responsibility or liability for any delays and/or penalties imposed due to non-receipt of good funds as described herein, including but not limited to wire transfer delays caused by either the transmitting or receiving bank.

**IMPORTANT: Notify our office at (866)889-7619 when you have transmitted your wire.**

| | |
|---|---|
| PAYABLE TO: | First American Title Insurance Company |
| BANK: | First American Trust, FSB |
| ACCOUNT NO.: | 3139480000 |
| ROUTING NUMBER | 122241255 |
| SWIFT Code: | FATUUS66 |
| BANK ADDRESS | 5 First American Way, Santa Ana, CA 92707 (*Do not use* to mail checks. This address is for Wire Transfers only) |

PLEASE REFERENCE THE FOLLOWING:

| | |
|---|---|
| PROPERTY: | 53/61 Gansevoort Avenue,  New York, NY 10014 |
| FILE NUMBER: | 9960-6477998 |

## WIRES MAY BE RETURNED IF THE FILE NUMBER AND PROPERTY REFERENCE ARE NOT INCLUDED

EXHIBIT C

PERMITTED EXCEPTIONS

1.    Zoning regulations, ordinances, and requirements adopted by any governmental or municipal authority having jurisdiction thereof, and amendments and additions thereto now in force and effect, which relate to the Property.

2.    State of facts shown on a survey made by Apple Surveying dated June 27, 2012 and any additional state of facts said survey brought down to date would show, provided such additional state of facts would not render title to the Property to be unmarketable.

3.    The Lease, any recorded memorandum of the Lease of record as of the date of this Agreement, and the rights of Tenant as set forth in the Lease.

4.    Any agreements, financing statements, chattel mortgages, liens or encumbrances entered into by, or arising from, the acts of Tenant.

5.    Premises described in Schedule A is located in an area designated as a landmark historic district by a notice recorded in the New York City Register's Office January 13, 2011 as CRFN 2011000016764. Said premises is therefore the subject to the restrictions as to use provided for in the Administrative Code of the City of New York, Title 25, Chapter 3.

6.    Terms, covenants, conditions, restrictions and options of a Lease dated July 8, 2015 made by and between Griffon Gansevoort Holdings LLC, as Landlord, and Restoration Hardware, Inc., as Tenant, as set forth in the Memorandum of Lease, dated as of July 8, 2015 and recorded July 29, 2015 as CRFN 2015000259338.

7.    Board of Standard and Appeals recorded September 2, 2022 as CRFN 2022000344907.

8.    Real estate tax, assessment, water and sewer charge liens, subject to adjustment (if applicable) in accordance with the Agreement.

9.    All violations (other than any violations caused by or due to the negligence of any Seller Party that arises after the date hereof until the Closing).

10.    Caretakers Apartment Restrictive Declaration dated January 9, 2005 and recorded February 18, 2005 as CRFN 2005000104979.

11.    Notice of Sidewalk Violation filed May 8, 2000 under Index No. 75575.

12.    Certification pursuant to Zoning Lot Subdivision recorded as CRFN 201700020194.

13.    Zoning Lot Description and Ownership Statement recorded as CRFN 2017000120195.

C-1

<u>EXHIBIT D</u>

<u>DESCRIPTION OF THE LEASE</u>

All documents are dated July 8, 2015 unless otherwise stated.

1.     Agreement of Lease between Griffon Gansevoort Holdings LLC and Restoration Hardware, Inc.

2.     Guaranty executed by Michael Shah.

3.     Letter Agreement with Raven re: surrender of Raven Space, including a Stipulation of Settlement signed by Raven and Landlord in the event of holdover by Raven.

4.     SNDA by and among Landlord, Tenant, 55 Gans Lender LLC and Pacific Western Bank, recorded/filed on July 29, 2015, CRFN 2015000259339.

5.     Memorandum of Lease, recorded/filed on July 29, 2015, CRFN 2015000259338.

6.     Stipulation by and among Tenant, Landlord and 55 Gans Lender LLC.

7.     Letter Agreement between Landlord and Tenant regarding removal of Landlord's personal property.

8.     Letter Agreement between Landlord and Tenant regarding VIP status.

9.     Commencement Date Confirmation executed by Tenant (Exhibit B to the Lease).

10.    Emails from Eugene Chang, dated December 9, 2015, and from Michael Shah, dated December 11, 2015, confirming that Tenant's general contractor may deliver a performance and payment bond for 100% of the estimated cost of Tenant's Alterations.

11.    Email from Michael Shah, dated July 16, 2015, confirming Term Commencement Date and Delivery Date.

12.    Subordination, Non-Disturbance and Attornment Agreement made among Tenant, Griffon Gansevoort Holdings LLC and Mishmeret Trust Company Ltd recorded on August 25, 2017 as CRFN 2017000318915.

13.    Escrow Agreement dated January 25, 2017 between Seller, Purchaser and First American Title Insurance Company regarding Landlord's Contribution

14.    Forbearance Agreement dated June 2020, between Landlord and Tenant.

15.    Notice of Close of Escrow Account dated February 8, 2021 from Purchaser to Seller.

D-1

## EXHIBIT E

## DESCRIPTION OF EXISTING LITIGATION

NONE.

E-1

EXHIBIT F

FORM OF CONSENT OF ISRAELI BOND TRUSTEE

Mishmeret - Trust Services Company Ltd. (the "<u>Trustee</u>")
48 Menachem Begin Road
Tel Aviv, Israel 6618001

Date: [_____], 2023

Delshah Capital Limited                          Restoration Hardware, Inc.
114 East 13th Street, Front 1                    15 Koch Road, Suite J
New York, New York 10003                         Corte Madera, CA 95925

Ladies and Gentlemen:

The Trustee is the trustee under that certain Deed of Trust, dated as of January 5, 2016, as amended by that certain Amendment No. 1 to the Deed of Trust, dated as of October 25, 2023 (the "<u>Deed of Trust</u>"), governing the Debentures (Series B) of Delshah Capital Limited listed for trade on the Tel Aviv Stock Exchange (the "<u>Bonds</u>").

Reference is hereby made to that certain Agreement of Purchase and Sale, dated as of [_____], 2023 in the form attached hereto as <u>Exhibit A</u> (the "<u>PSA</u>") between Griffon Gansevoort Holdings LLC, a Delaware limited liability company ("<u>Seller</u>") and Restoration Hardware Inc. ("<u>Purchaser</u>").  Capitalized terms used but not defined herein shall have the meanings given to them in the PSA.

The Trustee, on behalf of the bondholders, hereby acknowledges (a) the execution and delivery of the PSA and (b) the performance of Seller's obligations under the PSA by Seller, subject to, with respect to this clause (b), satisfaction of the condition precedent to closing set forth in Section 13 of the PSA by the Trustee's delivery of the waiver and release attached hereto as <u>Exhibit B</u> (in favor of Purchaser and certain related parties of Purchaser) referred to therein (the "<u>Waiver and Release</u>"), which Waiver and Release will require the approval of the bondholders by means of a Special Resolution (as defined in the Deed of Trust) in accordance with the Deed of Trust (the "<u>Required Bondholder Approval</u>").

Pursuant to Section 13 of the PSA, the Trustee, on behalf of the bondholders, irrevocably confirms that, provided that (i) the transactions contemplated by the PSA are consummated in accordance with the terms of the PSA in all material respects, and that proceeds from the sale of the Property under the PSA in an amount of not less than US $52,700,000.00 are paid directly to the Trustee in accordance with the account instructions set forth below (the "<u>Payment to the Trustee</u>"), and (ii) the Required Bondholder Approval is obtained, then the Trustee, on behalf of the bondholders, shall deliver to Purchaser the Waiver and Release, concurrently with the Closing under the PSA, and shall take all necessary administrative actions incidental to the foregoing matters including execution and delivery of any other necessary documents to release, all of its and the bondholders' rights, liens and encumbrances with respect to or in connection with the Property, the Bonds, and the termination of the Lease by Purchaser at the time of the Closing.  Notwithstanding the above, in the event requested by Seller and Purchaser, subject to the terms and conditions set forth above, the Trustee, on behalf of the bondholders, will assign the mortgages it holds to Purchaser's lender at the time

of the Closing or spread it to other assets designated by Delshah Capital Limited, as the PSA may permit.

The Trustee hereby represents and warrants that it is duly authorized to provide this acknowledgement and agreement.

If applicable as set forth above, the Payment to the Trustee shall be wired to the following account:

> Name: MISHMERET - TRUST SERVICES COMPANY LTD.
> Bank Hapoalim B.M.
> Bank: 12 Branch: 772
> Account: 240029
> IBAN: IL100127720000000240029

Very truly yours,

Mishmeret - Trust Services Company Ltd.

By:_____
Name: Rami Katzav
Title: Vice President

<u>EXHIBIT A</u>

<u>PURCHASE AND SALE AGREEMENT</u>

## EXHIBIT B

FORM OF WAIVER AND RELEASE

EXHIBIT G

FORM OF DEED

RECORDING REQUESTED BY,
AND WHEN RECORDED RETURN TO:

_____

_____

_____

Attn: _____

Email: _____

BARGAIN AND SALE DEED

THIS INDENTURE, made as of the ___ day of _____, 2023 by GRIFFON GANSEVOORT HOLDINGS LLC ("Grantor"), a Delaware limited liability company, having an address at 114 East 13th Street, Front 1, New York, New York 10003, and **RESTORATION HARDWARE, INC.** ("Grantee"), a _____, having an address at _____,

WITNESSETH, that Grantor, for and in consideration of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration paid by Grantee, the receipt whereof is hereby acknowledged, hereby grants and releases to Grantee all that certain plot, piece or parcel of land, together with the buildings and improvements thereon erected, situate, lying and being in the City of New York, County of New York, State of New York, more particularly described on Schedule A attached hereto and made a part hereof,

Said Property being and intended to be the same Property described in the deed, dated June 21, 2012 and effective as of July 20, 2012, made by GHC NY Corp., as grantor, and Grantor, as grantee, which deed was recorded on August 14, 2012 19, 2018 in the Office of the City Register of New York City, New York County as City Register File No. 2012000321639.

Said Property also known as and by the street address 55-61 Gansevoort Street, New York, New York and the New York County Tax Map Designation of Block 644, Lot 60;

TOGETHER with all right, title and interest, if any, of the Grantor in and to any streets and roads abutting the above described Property to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the Grantor in and to said Property; TO HAVE AND TO HOLD the Property herein granted unto the Grantee forever.

AND, Grantor, in compliance with Section 13 of the Lien Law, covenants that Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first for the purpose of paying the cost of the improvement before using any part of the total of the same for any other purpose.

G-1

Wherever in this instrument any party shall be designated or referred to by name or general reference, such designation is intended to and shall have the same effect as if the words "successors and assigns" had been inserted after each and every such designation.

IN WITNESS WHEREOF, the undersigned has executed this indenture as of the date first above written.

GRIFFON   GANSEVOORT   HOLDINGS   LLC, a Delaware limited liability company

By:   Griffon Gans Manager LLC,
a   Delaware   limited   liability   company, its Manager

By:   _____

Name:  Michael Shah
Title:   Manager

G-2

STATE OF NEW YORK      )
                                                )                                                               ss.
COUNTY OF _____    )

           On this ___ day of _____, in the year 2023 before me, the undersigned personally appeared Michael Shah, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to in the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

           IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

NOTARIAL SEAL                             My Commission Expires:

ny-2632276

EXHIBIT H

FORM OF BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged (i) Griffon Gansevoort Holdings LLC, a Delaware limited liability company (the "Seller"),  hereby grants, bargains, sells, transfers, assigns, and conveys to **RESTORATION HARDWARE, INC.,** a _____ (the "Purchaser"), all of Seller's right, title and interest to all personal property, if any (whether tangible, intangible or otherwise) now at, in or upon or used in connection with the Property located at 55-61 Gansevoort Street, New York, New York (the "Land") including, without limitation, all tangible personal property upon the Land or within the improvements located thereon, including specifically, without limitation, appliances, furniture, carpeting, draperies and curtains, tools and supplies, and other items of personal property (excluding cash and accounts receivable) related to, used in connection with, or required for the operation of the Land and the improvements, but excluding any business and trade fixtures, machinery, and equipment belonging to any tenant of the building in their capacity solely as tenant and located within the space leased to that tenant and all materials that are used or useful in the leasing and marketing of the Property (collectively, the "Personal Property"), but specifically excluding from the Personal Property all property owned by tenants, if any, to have and to hold the Personal Property unto Purchaser, its successors and assigns, forever, and (ii) Purchase and Seller agree and acknowledge that such transfer of the Personal Property is being made pursuant to that certain Purchase and Sale Agreement (the "PSA"), dated as of _____ __, 2023, to which Purchaser and Seller are parties.

Seller grants, bargains, sells, transfers and delivers the Personal Property in its "AS IS" condition, WITH ALL FAULTS, IF ANY, and makes no representations or warranties, direct or indirect, oral or written, express or implied, other than as set forth in the PSA.

EXECUTED as of the day and year first above written.

**SELLER:**

**GRIFFON  GANSEVOORT  HOLDINGS LLC**, a Delaware limited liability company

By:  Griffon Gans Manager LLC,
      a  Delaware  limited  liability  company,
      its Manager

By:  _____
      Name: Michael Shah
      Title:  Manager

H-1

<u>EXHIBIT I</u>

<u>FORM OF GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

KNOW ALL MEN BY THESE PRESENTS:

THIS GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made and entered into as of the _____ day of _____, 2023 by DS Brooklyn Portfolio Owner LLC ("Assignor"), a Delaware limited liability company, having an address at 114 East 13th Street, Front 1, New York, New York 10003, and RESTORATION HARDWARE, INC. ("Assignee"), a _____, having an address at _____.

W I T N E S S E T H:

WHEREAS, Assignee is purchasing from Assignor and Assignor is conveying to Assignee that certain real property located at 55-61 Gansevoort Street, New York, New York (the "Property") pursuant to that certain Purchase and Sale Agreement (the "PSA"), dated as of _____ __, 2023, to which Assignor and Assignee are parties; and

WHEREAS, in connection with such conveyance, Assignor is conveying to Assignee: (i) all transferable or assignable licenses, permits, registrations, certificates, authorizations and governmental approvals obtained in connection with the design, construction, rehabilitation, use and/or operation of the Property, if any; (ii) trademark rights, and other intangible property, rights, titles, interests, privileges and appurtenances related to or used in connection with the Property or its operations, if any; and (iii) warranties and guaranties of architects, engineers, contractors, subcontractors, suppliers or materialmen involved in the repair, construction, maintenance, design, reconstruction or operation of the Property, or of any equipment or system constituting a part of the Real Property (as defined in the PSA), if any; (collectively, the "Intangible Property").

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) paid by Assignee to Assignor, the receipt and sufficiency of which is hereby acknowledged and confessed, Assignor and Assignee agree to the terms and conditions set forth in this Assignment. Except as expressly set forth in the PSA and subject to the limitations therein:

1.      Assignor hereby assigns and transfers to Assignee, its successors and assigns, all of the right, title, and interest of Assignor in and to the Intangible Property.

2.      From and after the date hereof, Assignee hereby affirmatively and unconditionally assumes the obligations of the Assignor with respect to the Intangible Property and indemnifies and holds harmless Assignor for all claims and liabilities thereunder arising from and after the date hereof.

3.      This Assignment is made without warranty, representation, or guaranty by, or recourse against, Assignor of any kind whatsoever.

I-1

4.       This Assignment shall be binding upon, and inure to the benefit of, all of the parties hereto, their successors and assigns.

[Signature page follows]

I-2

EXECUTED as of the day and year first above written.

**ASSIGNOR:**

GRIFFON GANSEVOORT HOLDINGS LLC,
a Delaware limited liability company

By:     Griffon Gans Manager LLC,
         a Delaware limited liability company,
         its Manager


By:_____
Name: Michael Shah
Title:   Manager




**ASSIGNEE:**

_____


By: _____
     Name:
     Title:

I-3

<u>EXHIBIT J</u>

<u>FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE</u>

KNOW ALL MEN BY THESE PRESENTS:

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") is made and entered into as of the _____ day of _____, 2023 by Griffon Gansevoort Holdings LLC ("Assignor"), a Delaware limited liability company, having an address at 114 East 13th Street, Front 1, New York, New York 10003, and RESTORATION HARDWARE, INC. ("Assignee"), a _____, having an address at _____.

W I T N E S S E T H:

WHEREAS, Assignee is purchasing from Assignor and Assignor is conveying to Assignee that certain real property located at 55-61 Gansevoort Street, New York, New York (the "Property") pursuant to that certain Purchase and Sale Agreement (the "PSA") dated as of _____ __, 2023, to which Assignor and Assignee are parties; and

WHEREAS, Assignor is the lessor under that certain lease more fully described on <u>Exhibit A</u> attached hereto and made apart hereof (the "Lease") affecting the Property; and

WHEREAS, in accordance with the terms and provisions of the PSA, Assignor is assigning, and Assignee is assuming the Lease and the security deposit to which the tenant is entitled pursuant to the Lease as hereinafter provided.

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) paid by Assignee to Assignor, the receipt and sufficiency of which is hereby acknowledged and confessed, Assignor and Assignee agree to the terms and conditions set forth in this Assignment and Assumption of Lease.  Except as expressly set forth in the PSA and subject to the limitations therein:

1.      Assignor hereby assigns and transfers to Assignee, its successors and assigns, all of the right, title, and interest of Assignor in the Lease and the security deposit in accordance with the terms of the Lease pursuant to which the same was initially deposited.

2.      From and after the date hereof, Assignee hereby affirmatively and unconditionally assumes the obligations of the lessor under the Lease and indemnifies and holds harmless Assignor for all claims and liabilities thereunder arising from and after the date hereof.

3.      Assignor hereby indemnifies and holds harmless Assignee from all claims and liabilities with respect to the Lease arising prior to the date hereof.

4.      This Assignment is made without warranty, representation, or guaranty by, or recourse against, Assignor of any kind whatsoever.

J-1

5.        This Assignment and Assumption of Lease shall be binding upon, and inure to the benefit of, all of the parties hereto, their successors and assigns.

[*Signature page follows*]

J-2

EXECUTED as of the day and year first above written.

**ASSIGNOR:**

55 GANSEVOORT HOLDINGS LLC


By: _____
     Name:  Michael Shah
     Title:  Manager


**ASSIGNEE:**

RESTORATION HARDWARE, INC.


By: _____
     Name:
     Title:

J-3

<u>EXHIBIT K</u>

<u>FORM OF TITLE AFFIDAVIT</u>

Title No. _____

Block 644, Lot 60

Property:  55-61 Gansevoort Street, New York

State of New York        )

                                  ) :ss

County of New York  )

           The undersigned, of full age, being duly sworn according to law, deposes and says that:

           1.      I am the Manager of Griffon Gansevoort Holdings LLC, a Delaware limited liability company, the owner of the above-described Property (the "Property").

           2.      There has been no work done upon the Property by the City of New York, nor any demand made for any such work by the City of New York that may result in charges assessed by the Office of Rent and Housing Maintenance, Emergency Repairs Division.

           3.      There has been no work done upon the Property by the City of New York, nor any demand for any such work by the City of New York that may result in charges assessed by the Department of Health.

           4.      There are no unpaid fees or charges levied by the City of New York Department of Buildings for inspections, re-inspections, examinations, services or permits relating to the Property.

           5.      Attached hereto as Exhibit A is a list of all tenants currently in possession at the Property. All persons in possession are in possession as tenants only.  There are no options to purchase or rights of first refusal either pursuant to written leases or by separate agreements.

           6.      There are no judgments against the owner of the Property in any of the Courts of this State or of the United States of America and no petition in bankruptcy has been filed by or against said owner, except for that certain Bankruptcy Case, filed in the _____ District of New York under Case No. _____.

*[Signature page follows]*

K-1

This affidavit is qualified in all respects to the knowledge of the undersigned. I make this affidavit to induce _____ Title Insurance Company to insure title to the aforesaid policy.

_____
Michael Shah

Sworn to before me this ____ day of
_____, 2023

_____
Notary Public

K-2

EXHIBIT L

FORM OF PURCHASER RELEASE

[ATTACHED]

L-3

# RELEASE AGREEMENT

This **RELEASE AGREEMENT** (this "**Release**"), dated as of [●] 2023, is made and entered into by RESTORATION HARDWARE, INC. a Delaware corporation with an office at 15 Koch Road, Suite J, Corte Madera, CA 95925 ("**RHI**").   Capitalized terms used in this Release, but not otherwise defined in this Release, shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, RHI and GRIFFON GANSEVOORT HOLDINGS LLC, a Delaware limited liability company ("**Seller**") are parties to that certain Agreement of Purchase and Sale dated as of November __, 2023 (the "**Purchase Agreement**"), pursuant to which RHI or its assignee shall purchase from Seller, and Seller shall sell the Property, in accordance with the terms contained therein.

**WHEREAS**, the execution and delivery of this Release by each Seller Party is being undertaken as a material inducement to RHI with respect to the closing of the transaction contemplated by the Purchase Agreement and in order to satisfy a condition precedent under the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the representations, warranties, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to create a legal contract and to be legally bound hereby, RHI agrees as follows:

## ARTICLE I

## RELEASE; WAIVER

1.1    <u>Release and Waiver</u>.    RHI, on behalf itself and the Releasing Parties, hereby:

(a)    unconditionally, irrevocably and forever releases, acquits and discharges the Released Parties from, and covenants not to sue any Released Parties for, any and all Released Claims that the Releasing Parties shall or may have, whether known or unknown, at any time on or prior to the Closing Date;

(b)    represents and warrants that none of the Releasing Parties has pledged, transferred or assigned, or purported to pledge, transfer or assign, any interest with respect to any of the Released Claims;

(c)    RHI (i) has read and understands this Release and has been advised by its legal counsel prior to signing this Release, (ii) has signed this Release, freely and voluntarily, and (iii) does not rely, and has not relied, on any representation or statement not set forth in this Release made by any of the Released Parties or any other Person with regard to the subject matter, basis or effect of this Release or otherwise;

(d)    acknowledges and agrees that this Release may be pleaded by any Released Party as a full and complete defense to, and may be used as a basis for an injunction against, any action, suit or other proceeding that may be instituted, prosecuted or attempted by any party contrary to this Release; and

1

(e)    acknowledges that RHI has entered into this Release for the benefit and protection of the Released Parties, with the understanding that the Released Parties intend to rely upon the provisions hereof in agreeing to consummate the transactions contemplated by the Purchase Agreement and will be the intended beneficiaries of this Release.

1.2    <u>Effectiveness</u>.    Notwithstanding anything to the contrary contained herein: (a) this Release shall not become effective unless and until the Closing occurs pursuant to the Purchase Agreement; (b) subject to the foregoing clause (a), this Release shall become (and shall automatically become) effective and binding upon the Releasing Parties upon the execution and delivery of this Release by RHI (irrespective of whether other Releasing Parties have executed and delivered this Release); and (c) no party hereto shall have any right to revoke or nullify, or withdraw from, this Release.

## ARTICLE II

## MISCELLANEOUS

2.1    <u>Entire Agreement</u>.    This Release, the Purchase Agreement and the other documents executed and delivered in connection with and pursuant to the Purchase Agreement (the "**Purchase Deliverables**"; together with this Release and the Purchase Agreement, collectively, the "**Documents**") constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof, and shall be the final, complete and exclusive agreement, and shall supersede all other prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, among the parties with respect to the subject matter hereto or thereto.    Except as expressly set forth in the Documents, the parties hereto agree that the rights and entitlements under all other agreements by and among the parties hereto shall be irrevocably and forever released, acquitted and discharged, and such Documents shall govern the rights and entitlements of the parties hereto with respect to the subject matter hereto or thereto.

2.2    <u>Conflict</u>.    If the provisions of this Release conflict in any way with the provisions of the Purchase Agreement, the provisions of this Release shall control.    The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.

2.3    <u>Definitions</u>. The term "**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The term "**Person**" shall mean any natural person, partnership, trust, estate, association, limited liability company, corporation, custodian, nominee, governmental instrumentality or agency, body politic or any other entity in its own or any representative capacity. The term "**Lease Documents**" shall mean that certain Agreement of Lease dated as of July 8, 2015 (the "**Lease**"), as well as all other related instruments, agreements and undertakings entered into by any of the Seller Parties in connection with the Lease, including without limitation that certain Guaranty dated July 8, 2015 executed by Michael Shah in favor of RHI. The term "**Releasing Party**" shall mean RHI and its current or former Affiliates (as defined below), officers, directors, employees, managers, partners, principals, advisors, agents, stockholders, members, investors, equity holders or other representatives (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), family members, heirs, beneficiaries, estates, executors, administrators, trustees, successors or assigns (for the avoidance of doubt, the foregoing Persons shall include any and all Persons that such RHI may, directly or indirectly, own or control (whether currently or in the past), including any Person that has had a relationship of any nature with the

2

Property, RHI or RHI's Affiliates, including as an employee, owner, equity interest holder, lender, debt holder or otherwise). The term "**Released Claims**" means any and all claims, demands, allegations, assertions, complaints, controversies, charges, duties, breaches of duties, grievances, rights, causes of action, actions, suits, liabilities, debts, obligations, promises, commitments, agreements, guarantees, endorsements, duties, damages, costs, losses, debts and expenses (including out-of-pocket attorneys' fees and costs incurred) of any nature whatsoever (whether direct or indirect, known or unknown, disclosed or undisclosed, matured or unmatured, accrued or unaccrued, asserted or unasserted, absolute or contingent, determined or conditional, express or implied, fixed or variable and whether vicarious, derivative, joint, several or secondary) (collectively, "**Claims**") arising whether at law or equity, or under any agreement or contract, with respect to or in connection with: (1) the Property, (2) any of the Lease Documents, (3) any facts or circumstances occurring at any time prior to the Closing Date and insofar as such Claims relate to any duty or obligation of any of the Released Parties to the Releasing Parties (directly or indirectly) in connection with the Property or any of the Lease Documents, and/or (5) any dispute concerning the amount of the Purchase Price or the other terms and conditions of the Purchase Agreement including the other consideration to be received or any actions required to be undertaken in connection with the Purchase Agreement, which such Releasing Party and/or any of the Releasing Parties shall have or may have at any time prior to the Closing Date, or with respect to period prior to the Closing Date; provided that this Release shall not apply to (x) any matters under the Purchase Agreement that survive the Closing Date, (y) any purchase or sale of merchandise or services from RHI or any of its affiliates by any of the Released Parties, or (z) any matters related to the ownership, purchase or sale of any securities of RH including shares of its common stock by any of the Released Parties.. The term "**Released Parties**" shall mean (i) Griffon Gansevoort Holdings LLC, a Delaware limited liability company ("**Seller**"), (ii) Michael Shah, an individual, (iii) Griffon GHC LLC, a Delaware limited liability company, (iv) Delshah Capital Limited, a British Virgin Islands Company, (v) Delshah BVI Holdings, LLC, a Delaware limited liability company, and (vi) Griffon Gans Manager LLC, a Delaware limited liability company, and any of its or their current or former Affiliates, subsidiaries (whether direct or indirect), minority interests, subdivisions, officers, directors, employees, managers, partners, principals, advisors, agents, stockholders, members, investors, equity holders or other representatives (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), successors, predecessors or assigns.

     2.4   <u>Limitations of Applicable Law</u>.  Notwithstanding any other provision of this Release, the parties acknowledge and agree that the scope of this Release shall be limited to the extent that any provision of applicable law with respect to the Releasing Parties provides that rights cannot be waived or released.

     2.5   <u>Miscellaneous Provisions</u> The provisions of Section 20 (Notices) and subsections 31(a)-(e), (i), (k)-(m) (Miscellaneous) of the Purchase Agreement shall apply *mutatis mutandis* to this Release except to the extent of any express conflict with the provisions of this Release, taken together as a single agreement, reflecting the terms therein as modified by this Release.

*     *     *     *     *

sf-5659883.3

IN WITNESS WHEREOF, each Seller Party has caused this Release to be duly executed as of the date first above written.

RESTORATION HARDWARE, INC.

By: _____
      Name:
      Title:

EXHIBIT M

FORM OF SELLER PARTY RELEASE

[ATTACHED]

M-1

## RELEASE AGREEMENT

This **RELEASE AGREEMENT** (this "**Release**"), dated as of [●] 2023, is made and entered into by (i) GRIFFON GANSEVOORT HOLDINGS LLC, a Delaware limited liability company ("**Seller**"), (ii) Michael Shah, an individual, (iii) Griffon GHC LLC, a Delaware limited liability company, (iv) Delshah Capital Limited, a British Virgin Islands company, (v) Delshah BVI Holdings, LLC, a Delaware limited liability company, and (vi) Griffon Gans Manager LLC, a Delaware limited liability company (the Persons (as defined below) listed in (i) through (vi) above are each referred to herein as a "**Seller Party**" and collectively as the "**Seller Parties**"). Capitalized terms used in this Release, but not otherwise defined in this Release, shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, Seller and Restoration Hardware, Inc. ("**RHI**") are parties to that certain Agreement of Purchase and Sale dated as of November __, 2023 (the "**Purchase Agreement**"), pursuant to which RHI or its assignee shall purchase from Seller and Seller shall sell the Property in accordance with the terms contained therein.

**WHEREAS**, the execution and delivery of this Release by each Seller Party is being undertaken as a material inducement to RHI with respect to the closing of the transaction contemplated by the Purchase Agreement and in order to satisfy a condition precedent under the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the representations, warranties, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to create a legal contract and to be legally bound hereby, each undersigned Seller Party agrees as follows:

## ARTICLE I

## RELEASE; WAIVER

1.1 <u>Release and Waiver</u>. Each undersigned Seller Party, on behalf of him/her/itself and the Releasing Parties, hereby:

(a) unconditionally, irrevocably and forever releases, acquits and discharges the Released Parties from, and covenants not to sue any Released Parties for, any and all Released Claims that such Seller Party and his/her/its Releasing Parties shall or may have, whether known or unknown, at any time on or prior to the Closing Date;

(b) assigns, releases and quitclaims to RHI any rights that it may have with respect to any of the Quitclaimed Assets;

(c) represents and warrants that neither it nor any of the other Releasing Parties, has pledged, transferred or assigned, or purported to pledge, transfer or assign, any interest with respect to any of the Released Claims;

(d) such Seller Party (i) has read and understands this Release and has been advised by its legal counsel prior to signing this Release, (ii) has signed this Release, freely and voluntarily, and (iii) does not rely, and has not relied, on any representation or statement not set forth in this Release made by any of the Released Parties or any other Person with regard to the subject matter, basis or effect of this

1

Release or otherwise;

(e)    acknowledges and agrees that this Release may be pleaded by any Released Party as a full and complete defense to, and may be used as a basis for an injunction against, any action, suit or other proceeding that may be instituted, prosecuted or attempted by any party contrary to this Release; and

(f)    acknowledges that each Seller Party has entered into this Release for the benefit and protection of the Released Parties, with the understanding that the Released Parties intend to rely upon the provisions hereof in agreeing to consummate the transactions contemplated by the Purchase Agreement and will be the intended beneficiaries of this Release;

(g)    acknowledges and agrees that all RH-related IPR (as defined below) was, is and shall be owned by RH or one or more of its Affiliates, including the names "RH" and "Restoration Hardware" and derivatives thereof and that neither the Lease, the Purchase Agreement, nor any agreement in connection with the matters contemplated thereby shall assign, grant, or license any rights of ownership, invention, or proprietorship (whether held solely or jointly) with respect to any RH-related IPR to Landlord or any Affiliate of Landlord (nor shall this Lease be deemed to create or license any such rights whether express or implied); and

(h)    acknowledges and agrees that no trademark, service mark, trade name or trade dress adopted by RHI or one or more of its Affiliates or photograph, digital image, drawing, design, rendering or other embodiment (collectively, "Images") of any of the Property or premises that bear RH-related IPR, shall be used or disclosed by any Releasing Party.

1.2    Effectiveness.    Notwithstanding anything to the contrary contained herein: (a) this Release shall not become effective unless and until the Closing occurs pursuant to the Purchase Agreement; (b) subject to the foregoing clause (a), this Release shall become (and shall automatically become) effective and binding upon each undersigned Seller Party and the Releasing Parties upon the execution and delivery of this Release by such undersigned Seller Party (irrespective of whether other Seller Parties have executed and delivered this Release); and (c) no party hereto shall have any right to revoke or nullify, or withdraw from, this Release.

## ARTICLE II

## MISCELLANEOUS

2.1    Entire Agreement.    This Release, the Purchase Agreement and the other documents executed and delivered in connection with and pursuant to the Purchase Agreement (the "**Purchase Deliverables**"; together with this Release and the Purchase Agreement, collectively, the "**Documents**") constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof, and shall be the final, complete and exclusive agreement, and shall supersede all other prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, among the parties with respect to the subject matter hereto or thereto.  Except as expressly set forth in the Documents, the parties hereto agree that the rights and entitlements under all other agreements by and among the parties hereto shall be irrevocably and forever released, acquitted and discharged, and such Documents shall govern the rights and entitlements of the parties hereto with respect to the subject matter hereto or thereto.

2.2    Conflict.    If the provisions of this Release conflict in any way with the provisions of the Purchase Agreement, the provisions of this Release shall control.    The express terms hereof control and

2

supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.

2.3    <u>Definitions</u>. The term "**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The term "**Person**" shall mean any natural person, partnership, trust, estate, association, limited liability company, corporation, custodian, nominee, governmental instrumentality or agency, body politic or any other entity in its own or any representative capacity. The term "**Lease Documents**" shall mean that certain Agreement of Lease dated as of July 8, 2015 (the "**Lease**"), as well as all other related instruments, agreements and undertakings entered into by any of the Seller Parties in connection with the Lease. The term "**Quitclaimed Assets**" means any rights with respect to any registered and common law trademarks, service marks, trade dress, names, brand names, corporate names, fictitious and other business names, domain names, IP addresses, email addresses, logos, designs, artworks or variants thereof that (x) include or relate to the names "RH", "RH Guesthouse" or "Restoration Hardware" or any other similar name or derivatives of the name "RH", "RH Guesthouse" or "Restoration Hardware" or combinations including the name "RH", "RH Guesthouse" or "Restoration Hardware", or (y) are currently owned or used by or contemplated to be used by RH in the operation of the Property, or in connection with the Property, or that by their nature contain a reference to the Property or RH. The term "**Releasing Party**" with respect to each Seller Party, shall mean each of such Seller Party's current or former Affiliates (as defined below), officers, directors, employees, managers, partners, principals, advisors, agents, stockholders, members, investors, equity holders or other representatives (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), family members, heirs, beneficiaries, estates, executors, administrators, trustees, successors or assigns (for the avoidance of doubt, the foregoing Persons shall include any and all Persons that such Seller Party may, directly or indirectly, own or control (whether currently or in the past), including any Person that has had a relationship of any nature with the Property, RHI or RHI's Affiliates, including as an employee, owner, equity interest holder, lender, debt holder or otherwise).    The term "**Released Claims**" means:    with respect to each Seller Party and each of the other Releasing Parties, any and all claims, demands, allegations, assertions, complaints, controversies, charges, duties, breaches of duties, grievances, rights, causes of action, actions, suits, liabilities, debts, obligations, promises, commitments, agreements, guarantees, endorsements, duties, damages, costs, losses, debts and expenses (including out-of-pocket attorneys' fees and costs incurred) of any nature whatsoever (whether direct or indirect, known or unknown, disclosed or undisclosed, matured or unmatured, accrued or unaccrued, asserted or unasserted, absolute or contingent, determined or conditional, express or implied, fixed or variable and whether vicarious, derivative, joint, several or secondary) (collectively, "**Claims**") arising whether at law or equity, or under any agreement or contract, with respect to or in connection with: (1) the Property or the Releasing Party's current, past or putative ownership or other interests in the Property, (2) any of the Lease Documents, (3) any Quitclaimed Assets (as defined below), (4) any facts or circumstances occurring at any time prior to the Closing Date and insofar as such Claims relate to any duty or obligation of any of the Released Parties to the Releasing Parties (directly or indirectly) in connection with the Property, any of the Lease Documents or any Quitclaimed Assets, (5) any dispute concerning the amount of the Purchase Price or the other terms and conditions of the Purchase Agreement including the other consideration to be received or any actions required to be undertaken in connection with the Purchase Agreement, which such Releasing Party and/or any of the Releasing Parties shall have or may have at any time prior to the Closing Date, or with respect to period prior to the Closing Date, and/or (6) the Bonds; <u>provided</u> that this Release shall not apply to (x) any matters under the Purchase Agreement that survive the Closing Date, (y) any purchase or sale of merchandise or services from RHI or any of its affiliates by any of the Releasing Parties, or (z) any matters related to the ownership, purchase or sale of any securities

3

sf-5656013.7

of RH including shares of its common stock by any of the Releasing Parties. The term "**Released Parties**" shall mean RHI, and any of its current or former Affiliates, subsidiaries (whether direct or indirect), minority interests, subdivisions, officers, directors, employees, managers, partners, principals, advisors, agents, stockholders, members, investors, equity holders or other representatives (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), successors, predecessors or assigns.   The term "**RH-related IPR**" means any and all intellectual property rights (whether statutory, common law or otherwise) relating to, directly or indirectly, patents, trade secrets, copyrights, trademarks, service marks, trade names, trade dress in connection with, arising from, or associated with discoveries, ideas, inventions, concepts, developments, know-how, works of authorship, materials, software, HTML, scripts, writings, drawings, designs, processes, techniques, formulas, data, specifications, technology, names and other creations (and any related improvements or modifications to the foregoing) that are (i) conceived, created, reduced to practice, or otherwise developed in connection with the transactions or activities contemplated by the Lease, and (ii) incorporated into the physical aspects of the Property or the premises and/or into the operation of any of the premises including the designs and drawings developed in connection therewith and/or the policies and procedures that are used in connection with the operation thereof

2.4    <u>Limitations of Applicable Law</u>.   Notwithstanding any other provision of this Release, the parties acknowledge and agree that the scope of this Release shall be limited to the extent that any provision of applicable law with respect to the Releasing Parties provides that rights cannot be waived or released.

2.5    <u>Miscellaneous Provisions</u> The provisions of Section 20 (Notices) and subsections 31(a)-(e), (i), (k)-(m) (Miscellaneous) of the Purchase Agreement shall apply *mutatis mutandis* to this Release except to the extent of any express conflict with the provisions of this Release, taken together as a single agreement, reflecting the terms therein as modified by this Release.

\*     \*     \*     \*     \*

IN WITNESS WHEREOF, each Seller Party has caused this Release to be duly executed as of the date first above written.

**SELLER PARTY:**

GRIFFON GANSEVOORT HOLDINGS LLC

By:   Griffon Gans Manager LLC, its manager

By:   _____
      Name: Michael Shah
      Title:   Manager


GRIFFON GHC LLC

By:   Griffon Gans Manager LLC, its manager

By:   _____
      Name:
      Title:


DELSHAH CAPITAL LIMITED

By:   _____
      Name: Michael Shah
      Title:   Chairman and CEO


_____

Michael Shah


DELSHAH BVI HOLDINGS, LLC

By:   _____
      Name: Michael Shah
      Title:   Manager


GRIFFON GANS MANAGER LLC

By:   _____
      Name: Michael Shah
      Title:   Manager

## EXHIBIT N

## LIST OF ISRAELI BOND DOCUMENTS

1.     Debentures (Series B) Deed of Trust dated January 5, 2016 between Delshah Capital Limited, a British Virgin Islands company, and Mishmeret - Trusts Company Ltd, as trustee for bondholders ("Trustee"), and joined in for limited purposes by Griffon Gansevoort Holdings LLC, a Delaware limited liability company ("Holdings"), and Griffon GHC LLC, a Delaware limited liability company.

2.     Bonds issued under the Deed of Trust.

3.     Amendment to the Deed of Trust dated October 10, 2023.

4.     Standstill Letter dated September 1, 2023 between the Trustee, Michael Shah, Delshah Capital Limited, Griffon GHC LLC and Griffon Gansevoort Holdings LLC.

N-1

<u>EXHIBIT O</u>

<u>FORM OF JOINDER</u>

To further induce Purchaser to enter into this Agreement, the Seller Parties (collectively, "**Joint and Several Obligors**"), hereby join in this Agreement in order to evidence their joint and several obligation in favor of Purchaser with respect to all obligations of Seller and the various Seller Parties in connection with the transactions contemplated by this Agreement including the payment and performance of all of Seller's Joint and Several Obligations pursuant to the terms of this Agreement.  The Joint and Several Obligors acknowledge that they hold indirect interests with respect to the Seller Parties and the Property and are either direct or indirect owners in Seller and will receive substantial economic and other benefits from the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated herein.  The obligations of the Joint and Several Obligors constitute joint and several obligations with respect to payment and performance and not of collection.  Each Joint and Several Obligor hereby irrevocably and unconditionally covenants and agrees that each Joint and Several Obligor is jointly and severally liable for Seller's Joint and Several Obligations as a primary obligor.  The Joint and Several Obligors hereby waive, to the extent waivable by applicable law, any and all (i) defenses, offsets, counterclaims, demands, protests, presentments and notices of every kind and nature (except for mandatory counterclaims and any defense of actual performance), and (ii) legal requirements that Purchaser institute any action or proceeding at law or in equity against Seller.  The Joint and Several Obligors acknowledge and agree that any amendments made to this Agreement without the Joint and Several Obligors' consent shall not affect the validity or enforceability of this Joinder, provided that Seller joins in the execution of any such amendment.

Dated as of _____, 2023.

[END OF PAGE; SIGNATURE PAGE FOLLOWS]

O-1

THE JOINT AND SEVERAL OBLIGORS:

GRIFFON GHC LLC

By:  Griffon Gans Manager LLC, its manager

By:     _____

      Name:

      Title:

DELSHAH CAPITAL LIMITED

By:     _____

      Name:  Michael Shah

      Title:   Chairman and CEO

_____

Michael Shah

DELSHAH BVI HOLDINGS, LLC

By:     _____

      Name:  Michael Shah

      Title:   Manager

GRIFFON GANS MANAGER LLC

By:     _____

      Name:  Michael Shah

      Title:   Manager

<u>EXHIBIT P</u>

<u>FORM OF SELLER PARTY BRING-DOWN CERTIFICATE</u>

Reference is made to that certain Agreement of Purchase and Sale, dated as of November 3, 2023, by and between Griffon Gansevoort Holdings LLC, a Delaware limited liability company ("**Seller**") and Restoration Hardware, Inc., a Delaware corporation ("**Purchaser**"), pursuant to which Seller agreed to sell, and Purchaser agreed to purchase, the property known as 55 Gansevoort Street as more particularly described in the Agreement. Capitalized terms used herein which are not defined herein shall have the meanings given to such terms in the Agreement.

The Seller Parties made certain representations and warranties to Purchaser set forth in Section 12(a) of the Agreement, as being true and correct in all material respects as of the date of the Agreement. Pursuant to Section 14(a)(xii), each Seller Party hereby remakes and certifies to Purchaser all of the representations and warranties set forth in Section 12(a) of the Agreement and confirms the same are true and correct in all material respects with respect to the Seller Parties, as of the date of Closing.  Any limitations on survival of the representations expressly set forth in the Agreement are incorporated herein by this reference.

Dated as of _____, 2023.

[END OF PAGE; SIGNATURE PAGE FOLLOWS]

P-1

SELLER PARTIES:

GRIFFON GANSEVOORT HOLDINGS LLC, a Delaware limited liability company

By:    Griffon Gans Manager LLC, a Delaware limited liability company, its Manager

By:    _____

Name:  Michael Shah
Title:   Manager

GRIFFON GHC LLC

By:  Griffon Gans Manager LLC, its manager

By:    _____

Name:

Title:

DELSHAH CAPITAL LIMITED

By:    _____

Name:  Michael Shah

Title:   Chairman and CEO

_____

Michael Shah

DELSHAH BVI HOLDINGS, LLC

By:    _____

Name:  Michael Shah

Title:   Manager

P-2

GRIFFON GANS MANAGER LLC

By:  _____
        Name:  Michael Shah
        Title:   Manager

P-3

<u>EXHIBIT Q</u>

**Confirmation Order Provisions**

Definitions not otherwise defined below:

    A.    <u>Hearing</u>: The hearing to approve the Sale Transaction.

    B.    <u>Purchase Agreement</u>: That certain Agreement of Purchase and Sale, dated as of November 3, 2023, between Griffon Gansevoort Holdings LLC, as Seller (the "<u>Seller</u>" or "<u>Debtor</u>"), and [Restoration Hardware, Inc.], as Purchaser (the "<u>Purchaser</u>").

    C.    <u>Sale Transaction</u>: The proposed sale (the "<u>Sale</u>") of the Property (as defined in the Purchase Agreement) in accordance with the terms and conditions of this Order, the Purchase Agreement, and the Transaction Documents (as defined herein).

<u>Findings of Fact</u>

    A.    Upon entry of this Order, the Debtor has or will be deemed to have full corporate power and authority to execute and deliver the Purchase Agreement, and all other documents contemplated thereby (collectively, the "<u>Transaction Documents</u>"), to consummate the transactions contemplated thereby, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of transferring the Property.  The Israeli Bond Trustee has consented to the Sale Transaction, entry into the Transaction Documents, and entry of this Order. No consents or approvals other than those expressly provided for in the Purchase Agreement are required for the Debtor to consummate the Sale Transaction.

    B.    As evidenced by the certificates of service previously filed with the Court [D.I. [•]], proper, timely, adequate, and sufficient notice of the Hearing, the Sale Transaction, and the transactions contemplated thereby, and a fair and reasonable opportunity to object and to be heard, has been given to all interested persons and entities in accordance with the Bankruptcy Code, the

ny-2632276

Bankruptcy Rules, the Local Rules, and the *Guidelines for the Conduct of Asset Sales*, adopted by General Order M-331, dated September 5, 2006, as amended by General Order M-383, dated November 18, 2009, and as updated June 17, 2013 (the "Sale Guidelines") (collectively, the "Sale Notice Parties"), and no further notice is required.[2]

C.     The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale Transaction and the other transactions contemplated by the Transaction Documents.  The Transaction Documents, and the consummation of the transactions contemplated thereby, including the Sale Transaction, constitutes the highest or otherwise best offer for the Property and a reasonable exercise of the Debtor's sound business judgment and such acts are in the best interests of the Debtor, its estate, its creditors, and all other parties in interest.

D.     The Transaction Documents were negotiated, proposed, and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  None of the Debtor, the Purchaser, any other party in interest, or any of their respective representatives, has engaged in any conduct that would cause or permit the Transaction Documents, or the consummation of the Sale Transaction, to be avoidable or avoided, or for costs or damages to be imposed, or has acted in bad faith or in any improper or collusive manner with any person or entity in connection therewith.  The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded to such purchasers under the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law.  The Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code,

---

[2]     [**NTD**: All holders of liens and claims against the Debtor should be served.]

and no common identity of incorporators, directors, or controlling stockholders exists between the Debtor and the Purchaser.

E.    The Debtor may sell the Property free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code) or other encumbrances, rights, obligations, liabilities, and any other interest of any kind or nature whatsoever against the Debtor or the Property, including claims based upon successor liability, transferee or vicarious liability, de facto merger, or theories of similar effect (other than the Permitted Exceptions (as defined in the Purchase Agreement)) (collectively, the "Interests").  The Purchaser will not consummate the transactions contemplated by the Purchase Agreement and the other Transaction Documents, including the Sale Transaction, unless this Court expressly orders that none of the Purchaser or the Property will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Interest.

F.    The transfer of the Property to the Purchaser as set forth in the Purchase Agreement will be a legal, valid, and effective transfer of the Property, and will vest the Purchaser with all right, title, and interest to the Property free and clear of all Interests.

## **Conclusions of Law**

1.    The sale of the Property, the terms and conditions of the Purchase Agreement and Transaction Documents, and the Sale Transaction contemplated thereby and all of the terms and conditions thereof, are hereby authorized and approved in all respects.  Upon the Closing, this Order will be construed as, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Property.

2.    Pursuant to sections 363, 365, 1129, 1141 of the Bankruptcy Code, the Property shall be transferred to the Purchaser on the date of the Closing free and clear of all Interests

[provided, that such Interests, shall attach solely to the proceeds of the Sale Transaction in the order of their priority, and with the same validity, extent, nature, perfection, force and effect that they have against such Property immediately prior to consummation of the Sale Transaction].[3] All persons and entities are hereby forever prohibited, enjoined, and barred from taking any action that would adversely affect or interfere, or that would be inconsistent with the ability of (a) the Debtor to sell and transfer the Property to the Purchaser free and clear of all Interests in accordance with the terms of the Transaction Documents and this Order or (b) the Purchaser to acquire, take possession of, use and operate the Property in accordance with the terms of the Transaction Documents and this Order.

3.     Except as expressly permitted by the Purchase Agreement, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding Interests against or in a Debtor or the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Property, or the operation of the Property before the Closing, or the transactions contemplated by the Purchase Agreement and the other Transaction Documents, including the Sale Transaction, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such persons' or entities' Interests, whether by payment, setoff, or otherwise, directly or indirectly, against the Purchaser and its affiliates, or any successors or assigns, its respective property and the Property.  Following the Closing of the Sale Transaction, no party shall interfere with the

---

[3]     [**NTD**: If sale is pursuant to section 363 of the Bankruptcy Code, this concept is required by the Court's Sale Guidelines.]

ny-2632276

Purchaser's title to, or use and enjoyment of, the Property based on or related to any such Interest or based on any action the Debtor has taken or may take in the Chapter 11 Case.

4.      The provisions of this Order shall be self-executing.  Following the date of the Closing, the Purchaser may, but shall not be required to, file a certified copy of this Order in any filing or recording office in any federal, state, county, or other jurisdiction in which the Debtor is incorporated or has or had real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and, to the extent permitted by applicable law, such filing or recording may be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Order as of the Closing.  This Order constitutes authorization under all applicable jurisdictions and versions of the Uniform Commercial Code (the "UCC") for the Purchaser to file UCC termination statements with respect to all security interests in or liens on the Property, if any, subject to and in accordance with the terms of this paragraph.

5.      At the Closing of the Sale Transaction, (a) each of the Debtor's creditors is authorized to execute such documents and take all other actions as may be reasonably necessary to release its Interests in or against the Property, if any, as such Interests may have been recorded or otherwise exist and (b) the Debtor and the Purchaser are authorized to take such actions as may be necessary to obtain a release of any and all Interests in, on or against the Property, if any, and to the extent contemplated hereby and by the Transaction Documents.  Each and every federal, state, and county governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

6.      To the greatest extent available under applicable law and in accordance with the Purchase Agreement and the other Transaction Documents, the Purchaser shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization

Q-5

or approval of the Debtor with respect to the Property, and, to the greatest extent available under applicable law and in accordance with the Purchase Agreement and the other Transaction Documents, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing.

7.      Upon consummation of the Sale Transaction, the Purchaser shall not, by virtue of the Sale Transaction and/or the Purchaser's continued ownership and operation of the Property following the date of the Closing, be deemed, now or in the future, to (a) be the successor to the Debtor, (b) have, *de facto* or otherwise, merged or consolidated with or into the Debtor, or (c) be a mere continuation, alter ego, or substantial continuation of the Debtor (or be vicariously liable for or with the Debtor), including, without limitation, within the meaning of any foreign, federal, state or county debt collection practices, insurance, revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations).

8.      The transactions contemplated by the Transaction Documents are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided by this Order to consummate the transactions contemplated by the Purchase Agreement and the other Transaction Documents, including the Sale Transaction shall not alter, affect, limit, or otherwise impair the validity of the sale of the Property to the Purchaser.  The Debtor and the Purchaser shall be acting in good faith if they proceed to consummate the Sale Transaction in accordance with the Purchase Agreement, the other Transaction Documents, and the terms set forth herein.

9.      The terms and provisions of the Transaction Documents and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor and its affiliates,

successors and assigns, its estate, and its creditors, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in, on or against the Property to be sold to the Purchaser and any trustees, examiners, "responsible persons," liquidating trusts, liquidating trustees; and the Transaction Documents shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Purchaser hereunder shall remain effective and shall remain binding as set forth above, notwithstanding any subsequent dismissal, conversion or appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to trustee(s) such terms and provisions likewise shall be binding.

10.     The failure specifically to include any particular provisions of the Purchase Agreement or the other Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, and the Purchase Agreement is authorized and approved in its entirety. The Transaction Documents or any other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, in accordance with the terms thereof, without further order of the Court. To the extent that any provision of the Purchase Agreement conflicts with or is, in any way, inconsistent with any provision of this Order, this Order shall govern and control.

11.     All payment or reimbursement obligations of the Debtor owed to the Purchaser pursuant to the Purchase Agreement or the other Transaction Documents shall be paid in the manner provided therein, without further notice to or order of this Court. All such obligations shall constitute allowed administrative claims against the Debtor, with first priority administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code. Until satisfied in full

Q-7

in cash, all such obligations shall continue to have the protections provided in this Order, and shall not be discharged, modified, or otherwise affected by any chapter 11 plan for the Debtor.

12.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6006(d) are hereby expressly waived and shall not apply.  Accordingly, the Debtor is authorized and empowered to close the Sale and Sale Transaction upon entry of this Order.

13.     Nothing in this Order shall modify or waive any closing conditions or termination rights in the Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with the terms therein.

14.     This Court shall retain jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b), to, among other things, (a) interpret, implement, and enforce the terms and provisions of this Order, the Purchase Agreement, the other Transaction Documents, any amendments thereto, and any waivers and consents given thereunder, (b) compel delivery of the Property to the Purchaser, and (c) enforce the injunctions and limitations of liability set forth in this Order.

EXHIBIT R

SELLER PARTIES' ORGANIZATIONAL CHART



R-1

## EXHIBIT S

## ISRAELI INDEBTEDNESS OF SELLER PARTIES

None.

<u>EXHIBIT T</u>

<u>LEASE TERMINATION AGREEMENT</u>

[ATTACHED]

R-3

## TERMINATION OF LEASE

This **TERMINATION OF LEASE** (this "**Termination**"), dated as of [●] 2023 (the "**Effective Date**"), is made and entered into by GRIFFON GANSEVOORT HOLDINGS LLC, a Delaware limited liability company ("**Landlord**") and Restoration Hardware, Inc., a Delaware corporation ("**Tenant**"; together with Landlord, each a "**Party**", and collectively, the "**Parties**").

## RECITALS

**WHEREAS**, Landlord and Tenant are parties to that certain Agreement of Lease dated as of July 8, 2015 (as amended or otherwise modified from time to time, the "**Lease**"; together with all other documents listed in Exhibit D of the Purchase Agreement (as defined herein), collectively, the "**Lease Documents**"), pursuant to which Landlord leased to Tenant and Tenant leased from Landlord the Premises (as defined in the Lease) in accordance with the terms contained therein. A Memorandum of Lease was recorded on July 29, 2015, as CRFN 2015000259338.

**WHEREAS**, Landlord and Tenant are also parties to that certain Agreement of Purchase and Sale dated as of November __, 2023 (the "**Purchase Agreement**"), pursuant to which Tenant or its assignee shall purchase from Landlord and Landlord shall sell the Premises in accordance with the terms contained therein.

**WHEREAS**, the Purchase Agreement provides that Tenant may elect to terminate the Lease as of the Closing (as defined in the Purchase Agreement), and if Tenant elects to do so, the parties to the Lease shall execute and deliver this Termination at Closing. Tenant hereby elects and hereby notifies Landlord of its intent to terminate the Lease as of the Closing.

**WHEREAS**, the execution and delivery of this Termination by the Parties is being undertaken as a material inducement with respect to the closing of the transaction contemplated by the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the representations, warranties, covenants and agreements herein contained, which are true and correct in all material respects and hereby incorporated into this Termination by reference, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to create a legal contract and to be legally bound hereby, the Parties agree that, effective as of the Effective Date, each of the Lease the other Lease Documents is hereby terminated and shall cease to have further force or effect. Landlord agrees to perform, execute, acknowledge, and deliver or cause to be performed, executed, acknowledged, and delivered all such further and other acts, instruments, and assurances as may reasonably be required by Tenant for the carrying out or performing of the provisions of this Termination.

[END OF DOCUMENT; SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the Parties has caused this Termination to be duly executed and delivered as of the date first above written.

**LANDLORD:**

GRIFFON GANSEVOORT HOLDINGS LLC

By:   Griffon Gans Manager LLC, its manager

By:    _____
Name: Michael Shah
Title:   Manager

**TENANT**:

RESTORATION HARDWARE, INC.

By:    _____
        Name:
        Title:

<u>EXHIBIT U</u>

<u>FORM OF ISRAELI BOND TRUSTEE WAIVER AND RELEASE</u>

[ATTACHED]

ny-2632276

# RELEASE AND WAIVER

This RELEASE AND WAIVER (this "**Release**"), dated as of [●] 2023, is executed and delivered by MISHMERET -TRUST SERVICES COMPANY LTD., an Israeli company (the "**Trustee**"), in its capacity as trustee with respect to that certain Deed of Trust, dated as of January 5, 2016, as amended by that certain Amendment No. 1 to the Deed of Trust, dated as of October 25, 2023 (as further amended or otherwise modified from time to time, the "**Deed of Trust**"; and together with all other documents and agreements executed in connection therewith, the "**Bond Documents**")) on behalf of the holders of Series B Debentures issued by Delsha (as defined herein) and listed on the Tel Aviv Stock Exchange.

## RECITALS

**WHEREAS**, the Trustee, DELSHAH CAPITAL LIMITED, a British Virgin Islands company ("**Delsha**"), GRIFFON GHC LLC, a Delaware limited liability company, and GRIFFON GANSEVOORT HOLDINGS LLC, a Delaware limited liability company ("**Seller**"), are parties to the Deed of Trust.

WHEREAS, Seller and Restoration Hardware, Inc., a Delaware corporation ("**RHI**"), are parties to that certain Agreement of Lease, dated July 8, 2015 (as amended or other modified from time to time, the "**Lease**").

WHEREAS, Seller and RHI are parties to that certain Agreement of Purchase and Sale, dated as of November [●], 2023 (the "**Purchase Agreement**"), pursuant to which RHI or its assignee shall purchase from Seller and Seller shall sell the Property (as defined in the Purchase Agreement) in accordance with the terms contained therein, and a portion of the proceeds of such transaction shall become available to the Trustee in order to repay in the full the outstanding Debentures under the Deed of Trust (the "**Bond Repayment Proceeds**").

WHEREAS, it is a condition to Purchaser's obligation to complete the purchase of the Property pursuant to the Purchase Agreement that the Trustee deliver this Release in favor of the Released Parties.

WHEREAS, the execution and delivery of this Release by the Trustee is being undertaken as a material inducement to RHI with respect to the closing of the transaction contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals and the representations, warranties, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Trustee agrees as follows:

## ARTICLE I

## RELEASE; WAIVER

1.1   <u>Release and Waiver</u>.   In consideration of the foregoing recitals and representations, and subject to the terms and conditions herein, the Trustee, in its capacity as

1

trustee with respect to the Deed of Trust and in such capacity acting on behalf of the Debenture holders, having obtained the approval of the bondholders by means of a Special Resolution (as defined in the Deed of Trust) in accordance with the Deed of Trust (the "**Required Bondholder Approval**"), hereby:

(a)        unconditionally, irrevocably and forever releases, acquits and discharges the Released Parties from, and covenants not to sue any Released Parties for, any and all Released Claims that the Trustee and/or the Debenture holders shall or may have at any time on or prior to the Closing Date;

(b)        represents and warrants that it has not assigned, or purported to transfer or assign, any interest in the Property, or with respect to any of the Released Claims;

(c)        the Trustee (i) has read and understands this Release and has been advised by its legal counsel prior to signing this Release, (ii) has signed this Release, freely and voluntarily, and (iii) does not rely, and has not relied, on any representation or statement not set forth in this Release made by RHI, its Affiliates or any other Person with regard to the subject matter, basis or effect of this Release or otherwise other than (a) the Purchase Agreement and (b) the Required Bondholder Approval, duly obtained prior to the execution and delivery of this Release;

(d)        acknowledges and agrees that this Release may be pleaded and relied upon by any Released Party as a full and complete defense to, and may be used as a basis for an injunction against, any action, suit or other proceeding that may be instituted, prosecuted or attempted by any party contrary to this Release; and

(e)        acknowledges that the Trustee has entered into this Release for the benefit and protection of the Released Parties, with the understanding that the Released Parties intend to rely upon the provisions hereof in agreeing to consummate the transactions contemplated by the Purchase Agreement and are the intended beneficiaries of this Release.

1.2        <u>Effectiveness</u>.  Notwithstanding anything to the contrary contained herein, (i) this Release shall not become effective unless and until the Closing occurs pursuant to the Purchase Agreement and the Trustee has received the Payment to the Trustee (as defined in that certain letter of acknowledgement and agreement from the Trustee to Delshah Capital Limited and RHI dated the same date as the PSA, a copy of which is annexed hereto as Exhibit A) ("**Payment to the Trustee**") in US Dollars in accordance with the terms therein and to the account specified therein, and (ii) no party hereto shall have any right to revoke or nullify, or withdraw from, this Release.

## ARTICLE II

## MISCELLANEOUS

2.1        <u>Miscellaneous</u>. The recitals set forth above are true and correct in all material respects and are hereby incorporated into this Release by reference.

2.2        <u>Governing Law</u>. This Release shall be governed by and construed according to

the laws of the State of Israel, without regard to the conflict of laws provisions thereof. Any dispute arising under or in relation to this Release shall be resolved in a competent court in Tel Aviv, Israel, and each signatory hereto hereby submits irrevocably to the exclusive jurisdiction of such court.

      2.3   <u>Definitions</u>. The term "**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The term "**Person**" shall mean any natural person, partnership, trust, estate, association, limited liability company, corporation, custodian, nominee, governmental instrumentality or agency, body politic or any other entity in its own or any representative capacity. The term "**Releasing Party**" means the Trustee (in its capacity as trustee with respect to the Deed of Trust and in such capacity acting on behalf of the Debenture holders) and the Debenture holders. The term "**Released Claims**" means:   any and all claims, demands, allegations, assertions, complaints, controversies, charges, duties, breaches of duties, grievances, rights, causes of action, actions, suits, liabilities, debts, obligations, promises, commitments, agreements, guarantees, endorsements, duties, damages, costs, losses, debts and expenses (including out-of-pocket attorneys' fees and costs incurred) of any nature whatsoever (whether direct or indirect, known or unknown, current or future, disclosed or undisclosed, matured or unmatured, accrued or unaccrued, asserted or unasserted, absolute or contingent, determined or conditional, express or implied, fixed or variable and whether vicarious, derivative, joint, several or secondary) (collectively, "**Claims**") arising whether at law or equity, or under any agreement or contract, with respect to or in connection with: (1) the Bond Documents, including without limitation, the failure by the parties to comply with the terms of the Deed of Trust and the other Bond Documents; (2) any amount, principal, interest or otherwise, owed to the Debenture holders, (3) the Property, and/or (4) any facts or circumstances occurring at any time prior to the Closing Date (as defined in the Purchase Agreement) and insofar as such Claims relate to any duty or obligation of any of the Released Parties to the Releasing Parties (directly or indirectly) in connection with the Bond Documents   or the Property, which the Trustee, for itself and on behalf of the Debenture holders, and/or any of the Releasing Parties (x) shall or may have at any time prior to the Closing Date, or (y) shall or may hereafter have with respect to periods prior to the Closing Date; provided that the Released Claims shall not include the right of the Trustee and the Debenture holders to receive the Bond Repayment Proceeds and/or the payment to the Trustee in connection therewith. The term "**Released Parties**" shall mean (i) RHI, (ii) any of RHI's current or former Affiliates, subsidiaries (whether direct or indirect), minority interests or subdivisions (the "**RHI Affiliated Parties**"), and (ii) any officers, directors, employees, managers, partners, principals, advisors, agents, stockholders, members, investors, equity holders or other representatives (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), successors, predecessors or assigns in each case with respect to this clause (iii) solely in their capacity acting for RHI or any such RHI Affiliated Party.

*    *    *    *    *

3

IN WITNESS WHEREOF, the Trustee has caused this Release to be duly executed and delivered to the Released Parties as of the date first above written.

**TRUSTEE:**

MISHMERET -TRUST SERVICES COMPANY LTD.

By:_____
     Name: Rami Katzav
     Title: Vice President

EXHIBIT A – TRUSTEE'S LETTER

[ATTACHED]

## EXHIBIT V

## FORM OF DEED-IN-LIEU ESCROW AGREEMENT

[ATTACHED]

**CHAPMAN**
**Focused on Finance**

|  |  |
|---|---|
| **Michael Friedman** | **Chapman and Cutler LLP** |
| Partner | 1270 Avenue of the Americas |
|  | New York, New York 10020 |
|  |  |
|  | D 212.655.2508 |
|  | F 646.690.6412 |
|  | friedman@chapman.com |

November [__], 2023

**VIA E-MAIL**

Madison Title Agency, LLC ("***Escrow Agent***")
1125 Ocean Avenue
Lakewood, NJ 08701
Attention:  Joseph Skaist
Email:  JSkaist@madisontitle.com

> Re:   Escrow Transaction No. MTANY-192564 with respect to that certain Deed of Trust, dated as of January 5, 2016, by and among DELSHAH CAPITAL LIMITED, a British Virgin Islands company ("***Company***"), MISHMERET -TRUST SERVICES COMPANY LTD. ("***Trustee***"), an Israeli company, pursuant to which Company issued certain Debentures (Series B) (the "***Series B Bonds***" together with all other obligations owed under the Deed of Trust, the "***Bond Obligations***") to Trustee

Ladies and Gentlemen:

Reference is made to that certain Agreement of Purchase and Sale, dated as of November [__], 2023 (the "***PSA***"), between Griffon Gansevoort Holdings LLC, a Delaware limited liability company ("***Gansevoort Owner***") and Restoration Hardware Inc. (the "***Purchaser***").  Gansevoort Owner is a subsidiary of the Company and owns the real property located at 55-61 Gansevoort Street, New York, New York (the "***Mortgaged Property***", together with all other collateral mortgaged, pledged and/or assigned to Trustee by Gansevoort Owner, the "***Collateral***"), which Mortgaged Property is currently under contract to be sold from Gansevoort Owner to Purchaser pursuant to the PSA.  This letter agreement (the "***Escrow Agreement***") shall constitute escrow instructions from Trustee, Purchaser, Gansevoort Owner and Company to Escrow Agent with respect to the satisfaction of certain requirements set forth in the PSA and that certain Amendment No. 1 to the Deed of Trust on November [__], 2023 between the Company and Trustee (the "***Amendment***" and together with the Original Deed of Trust, the "***Deed of Trust***", and together with all other documents and agreements executed in connection therewith, the "***Bond Documents***").

ny-2638639

November [__], 2023
Page 2

The fully executed, original documents listed on <u>Exhibit A</u> hereto (the "***Operating Agreement Addendums***") have been delivered by Company to Escrow Agent.

The original documents executed by the Gansevoort Owner listed on <u>Exhibit B</u> hereto (the "***Deed Documents***") have been delivered by the Gansevoort Owner to Escrow Agent.

By signing this Escrow Agreement below, Escrow Agent hereby confirms and agrees as follows:

1.      The Company has delivered and the Escrow Agent has received the original, fully executed and acknowledged Operating Agreement Addendums and the Deed Documents.

2.      Upon Escrow Agent's receipt of authorization in writing (which may be given via e-mail) (a "***Default Notice***") from Michael Friedman or another attorney at Chapman and Cutler LLP that an Event of Default (as defined in the Bond Documents) has occurred, Escrow Agent shall promptly deliver a copy of such Default Notice to Purchaser and the Company by certified mail (with a copy delivered by e-mail on the day sent), and each of the Purchaser and the Company shall have ten (10) business days after receipt by each such party of such Default Notice to deliver written notice to Escrow Agent and Trustee objecting to the release of the Operating Agreement Addendums and/or the Deed Documents, as the case may be (an "***Objection Notice***"). The Objection Notice must include a brief explanation of the reasons underlying such Objection Notice in the form of a duly signed affidavit by an officer or director of the Purchaser or the Company (other than the Controlling Shareholder), as applicable, attesting to such officer or directors knowledge and belief concerning such facts set forth therein; <u>provided</u> that the scope, detail and/or content of such reasons, facts and/or information shall not in any way affect the validity of such Objection Notice.  If Escrow Agent does not receive a timely Objection Notice from (i) either the Purchaser or the Company or (ii) both of them (each such party, an "***Objecting Party***"), within such ten (10) business day period, Escrow Agent shall thereafter release to the Trustee upon written request of the Trustee the Operating Agreement Addendums and/or the Deed Documents, as the case may be. If Escrow Agent does receive a timely Objection Notice from the Purchaser, the Company or both of them within such ten (10) business day period, Escrow Agent shall release to the Trustee the Operating Agreement Addendums and/or the Deed Documents, as the case may be, only upon receipt of, and in accordance with, (i) written instructions signed by the Trustee and each Objecting Party, or (ii) the final order of a court of competent jurisdiction. in the State of New York directing such release to the Trustee.  Notwithstanding anything to the contrary in this Escrow Agreement, if (A) in connection with the PSA the closing has occurred and title to the Mortgaged Property has been transferred from Gansevoort Owner to Purchaser or its assignee, then (x) the Deed Documents and any Operating Agreement Addendums with respect to the operating agreement of Griffon GHC LLC (the "***Gansevoort Operating Addendums***") shall be void and no force or effect, (y) Escrow Agent shall mark each of the Deed Documents and Gansevoort Operating Addendums 'cancelled', and (z) Escrow Agent shall send the cancelled Deed Documents and Gansevoort Operating Addendums to Purchaser in accordance with the written instructions of Purchaser (without any further action required by the Company, Griffon GHC LLC, Gansevoort Owner, Trustee, or any other party hereto) and (B) if all of the Company's

November [____], 2023
Page 3

obligations under the Bond Documents have been fully paid and satisfied in accordance with the Bond Documents, then in addition to the actions required under subsection (A) herein, (w) the other Operating Agreement Addendums shall be void and no force or effect, (x) Escrow Agent shall mark each of the other Operating Agreement Addendums 'cancelled', (y) Escrow Agent shall send such cancelled Operating Agreement Addendums to the Company in accordance with the written instructions of the Company (without any further action required by the Company, Trustee, or any other party hereto) and (z) this Escrow Agreement shall automatically terminate and be of no further force and effect.

3.    In the event: (a) Escrow Agent receives an Objection Notice from the Purchaser, the Company or both as provided herein; (b) there is any dispute between either (i) the Purchaser and the Trustee or (ii) the Company and the Trustee regarding any release or distribution of the Operating Agreement Addendums and/or the Deed Documents; or (c) Escrow Agent is uncertain as to Escrow Agent's obligations hereunder, Escrow Agent shall have the right, but not the obligation to: (i) refrain from taking any action and retain the Operating Agreement Addendums and/or the Deed Documents until otherwise directed by a final, non-appealable order or judgment of a court of competent jurisdiction in the State of New York or by a written agreement signed by the Purchaser, the Company and the Trustee; or (ii) solely after delivering written notice at least ten (10) business days in advance to the Purchaser, the Company and the Trustee, take such affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, depositing the Operating Agreement Addendums and/or the Deed Documents with a court of competent jurisdiction in the State of New York, the costs of which shall be borne equally by the Company and Trustee.

4.    Each of Gansevoort Owner and the Company waives, releases, and covenants not to assert any claim for damages of any kind against Escrow Agent.  In the event of any dispute with respect to this Escrow Agreement, any claims of Purchaser, Gansevoort Owner and/or the Company shall be resolved solely between Purchaser, Gansevoort Owner, the Company and Trustee, but Escrow Agent may be named in pleadings to the extent required to obtain a TRO, injunction, order of specific performance or other equitable relief.

5.    Escrow Agent shall have no duties or responsibilities except as expressly set forth herein.  Escrow Agent shall have no duty to enforce any obligation of any person to make any delivery or perform any other act.  Escrow Agent shall be under no liability to the parties or to anyone else by reason of any failure on the part of any party hereto or any maker, guarantor, endorser, or other signatory of any document or any other person to perform such person's obligations under any such document.

6.    In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document, or item deposited with it and shall have no responsibility except to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party.  Escrow Agent is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Agent to have been signed by the

November [___], 2023
Page 4

proper person. Escrow Agent may (unless actually aware of contrary facts) assume that any person purporting to give any notice hereunder has been duly authorized to do so. Subject to Paragraph 2 above, if for any reason any dispute or uncertainty arises about any action to be taken hereunder, Escrow Agent shall have the right (i) to take no action until (A) it shall have received instructions in writing concurred to by Purchaser, Gansevoort Owner and Trustee or (B) it shall be directed by a judgment or decree of a court of competent jurisdiction in the State and County of New York or in a Federal court in the State and County of New York, whereupon Escrow Agent shall take such action in accordance with such instructions or such directions or (ii) solely after delivering written notice at least ten (10) business days in advance to the Purchaser, the Company and the Trustee, to take such affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, depositing the Operating Agreement Addendums and/or the Deed Documents with a court of competent jurisdiction in the State of New York, the costs of which shall be borne equally by the Company and Trustee.

       7.     Escrow Agent's duties are purely ministerial. Escrow Agent shall not be liable to the other parties hereto or to anyone else for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith and in the exercise of reasonable judgment, except for acts of willful misconduct or gross negligence or for a breach by Escrow Agent of its obligations under this Escrow Agreement.

       8.     Escrow Agent shall have the right (unless actually aware of contrary facts) to assume absent written notice to the contrary from the proper person or persons that a fact or an event by reason of which an action would or might be taken by Escrow Agent does not exist or has not occurred, without incurring liability to the other parties hereto or to anyone else for any action taken or omitted, or any action suffered by it to be taken or omitted, in good faith and in the exercise of reasonable judgment, in reliance upon such assumption.

       9.     Except regarding Escrow Agent's willful misconduct, gross negligence, or breach of its obligations under this Escrow Agreement, Escrow Agent shall be indemnified and held harmless jointly and severally by Gansevoort Owner and the Company from and against any and all expenses or loss suffered by Escrow Agent, including reasonable attorneys' fees (or the fair value of legal services rendered by Escrow Agent on behalf of itself), in connection with any action, suit or other proceeding involving any claim, which arises out of or relates to this Escrow Agreement (including any claim made by either party against Escrow Agent), the services of Escrow Agent hereunder or the documents and instruments held by it hereunder. As between Gansevoort Owner and/or the Company and Trustee, the prevailing party in any such action, suit or proceeding shall cover all such expenses and losses suffered by Escrow Agent. Promptly after the receipt by Escrow Agent of notice of any demand or claim or the commencement of any action, suit or proceeding, Escrow Agent shall, if a claim in respect thereof is to be made against any of the other parties hereto, notify such other parties hereto in writing; but the failure by Escrow Agent to give such notice shall not relieve any party from any liability which such party may have to Escrow Agent hereunder.

November [___], 2023
Page 5

10.      Escrow Agent may resign as Escrow Agent (i) by giving five (5) days' prior written notice to each party or (ii) solely after delivering written notice at least ten (10) business days in advance to the Purchaser, the Company and the Trustee, by taking such affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, depositing the Operating Agreement Addendums and/or the Deed Documents with a court of competent jurisdiction in the State of New York, the costs of which shall be borne equally by the Company and Trustee. In either such event, the successor Escrow Agent shall be a reputable law firm or a nationally recognized title insurance company, selected by Trustee and reasonably acceptable to Purchaser and Gansevoort Owner. The resigning Escrow Agent shall deliver, against receipt, to such successor Escrow Agent, the Operating Agreement Addendums and the Deed Documents held by such party, to be held by such successor Escrow Agent pursuant to the terms and provisions of this Escrow Agreement. If no such successor has been designated on or before the effective date of such party's resignation, its obligations as Escrow Agent shall continue until such successor is appointed; provided, however, its sole obligation thereafter shall be to safely keep all documents and instruments then held by it and to deliver the same to the person, firm or corporation designated as its successor or until directed by a final order or judgment of a court of competent jurisdiction in the State and County of New York or a Federal Court in the State and County of New York, whereupon Escrow Agent shall make disposition thereof in accordance with such order or judgment. If no successor Escrow Agent is designated and qualified within five (5) days after Escrow Agent's resignation is effective, such party that will no longer be serving as Escrow Agent may apply to any court of competent jurisdiction in the State of New York for the appointment of a successor Escrow Agent.

11.      Escrow Agent agrees that Trustee and its counsel have no obligation to pay any costs, expenses or fees to Escrow Agent with respect to the closing of the Amendment, the disposition of the Operating Agreement Addendums and/or the Deed Documents, or the performance of its other obligations hereunder, including, without limitation, legal fees and escrow fees.

12.      This Escrow Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New York without regard to its internal conflicts of law principles (other than Section 5-1401 of the General Obligations Law).

13.      This Escrow Agreement may be executed in counterparts, all of which when taken together shall constitute one and the same instrument.  A telecopied or e-mailed, signed counterpart of this Escrow Agreement shall constitute an original.

14.      Except as otherwise may be expressly provided in this Escrow Agreement, all notices under this Escrow Agreement shall be sent by certified mail (with a copy by e-mail) to the following individuals at their respective email addresses:

November [___], 2023
Page 6

|  |  |
|---|---|
| Escrow Agent: | Madison Title Agency, LLC<br>1125 Ocean Avenue<br>Lakewood, NJ 08701<br>Attn: Joseph Skaist<br>JSkaist@madisontitle.com |

Trustee:

Mishmeret Trust Company, Ltd.
46-48 Menachem Begin Road, Tel Aviv
ISRAEL
Attn: Rami Katzav
ramis@mtrust.co.il

Chapman and Cutler LLP
1270 Avenue of the Americas
New York, NY 10020
Attn: Michael Friedman
friedman@chapman.com

Company or Gansevoort Owner:

Delshah Capital Limited
114 East 13th Street, Front 1
New York, NY 10003
Attn:  Michael Shah and Patrick McCann
Michael@delshah.com and pmccann@delshah.com

Tarter Krinsky & Drogin LLP
1350 Broadway
New York, NY 10018
Attn:  William Weisner, esq.
wweisner@tarterkrinsky.com

Purchaser:

Restoration Hardware, Inc.
15 Koch Road, Suite J
Corte Madera, CA 95925
Email: EdwardLee@rh.com;
jpreston@restorationhardware.com

Morrison & Foerster LLP
425 Market Street

ny-2638639

November [___], 2023
Page 7


San Francisco, CA 94105-2482
Attn: Gavin Grover
Email: ggrover@mofo.com


If you have any questions with respect to the enclosed, please do not hesitate to contact me at 212.655.2508.


[*No further text on this page*]

Sincerely,

_____

Michael Friedman
Chapman and Cutler LLP


[*Signatures continue on the following page*]

Acknowledged and Agreed:

**ESCROW AGENT:**

**MADISON TITLE AGENCY, LLC**, a New York limited liability company


By: _____
        Name:  Joseph Skaist
        Title:  Officer

Date:  November [___], 2023

**COMPANY:**

**DELSHAH CAPITAL LIMITED**, a British Virgin Islands company

By: _____
      Name:
      Title:

**GANSEVOORT OWNER:**

**GRIFFON GANSEVOORT HOLDINGS LLC**,
a Delaware limited liability company

By:    Griffon Gans Manager LLC,
       a Delaware limited liability company, its Manager

    By: _____
         Name:  Michael Shah
         Title:  Manager

Date:  November [__], 2023

**PURCHASER:**

**RESTORATION HARDWARE, INC.**

By: _____
Name:
Title:


Date:  November [___], 2023

**TRUSTEE:**

**MISHMERET – TRUST SERVICES COMPANY LTD.**

By: _____
Name:  Rami Katzav
Title:  Vice President

Date:  November [___], 2023

## Exhibit A

### Amended and Restated Operating Agreements or Addendums

1.      Steuben Delshah LLC Amended and Restated Operating Agreements or Addendums;

2.      Delshah 461 Seventh Mezz LLC Amended and Restated Operating Agreements or Addendums;

3.      DS Manhattan Valley Noteholder LLC Amended and Restated Operating Agreements or Addendums; and

4.      Griffon GHC LLC Amended and Restated Operating Agreements or Addendums.

**Exhibit B**

**Deed Documents**

1. Warranty Deed with Covenant against grantor's acts executed by Gansevoort Owner.

2. Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from the Payment of Estimated Personal Income Tax for the Conveyance of Real Property Located in New York City (TP-584-NYC)

3. Real Property Transfer Report (RP 5217NYC)

4. Bill of Sale executed by Gansevoort Owner

5. Assignment of Contracts executed by Gansevoort Owner

6. Assignment and Assumption of Landlord's Interest in Leases executed by Gansevoort Owner

7. Notice to Tenant

8. Certificate of Non-Foreign Status executed by Gansevoort Owner

9. Member Consent

## EXHIBIT W

## ISRAEL BOND DEFAULTS

Several provisions of that certain Amendment of Deed of Trust dated October 10, 2023 have not yet been satisfied as required therein.  At this time, the Trustee has refrained from enforcing its rights with respect to such requirements, due to the expected repayment of the Series B Debentures upon the closing of this transaction.  The Company and the Trustee anticipate that the Series B Debentures will be paid in full from the net proceeds of the sale of the Property and of another property sold by a subsidiary of the Company.

R-6

*Execution Version*

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT ("Agreement") made as of this 3rd day of November, 2023, by and among **GRIFFON GANSEVOORT HOLDINGS LLC**, a Delaware limited liability company, having an address at c/o Delshah Capital Limited, 114 East 13th Street, Front 1, New York, New York 10003 ("Seller"), **RESTORATION HARDWARE, INC.**, a Delaware corporation, having an address at 15 Koch Road, Suite J, Corte Madera, CA 95925, ("Purchaser"), and **FIRST AMERICAN TITLE INSURANCE COMPANY**, having an address at 666 Third Avenue, New York, New York 10017 ("Escrow Agent").

## WITNESSETH

**WHEREAS**, Seller and Purchaser have entered into an Agreement of Purchase and Sale dated as of November 3, 2023 ("Contract") pursuant to which Seller has agreed to sell and Purchaser has agreed to purchase premises located at 55-61 Gansevoort Street, New York, New York (New York County Tax Map Designation of Block 644, Lot 60) ("Premises");

**WHEREAS**, Purchaser is obligated under the Contract to make a deposit in the amount of Two Million Eight Hundred Eighty-Five Thousand Five Hundred Fifty and no/100 Dollars ($2,885,550.00) (the "Deposit"); and

**WHEREAS**, in furtherance of the Contract, the Seller and Purchaser desire that the Escrow Agent hold the Deposit in escrow, and Escrow Agent is willing to do so, on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is duly acknowledged, the parties hereto agree as follows:

1. The Deposit shall be delivered to the Escrow Agent by wire transfer pursuant to Escrow Agent's wire instructions annexed to this Agreement.

2. The Deposit shall be deposited by Escrow Agent in an account with First American Trust (the "Bank"), and such Deposit shall be invested in any Permitted Investments (as defined herein) selected by Purchaser. "Permitted Investments" shall mean: (i) securities issued or fully guaranteed by United States government agencies with a maturity of one year or less, (ii) commercial paper rated AAA or better by Moody's Investors Services, Inc., (iii) money market funds h invested in instruments issued or fully guaranteed by United States government agencies with a maturity of one year or less, and/or (iv) other investments similar to those set forth in clauses (i)-(iii) as Purchaser may determine. A Form W-9 is annexed to this Escrow Agreement and must be completed and executed by either Seller or Purchaser, as the case may be, concurrently with the execution of this Agreement. The failure to submit to Escrow Agent an executed, completed Form W-9 shall stay Escrow Agent's obligation to deposit the escrow in either a segregated account or an interest bearing account until such time that said form has been provided to Escrow Agent. The party providing the Form W-9 shall receive a 1099 for the interest on the Deposit regardless of which party actually receives the interest on the Deposit. If

all parties agree, the deposit may be placed in an investment other than a bank savings or money market account, in which case Purchaser will pay any fees in connection with such investment.

Seller and Purchaser agree that the Escrow Agent shall not be responsible for any penalties, loss of principal or interest, or the consequences of a delay in withdrawal of the Deposit and interest accrued thereon, (the "Escrow"), if any, which may be imposed as a result of the making or the redeeming of the above investment, as the case may be, pursuant to this Agreement. Seller and Purchaser also agree that Escrow Agent shall not be liable for any loss or impairment of the Escrow which results from the failure, insolvency or suspension of the financial institution in which the Deposit is deposited.

3.    (a) Escrow Agent shall deliver the Escrow to Seller or Purchaser, as the case may be, as follows:

> (i) to Seller (and Purchaser shall receive credit toward the aggregate Purchase Price (as defined in the Contract)), upon completion of the closing under the Contract; or

> (ii) subject to subjection 3(b) below, to Purchaser, after receipt of Purchaser's demand in which Purchaser certifies that Purchaser is entitled to receive the Escrow in accordance with Section 3(a) of the Contract; or

> (iii) subject to subjection 3(b) below, to Seller, after receipt of Seller's demand in which Seller certifies that Seller is entitled to receive the Escrow in accordance with Section 3(a) of the Contract; or

> (iv) to Seller or Purchaser as designated by an instruction letter jointly executed by both Seller and Purchaser.

Escrow Agent shall deliver the Escrow at the election of the party entitled to receive the same by a bank wire transfer to an account designated by such party.

   (b)    Upon receipt of a demand for the Deposit made by Seller or Purchaser pursuant to either subsection 3(a)(ii) or 3(a)(iii) above, you shall promptly mail a copy thereof to the other party. The other party (the "Objecting Party") shall have the right to object to the delivery of the Deposit to the demanding party, by sending to you notice of objection for receipt within fifteen (15) days after the date you mail such copy to the Objecting Party, but not thereafter. Upon receipt of a notice of objection, you shall promptly mail a copy thereof to the demanding party.

   (c)    If (i) Escrow Agent shall have received a notice of objection as provided for above within the time therein prescribed, or (ii) any other disagreement or dispute shall arise resulting in adverse claims and demands being made for the Deposit, whether or not litigation has been instituted, or  (iii) Escrow Agent is uncertain for any reason whatsoever as to its duties or rights hereunder, then notwithstanding anything to the contrary herein, Escrow Agent shall continue to hold the Escrow, unless otherwise instructed in writing by a court of competent jurisdiction to deposit the Escrow with a governmental authority with jurisdiction.  In the event the Escrow is

deposited in a court by Escrow Agent pursuant to this Section 3, Escrow Agent shall be entitled to rely upon the final, non-appealable decision of such court.

 (d)  Upon delivery of the Escrow in accordance with the terms hereof, Escrow Agent shall be relieved of all liability hereunder.

4.  Seller and Purchaser acknowledge that Escrow Agent is serving solely as an accommodation to the parties hereto, and except for the negligence, fraud, breach of trust or willful misconduct of the Escrow Agent, Escrow Agent shall have no liability of any kind whatsoever arising out of or in connection with its activity as Escrow Agent.  Seller and Purchaser jointly and severally agree to and do hereby indemnify and hold harmless Escrow Agent from all suits, actions, loss, costs, claims, damages, liabilities, and expenses (including, without limitation, attorneys' fees and disbursements) which may be incurred by reason of its acting as Escrow Agent, and such indemnity shall survive the termination of this agreement.   In no event shall the Escrow Agent be liable for any lost profits or for any incidental, special, consequential or punitive damages whether or not the Escrow Agent knew of the possibility or likelihood of such damages. Escrow Agent's fee for serving as escrow agent is $500.00.

5.  All notices, demands, elections or other communications required or permitted by this Escrow Agreement shall be in writing and shall be delivered either by hand delivery, nationally recognized overnight courier service or electronic mail with delivery confirmation receipt and addressed to the party at the following addresses:

|  |  |
|---|---|
| Seller: | Griffon Gansevoort Holdings LLC |
|  | c/o Delshah Capital Limited |
|  | 114 East 13th Street, Front 1 |
|  | New York, New York 10003 |
|  | Attn: Michael Shah |
|  | Email: michael@delshah.com |
|  |  |
| with a copy to: | Tarter Krinsky & Drogin LLP |
|  | 1350 Broadway, 11th Floor |
|  | New York, New York 10018 |
|  | Attn: William W. Weisner, Esq. |
|  | Email: wweisner@tarterkrinsky.com |
|  |  |
| Purchaser: | Restoration Hardware, Inc. |
|  | 15 Koch Road, Suite J |
|  | Corte Madera, CA 95925 |
|  | Attn:   Edward Lee; Jack Preston |
|  | Email:  EdwardLee@rh.com; jpreston@restorationhardware.com |
|  |  |
|  | with a copy to: |
|  | Morrison & Foerster LLP |
|  | 425 Market Street |
|  | San Francisco, CA 94105-2482 |

Attn: Gavin Grover
Email: ggrover@mofo.com

Escrow Agent:           First American Title Insurance Company
666 Third Avenue- 5th Floor
New York, NY 10017
Attn:  Vincent L. Plaia
Phone:  (212) 381-6601
Email:  vplaia@firstam.com

Notice shall be deemed to have been given or delivered if personally delivered, upon delivery; or, if sent by nationally recognized overnight courier service, on the first business day after being sent; or if sent by electronic mail with delivery confirmation, upon delivery.  Notwithstanding the preceding sentence to the contrary, and solely with respect to the Escrow Agent, notice shall be deemed to have been given or delivered to the Escrow Agent on the date of the Escrow Agent's actual receipt of such notice.

6.  In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any instrument, document or item deposited with it, and shall have no responsibility other than to faithfully follow the instructions contained herein. The parties hereto agree that Escrow Agent is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto believed by Escrow Agent to have been signed by the proper person, subject to compliance with the procedures in Section 3 above. Escrow Agent may assume that any person purporting to give any notice hereunder has been duly authorized to do so.  Escrow Agent shall have no obligation to review or confirm that actions taken pursuant to such notice in accordance with this Agreement comply with any other agreement or document.

7.  Escrow Agent hereunder may resign at any time on giving five (5) days prior written notice to that effect to each of the Seller and Purchaser.  In such event, a successor Escrow Agent shall be selected by the Seller and approved by the Purchaser, such approval not to be unreasonably withheld or delayed.  Escrow Agent shall then deliver to the successor Escrow Agent the Deposit and any interest earned thereon, if any, to be held by the successor Escrow Agent pursuant to the terms of this Escrow Agreement.  If no successor Escrow Agent is designated and qualified within five (5) business days after Escrow Agent's resignation is effective, Escrow Agent may apply to a qualified court for the appointment of a successor Escrow Agent. The expenses thereof shall be borne by equally by Purchaser and Seller.

8.  Escrow Agent shall have no duty to enforce any obligation of any person to make any payment or delivery or to enforce any obligation of any person to perform any other act.  Escrow Agent shall have no liability to the other parties hereto or to anyone else by reason of any failure on the part of any party hereto or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under such document.

9.  Escrow Agent shall be entitled to select any and all counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Agreement.

10.  If either Purchaser or Seller becomes subject to a voluntary or involuntary proceeding under the United States Bankruptcy Code (except as provided or contemplated in the Contract), or if the Escrow Agent is otherwise served with legal process which Escrow Agent in good faith believes affects funds deposited with Escrow Agent, Escrow Agent shall have the right to place a hold on funds deposited with the Escrow Agent until such time as Escrow Agent receives an appropriate final court order or other assurances satisfactory to Escrow Agent (in Escrow Agent's sole discretion) establishing that the funds may continue to be held or disbursed, as the case may be, according to the instructions contained in this Agreement.

11.  It is expressly agreed that this Agreement is for the sole benefit of the parties hereto and shall not be construed or deemed to have been made for the benefit of any third party or parties.

12.  This Agreement and the obligations of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of New York applicable to contracts executed, delivered and to be fully performed in New York. Each party waives the right to a jury in any dispute relating to this Agreement.

13.  If any provision of this Agreement or the application thereof to any entity, person or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

14.  This Agreement contains the entire understanding between the parties hereto, and Escrow Agent shall have no duties or responsibilities other than those expressly set forth herein. No waivers, variations, modifications or changes hereto shall be binding upon any party hereto, unless set forth in a document duly executed by all parties hereto.

15.  Whenever used herein, the singular number shall include the plural, and the use of any gender shall include all genders.  This Agreement shall be binding upon and enforceable between, and inure to the benefit of, the Seller and the Purchaser, their heirs, executors, administrators, legal representatives, successors, assigns or trustees.

16.  This Agreement may be executed in multiple original counterparts, all of which shall be deemed to be originals and with the same effect as if all parties hereto had signed the same document.  All such counterparts shall be construed together and shall constitute one and the same instrument. Signatures delivered via electronic mail in PDF format are acceptable.

17.    Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, after opportunity to consult with independent legal counsel, the right to a jury trial in connection with any action, suit or proceeding (including without limitation contract claims, tort claims, breach of duty claims, and all other common law and statutory claims and counterclaims) that directly or indirectly relates to the subject matter of this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

SELLER:

GRIFFON GANSEVOORT HOLDINGS LLC

By:  Griffon Gans Manager LLC,
a Delaware limited liability company, its Manager

By:  _____
Name: Michael Shah
Title:   Manager


PURCHASER:

RESTORATION HARDWARE, INC.

By: _____
    Name: _____
    Title: _____


ESCROW AGENT:

First American Title Insurance Company


By: _____
    Name: _____
    Title: _____


**WIRE INSTRUCTIONS AND FORM W-9 TO BE ANNEXED TO THIS AGREEMENT**

*[Signature Page to Escrow Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

SELLER:

GRIFFON GANSEVOORT HOLDINGS LLC

By:  Griffon Gans Manager LLC

By: _____
Name:  Michael Shah
Title:  Manager

PURCHASER:

RESTORATION HARDWARE, INC.

By: _____
    Name:   Jack Preston
    Title:   Chief Financial Officer

ESCROW AGENT:

First American Title Insurance Company

By: _____
    Name: _____
    Title: _____

**WIRE INSTRUCTIONS AND FORM W-9 TO BE ANNEXED TO THIS AGREEMENT**

*[Signature Page to Escrow Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

SELLER:

GRIFFON GANSEVOORT HOLDINGS LLC

By: Griffon Gans Manager LLC

By: _____
Name: Michael Shah
Title:  Manager


PURCHASER:

RESTORATION HARDWARE, INC.

By: _____
    Name: _____
    Title: _____


ESCROW AGENT:

First American Title Insurance Company

By: _____
Name:  VINCENT L. PLAIA
Title:  Senior Underwriting Counsel


**WIRE INSTRUCTIONS AND FORM W-9 TO BE ANNEXED TO THIS AGREEMENT**



First American Title Insurance Company
Att: Agent Advantage, 4795 Regent
Blvd, Mail Code 1300
Irving, TX 75063

# INCOMING WIRE INSTRUCTIONS

**Beware of cyber-crime**! If you receive an e-mail or any other communication that appears to be generated from a First American Title Insurance Company employee that contains new, revised or altered bank wire instructions, consider it suspect and call our office at a number you trust.

## ** Our Wire Instructions Do Not Change. **

**Funds from other than buyer or seller:** Other than funds from a designated lender, real estate agent or broker, or the attorney of record, we will only accept incoming wires that are from the buyer or seller on a transaction. Other third-party deposits not accompanied by appropriate instructions will be returned to the remitter.

**IMPORTANT! DO NOT SEND AN ACH TRANSFER FOR CLOSING:** An ACH transfer is not immediately available funds and requires additional time for clearance. *If you are unsure if you are sending the funds via Wire Transfer or ACH, contact your bank for Wiring Instructions prior to transmitting the funds.* **Contact our office at (866)889-7619 prior to sending funds by ACH transfer.** Acceptance of ACH transfers are subject to state law.

**Funds from a non-U.S. Bank:** If your funds are being wired from a non-U.S. bank, additional charges may apply. When wires are returned to a bank outside the United States, First American Title Insurance Company shall not be responsible or liable for any loss or expense incurred as a result of currency exchange rates, delays in availability of funds, or delays due to the U.S. bank or foreign bank requiring additional information. First American Title Insurance Company shall have no liability or responsibility after properly initiating the wire return. Failure to deposit funds as specified herein may delay the recordation and closing of this escrow transaction. First American Title Insurance Company will not accept any responsibility or liability for any delays and/or penalties imposed due to non-receipt of good funds as described herein, including but not limited to wire transfer delays caused by either the transmitting or receiving bank.

**IMPORTANT: Notify our office at (866)889-7619 when you have transmitted your wire.**

PAYABLE TO:         First American Title Insurance Company
BANK:               First American Trust, FSB
ACCOUNT NO.:        3139480000
ROUTING NUMBER      122241255
SWIFT Code:         FATUUS66
BANK ADDRESS        5 First American Way, Santa Ana, CA 92707 (*Do not use* to mail checks.
                    This address is for Wire Transfers only)

PLEASE REFERENCE THE FOLLOWING:
PROPERTY:           53/61 Gansevoort Avenue,  New York, NY 10014
FILE NUMBER:        9960-6477998

## WIRES MAY BE RETURNED IF THE FILE NUMBER
## AND PROPERTY REFERENCE ARE NOT INCLUDED

*Execution Version*

## JOINDER

To further induce RESTORATION HARDWARE, INC. ("**Purchaser**") to enter into that certain Agreement of Purchase and Sale of even date hereof, by and between Purchaser and Griffon Gansevoort Holdings LLC ("**Seller**") (the "**Agreement**"), the Seller Parties (collectively, "**Joint and Several Obligors**"), hereby join in the Agreement in order to evidence their joint and several obligation in favor of Purchaser with respect to all obligations of Seller and the various Seller Parties in connection with the transactions contemplated by the Agreement including the payment and performance of all of Seller's Joint and Several Obligations pursuant to the terms of the Agreement. The Joint and Several Obligors acknowledge that they hold indirect interests with respect to the Seller Parties and the Property and are either direct or indirect owners in Seller and will receive substantial economic and other benefits from the execution and delivery of the Agreement by Seller and the consummation of the transactions contemplated herein. The obligations of the Joint and Several Obligors constitute joint and several obligations with respect to payment and performance and not of collection. Each Joint and Several Obligor hereby irrevocably and unconditionally covenants and agrees that each Joint and Several Obligor is jointly and severally liable for Seller's Joint and Several Obligations as a primary obligor. The Joint and Several Obligors hereby waive, to the extent waivable by applicable law, any and all (i) defenses, offsets, counterclaims, demands, protests, presentments and notices of every kind and nature (except for mandatory counterclaims and any defense of actual performance), and (ii) legal requirements that Purchaser institute any action or proceeding at law or in equity against Seller. The Joint and Several Obligors acknowledge and agree that any amendments made to the Agreement without the Joint and Several Obligors' consent shall not affect the validity or enforceability of this Joinder, provided that Seller joins in the execution of any such amendment. Capitalized terms used herein which are not defined herein shall have the meanings given to such terms in the Agreement.

Dated as of November 3, 2023.

[END OF PAGE; SIGNATURE PAGE FOLLOWS]

<u>THE JOINT AND SEVERAL OBLIGORS</u>:

GRIFFON GHC LLC

By:  Griffon Gans Manager LLC, its manager

By: _____
    Name:
    Title:


DELSHAH CAPITAL LIMITED

By: _____
    Name: Michael Shah
    Title:   Chairman and CEO

_____
Michael Shah


DELSHAH BVI HOLDINGS, LLC

By: _____
    Name: Michael Shah
    Title:   Manager


GRIFFON GANS MANAGER LLC

By: _____
    Name: Michael Shah
    Title:   Manager

*Execution Version*

GRIFFON GANSEVOORT HOLDINGS LLC
c/o Delshah Capital Limited
14 East 13th Street, Front 1
New York, New York 10003

November 3, 2023

Restoration Hardware, Inc.
15 Koch Road, Suite J
Corte Madera, California 94925
Attn: Legal Department

Re:   Lease dated July 8, 2015 between Griffon Gansevoort Holdings LLC and
Restoration Hardware, Inc. regarding 55-61 Gansevoort Street, New York, NY

Dear Sir/Madam:

    We hereby withdraw (without prejudice) our letter to you dated September 14, 2023 relating to the above-referenced Lease.

Sincerely,

GRIFFON GANSEVOORT HOLDINGS LLC

By:     Griffon Gans Manager LLC,
        a Delaware limited liability company, its
        Manager

        By: _____
            Name: Michael Shah
            Title: Manager

*[Signature Page to Revocation of Notice of Termination]*



February 8, 2021

*VIA EMAIL AND OVERNIGHT DELIVERY*

Griffon Gansevoort Holdings LLC
c/o DelShah Capital, LLC
14 East 13th Street, Front 1
New York, New York 10003
Attn:  Michael Shah
Michael@DelShah.com

Tarter Krinsky & Drogin LLP
1350 Broadway
New York, New York 10018
Attn:  William W. Weisner, Esq.
wweisner@tarterkrinsky.com

<b>RE: Notice of Close of Escrow Account – 55-61 Gansevoort Street, New York, New York</b>

Dear Michael:

      This notice is being provided pursuant to the notice requirements set forth in Section 28 of that certain Lease Agreement dated July 8, 2015 (the "Lease") between Griffon Gansevoort Holdings LLC ("Landlord") and Restoration Hardware, Inc. ("Tenant").

      Previously, each Landlord Contribution disbursed by Landlord has been made into an escrow account established for the sole purpose of receiving such Landlord Contributions.  We are in the process of closing the escrow account and wish to provide formal notice that, in accordance with Section 33(G) of the Lease, any future Landlord Contribution payments that are to be made pursuant to the Lease should be paid directly to Tenant.

      In order to expedite the closure of the account, please provide your signature below, evidencing your acknowledgment and agreement and to close the account and disburse the proceeds held therein at our direction.  Please do not hesitate to contact me should you have any questions or wish to discuss.

Notice of Close of Escrow
February 8, 2021
Page 2


Sincerely,

Rishi M. Diwan
Senior Counsel


Agreed and Consented to by:

LANDLORD:

Griffon Gansevoort Holdings LLC

_____
_____
_____

Notice of Close of Escrow
February 8, 2021
Page 2

Sincerely,

Rishi M. Diwan
Senior Counsel

Agreed and Consented to by:

LANDLORD:

GRIFFON GANSEVOORT HOLDINGS LLC

By: Griffon Gans Manager LLC,
a Delaware limited liability company, its Manager

By: _____
Name:    Michael Shah
Title:    Manager

*[Signature Page to Notice of Close of Escrow Account]*

*Execution Version*

Mishmeret - Trust Services Company Ltd. (the "<u>Trustee</u>")
48 Menachem Begin Road
Tel Aviv, Israel 6618001

Date: November 3, 2023

Delshah Capital Limited                Restoration Hardware, Inc.
114 East 13th Street, Front 1          15 Koch Road, Suite J
New York, New York 10003               Corte Madera, CA 95925

Ladies and Gentlemen:

The Trustee is the trustee under that certain Deed of Trust, dated as of January 5, 2016, as amended by that certain Amendment No. 1 to the Deed of Trust, dated as of October 25, 2023 (the "<u>Deed of Trust</u>"), governing the Debentures (Series B) of Delshah Capital Limited listed for trade on the Tel Aviv Stock Exchange (the "<u>Bonds</u>").

Reference is hereby made to that certain Agreement of Purchase and Sale, dated as of November 3, 2023 in the form attached hereto as <u>Exhibit A</u> (the "<u>PSA</u>") between Griffon Gansevoort Holdings LLC, a Delaware limited liability company ("<u>Seller</u>") and Restoration Hardware Inc. ("<u>Purchaser</u>"). Capitalized terms used but not defined herein shall have the meanings given to them in the PSA.

The Trustee, on behalf of the bondholders, hereby acknowledges (a) the execution and delivery of the PSA and (b) the performance of Seller's obligations under the PSA by Seller, subject to, with respect to this clause (b), satisfaction of the condition precedent to closing set forth in Section 13 of the PSA by the Trustee's delivery of the waiver and release attached hereto as <u>Exhibit B</u> (in favor of Purchaser and certain related parties of Purchaser) referred to therein (the "<u>Waiver and Release</u>"), which Waiver and Release will require the approval of the bondholders by means of a Special Resolution (as defined in the Deed of Trust) in accordance with the Deed of Trust (the "<u>Required Bondholder Approval</u>").

Pursuant to Section 13 of the PSA, the Trustee, on behalf of the bondholders, irrevocably confirms that, provided that (i) the transactions contemplated by the PSA are consummated in accordance with the terms of the PSA in all material respects, and that proceeds from the sale of the Property under the PSA in an amount of not less than US $52,700,000.00 are paid directly to the Trustee in accordance with the account instructions set forth below (the "<u>Payment to the Trustee</u>"), and (ii) the Required Bondholder Approval is obtained, then the Trustee, on behalf of the bondholders, shall deliver to Purchaser the Waiver and Release, concurrently with the Closing under the PSA, and shall take all necessary administrative actions incidental to the foregoing matters including execution and delivery of any other necessary documents to release, all of its and the bondholders' rights, liens and encumbrances with respect to or in connection with the Property, the Bonds, and the termination of the Lease by Purchaser at the time of the Closing. Notwithstanding the above, in the event requested by Seller and Purchaser, subject to the terms and conditions set forth above, the Trustee, on behalf of the bondholders, will assign the mortgages it holds to Purchaser's lender at the time

of the Closing or spread it to other assets designated by Delshah Capital Limited, as the PSA may permit.

The Trustee hereby represents and warrants that it is duly authorized to provide this acknowledgement and agreement.

If applicable as set forth above, the Payment to the Trustee shall be wired to the following account:

> Name: MISHMERET - TRUST SERVICES COMPANY LTD.
> Bank Hapoalim B.M.
> Bank: 12 Branch: 772
> Account: 240029
> IBAN: IL100127720000000240029

Very truly yours,

Mishmeret - Trust Services Company Ltd.

By: _____

Name: Rami Sebty
Title: Vice President

ny-2638480

<u>EXHIBIT A</u>

<u>PURCHASE AND SALE AGREEMENT</u>